## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IMPALA PLATINUM HOLDINGS LIMITED, et al.**<br><br>v.<br><br>**A-1 SPECIALIZED SERVICES AND SUPPLIES, INC., et al.** | **CIVIL ACTION**<br><br>**NO. 16-1343**    **FILED**<br><br>SEP 1 6 2016<br><br>LUCY V. CHIN, Interim Clerk<br>By _____ Dep. Clerk |

**Baylson, J.**                                      **September 16, 2016**

## MEMORANDUM RE DEFENDANTS'
## MOTION TO DISMISS AMENDED COMPLAINT

### I. INTRODUCTION

Impala Platinum Holdings Limited and Impala Refining Services Limited (collectively,

"Impala") bring this action against A-1 Services and Supplies, Inc. ("A-1"), its shareholders,

officers and directors, as well as related individuals and entities. Impala brings claims under the

Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), as

well as state law claims for the avoidance of fraudulent transfers, conversion, deepening

insolvency, breach of fiduciary duty, aiding and abetting, conspiracy, and a declaratory judgment

under the federal Declaratory Judgment Act, 28 U.S.C. § 2201.

Impala, based in South Africa, indisputably advanced approximately $200 million to fund

operations of a closely held metal processing business operated by the defendants, whose

allegedly fraudulent conduct stripped the company of its assets, leaving it insolvent. What seems

like a bankruptcy case is nonetheless proceeding in this Court. While Defendants strongly

dispute any wrongdoing, the saga, at least as alleged by Impala, suggests the seldom performed

Bertolt Brecht-Kurt Weill opera, *Rise and Fall of the City of Mahagonny*, in which gangsters

raze a quiet community through crime and exploitation.

1



Presently before this Court are the motions to dismiss, filed on August 23, 2016, by defendants Suresh K. Khosla ("Suresh"), Ashok Kumar Khosla ("Kumar"), Om P. Khosla ("Om"), Leena Khosla ("Leena" and, together with Suresh, Kumar, and Om the "Khoslas"), Slogam Limited Partnership ("Slogam"), Alliance Industries Limited ("Alliance") and A-1 (together with Slogam, Alliance, and the Khoslas, "Defendants"). Impala's Amended Complaint also stated claims against Michael O'Hayer and Rajesh Seth (the "Stayed Defendants"); Impala's claims against Messrs. O'Hayer and Seth were stayed by Order of this Court dated August 15, 2016. (ECF 48 ¶¶ 7-8).

For the following reasons, the Court grants in part and denies in part Defendants' motions.

## II. BACKGROUND & PROCEDURAL HISTORY

The following well-pleaded allegations are contained in Impala's Amended Complaint. The Court writes primarily for the benefit of the parties in resolving the pending motions to dismiss. Accordingly, those unfamiliar with the history of this case are directed to prior opinions of this Court, which provide greater detail as to the factual background of this case generally.[1]

### A. A-1, Alliance and Slogam

A-1 is a closely held Pennsylvania corporation, with its principal place of business in Croydon, Pennsylvania. (Am. Compl. ¶ 12). A-1 has four shareholders: Suresh (32%), Om (32%), Kumar (31%), and Leena (5%). (Id. ¶¶ 13-16). Suresh was A-1's President and CEO from the company's founding through June 2014. (Id. ¶ 13). Om has held, or is still holding, the position of A-1's Vice-President. (Id. ¶ 15). Kumar has held various positions at A-1, including Secretary (til October 2012), Vice-President (October 2012-May 2015), and President/CEO and

---

[1]    Alliance Indus. Ltd. v. A-1 Specialized Servs. & Supplies, Inc., No. 13-2510, 2015 WL 4943471, at *2-5 (E.D. Pa. Aug. 19, 2015); see also Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc., No. 13-2930, at *1-3 (E.D. Pa. Apr. 26, 2016).

2

Chairman of the Board of Directors (May 2015-February 2016).  (Id. ¶ 14).  Leena has occupied the positions of Treasurer and, since May 2015, Secretary.  (Id. ¶ 16).

Alliance is a Gibraltar corporation, with its principal place of business in the United Arab Emirates.  (Id. ¶ 19).  Alliance is wholly owned and controlled by Kumar.  (Id.).  Slogam is a Pennsylvania limited liability partnership.  (Id. ¶ 20).  Slogam's general partner is Slogam Enterprises, Inc., a Pennsylvania corporation.  (Id.).  Slogam's limited partners are Suresh, Kumar, and Om.  (Id.).  Suresh is the President of Slogam Enterprises, Inc.  (Id.).  Suresh, Kumar and Om are the owners of Slogam Enterprises, Inc.  (Id.).

## B.  The Related Khosla Litigations and Settlement Agreements

The Khoslas have been embroiled in litigation over the control and (mis)management of the related companies and partnerships in various jurisdictions for a number of years.  The following is a brief overview of Impala's allegations about these litigations, and settlements, relevant to the instant motion.

### 1. Bucks County

On June 19, 2013, Om brought suit against Suresh, Kumar and A-1 by filing a complaint in the Court of Common Pleas in Bucks County, Pennsylvania, Index No. 2013-04631 (the "Bucks County Action").  (Am. Compl. ¶ 57).  Om alleged that Suresh and Kumar diverted corporate assets from A-1 to, *inter alia*, establish and assert control over Alliance.  (Id. ¶ 59).  In addition, Om's complaint in the Bucks County Action alleged that Suresh and Kumar each received excessive shareholder distributions in the amount of $4,026,240 and $4,894,020, respectively.  (Id. ¶ 60).

The parties settled the Bucks County Action on May 29, 2015 (the "Bucks County Settlement").  (Id. ¶ 61).  Neither Suresh nor Kumar were required, under the terms of the Bucks

3

County Settlement, to return their allegedly excessive shareholder distributions. (Id.). Instead, A-1 was to make the following shareholder payments: $10 million to Om ($6.5 million of which was secured by all of A-1's assets and inventory) and $1.1 million to Leena. (Id.). Leena, who had not asserted any claims in the Bucks County Action, was to receive a $1.5 million payment from A-1. (Id. ¶ 62). Suresh and Kumar agreed to pay Om $2.5 million, each. (Id. ¶ 61(d), (e)).

### 2. Burlington County

A-1 commenced a suit against Kumar on March 20, 2013, by filing a complaint in the Superior Court of Burlington County, New Jersey, Index No. L-000778-13 (the "New Jersey Action"). (Am. Compl. ¶ 48). In the New Jersey Action, A-1 sought repayment of $15 million that Kumar allegedly used to purchase Alliance. (Id.). In his counterclaim and third-party complaint against Suresh, Kumar alleged that he was ousted from A-1's management. (Id. ¶ 49). Of relevance to Impala's present action, Kumar's counterclaim and third-party complaint alleged that Suresh and Leena seized control of A-1 from Kumar shortly after a July 2012 Memorandum of Understanding ("2012 MOU"), described below, was reached between A-1 and Impala. (Id.). Kumar also alleged that, after his ouster, Suresh transferred large amounts of money from A-1 to Slogam. (Id. ¶¶ 49-50). Though Kumar alleged these improper transactions, his pleadings did not request the repayment of the transferred funds. (Id. ¶ 50).

### 3. Eastern District of Pennsylvania

The Khoslas' dispute reached the shores of this Court on May 7, 2013, when Alliance filed suit against A-1 (the "EDPA Action"). (Index No. 13-2510, ECF 1). In its complaint, Alliance asserted A-1's indebtedness, under several metal leases, to the tune of about $70 million. (Am. Compl. ¶ 45).

4

On September 15, 2015, on the eve of trial, the parties to the EDPA Action reached a settlement (the "EDPA Settlement"). (Id. ¶ 46). Under the terms of the EDPA settlement, A-1 gave to Alliance: (i) a secured $5.6 million payment; (ii) a $10 million promissory note; and (iii) the right to execute on an additional $20 million judgment against A-1 in the event Impala sought to enforce an arbitration award it had won in the London Court of International Arbitration ("LCIA"), described below. (Id. ¶ 46(a), (b), (c)). In addition, the EDPA Settlement provided Leena a security interest for the $1.5 million payment she was to receive from A-1 under the Bucks County Settlement. (Id. ¶¶ 46(d)). The Burlington County Action was settled pursuant to the EDPA Settlement, which effected a substantial forgiveness of Kumar's indebtedness to A-1. (Id. ¶ 55).

## C. Impala

Impala is a South African company, with its principal place of business in Johannesburg, South Africa. (Am. Compl. ¶ 10, 11). Impala, like A-1, has as one aspect of its business the extraction of metals from spent automotive catalytic converters. (Id. ¶ 2). As part of its long-term business relationship with A-1, Impala frequently extended A-1 advances and loans. (Id.). These advances and loans were memorialized in a series of written agreements, the most current of which were in effect from July 1, 2008 through June 30, 2013 (the "Agreements"). In order to better facilitate A-1's payment of its increasing indebtedness to Impala, on July 5, 2012, A-1 and Impala entered into 2012 MOU. (Id. ¶ 28). Shortly thereafter, in October of 2012, A-1 stopped making payments that were due under the 2012 MOU. (Id. ¶ 30). Also at this time, A-1 stopped paying Impala the refining fees it owed. (Id. ¶ 31). From this point onwards, A-1 hurtled farther and faster into insolvency. (Id. ¶¶ 33-39).

## D.  Procedural History

On May 28, 2013, Impala brought suit against A-1 by filing a complaint asserting breach

of contract (the "First Impala Action").  (Index No. 13-2930, ECF 1).  Impala filed an Amended

Complaint in the Impala Contract Action on August 1, 2013, adding defendants Suresh and

Slogam, and adding tort claims.  (Index No. 13-2930, ECF 12).  This Court, pursuant to a

Consent Order, referred the parties to mediation and, if mediation proved unsuccessful, to the

LCIA for resolution of the parties' contract claims.  (Index No. 13-2930, ECF 23).  In December

of 2015 the LCIA issued an arbitration award in favor of Impala, which exceeded $200 million.

(Am . Compl. ¶ 5).  This Court, by Order dated April 26, 2016 (Index No. 13-2930, ECF 79),

granted Impala's motion to confirm the arbitration award and entered judgment in favor of

Impala in conformity with the terms of the arbitration award.  (Id.).  On March 21, 2015, Impala

moved for leave to file a Second Amended Complaint in the Impala Contract Action.  (Index No.

13-2930, ECF 60).

Impala filed a complaint commencing the instant action on March 23, 2016 (ECF 1) (the

"Second Impala Action"), for purposes of preserving the claims it sought to assert in its Proposed

Second Amended Complaint.  (ECF 1).  On June 21, 2016, this Court entered an order

appointing a receiver in the First Impala Action, Second Impala Action, and EDPA Action (the

"Receivership Order").  (ECF 22).  By order of this Court dated August 15, 2016 (ECF 48), the

First Impala Action was consolidated with the instant Second Impala Action (collectively,

"Impala Action").

On July 28, 2016, this Court, upon receiving correspondence from counsel for Alliance

and Kumar indicating that Impala intended to file an amended complaint, issued an Order

directing Impala to file an Amended Complaint in the Impala Action and requiring Impala to

6

therein "state all claims it has, against any present party, or additional party, arising out of the factual nexus of the above-captioned cases . . . no later than Tuesday, August 2, 2016." (ECF 39). The July 28, 2016 Order set an expedited briefing schedule for any motions to dismiss, and set a tentative date for oral argument the week of September 12, 2016. (ECF 39 ¶¶ 2-4). On September 13, 2016, the parties had oral argument on Defendants' pending motions to dismiss before this Court.

Defendants filed their motions to dismiss Impala's Amended Complaint on August 23, 2016: Suresh and Leena ("S&L Br."), ECF 56; Alliance and Kumar ("Alliance Br."), ECF 57; A-1 ("A-1 Br."), ECF 59; Slogam ("Slogam Br."), ECF 60; Om ("Om Br."), ECF 61; and Alliance and Kumar's Supplemental Brief ("Alliance Suppl."), ECF 62.[2] For ease of reference the Court hereinafter refers to Defendants' motions generally as the Motion to Dismiss, and will only refer to specific motions where necessary. Impala opposed Defendants' Motion to Dismiss on September 6, 2016. (Impala Opp'n to Defs.' Mot. to Dismiss ("Impala Opp'n"), ECF 69). Defendants collectively filed their Reply on September 12, 2016. (Defs.' Reply Br. in Supp. of Mot. to Dismiss ("Defs.' Reply"), ECF 70).

## III. JURISDICTION & VENUE

This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper in this Court under 28 U.S.C. § 1391(b).

## IV. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6) tests the sufficiency of the allegations contained in a complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). Pursuant to Rule 12(b)(6), the defendant bears the burden of demonstrating that

---

[2]     On August 25, 2016, Impala moved to strike Alliance's supplemental memorandum (ECF 63), which Alliance opposed (ECF 64). By order dated August 29, 2016, the Court denied Impala's motion to strike. (ECF 65).

the plaintiff has failed to set forth a claim from which relief may be granted. Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). In evaluating a motion to dismiss, the court must view any inferences from the factual allegations in a light most favorable to the plaintiff. Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).

The United States Supreme Court has set forth a two-part test to determine whether to grant or deny a motion to dismiss. See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The United States Court of Appeals for the Third Circuit has noted that Iqbal and Twombly require courts "to apply a more exacting scrutiny of the complaint." Wilson v. City of Philadelphia, 415 F. App'x 434, 436 (3d Cir. 2011).

First, the court must ascertain whether the complaint is supported by well-pleaded factual allegations. Iqbal, 556 U.S. at 679. "[T]hreadbare recitals of the cause of action's elements, supported by mere conclusory statements," do not suffice. Id. at 663. Conclusions of law can serve as the foundation of a complaint, but to survive dismissal such conclusions must be supported by factual allegations. Id. at 679. In turn, these factual allegations must be sufficient to provide a defendant the type of notice contemplated in Rule 8. See Fed. R. Civ. P. 8(a)(2) (requiring a short and plain statement of the claim showing the pleader is entitled to relief); see also Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). Where there are well-pleaded facts, courts must assume their truthfulness. Iqbal, 556 U.S. at 679.

Upon a finding of a well-pleaded complaint, the court must then determine whether these allegations "plausibly" give rise to an entitlement to relief. Id. This is a "context specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. Plausibility mandates that the pleadings contain enough factual content to allow a court to make "a reasonable inference that the defendant is liable for the misconduct alleged." Id. This is not a

8

probability requirement.  Instead, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."  Id. at 678.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  Id. (quoting Twombly, 550 U.S. at 557).  In short, a complaint must not only allege entitlement to relief, but must also demonstrate such entitlement with sufficient facts to push the claim "across the line from conceivable to plausible."  Id. at 680; accord Holmes v. Gates, 403 F. App'x 670, 673 (3d Cir. 2010).

Rule 9(b) articulates a heightened pleading standard for fraud pursuant to which the plaintiff must plead the "date, place or time" of the transfers or "use alternative means of injecting precision and some measure of substantiation."  Image Masters, Inc. v. Chase Home Fin., 489 B.R. 375, 393 (E.D. Pa. 2013) (quoting Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)).  "[I]ntent need only be alleged generally."  Id. at 395.  This heightened pleading standard serves "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."  Id. at 392 (quoting Seville, 742 F.2d at 791).  Such charges might otherwise wrongly induce settlements or damage the defendants' reputations.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997).  It also serves to allow defendants to prepare an adequate answer to the allegations.  Image Masters, 489 B.R. at 395.

However, the application of Rule 9(b) is relaxed "in cases of corporate fraud," where plaintiffs "cannot be expected to have personal knowledge of the details of corporate internal affairs" and the pertinent "factual information is peculiarly within the defendant's knowledge or control."  Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989).  The policy underlying this practice recognizes that excessive focus on the "particularity requirement" results

9

in "too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." Id. (quoting Christidis v. First Pa. Mortg. Tr., 717 F.2d 96, 100 (3d Cir. 1983)). Furthermore, "sophisticated defrauders" should not be permitted to avoid liability simply by concealing the details of their fraud. Id. However, even if Rule 9(b) is relaxed, "boilerplate and conclusory allegations will not suffice" and complaints must contain factual allegations that render the claims asserted therein plausible. In re Burlington, 114 F.3d at 1418.

To receive the relaxed application of Rule 9(b) in cases of corporate fraud, plaintiffs must allege that "the necessary information lies within defendants' control" and must include "facts indicating why the charges against defendants are not baseless and why additional information lies exclusively within defendants' control." Craftmatic Sec. Litig, 890 F.2d at 645-46. Plaintiffs must also "delineate at least the nature and scope of [their] effort to obtain . . . the information needed to plead with particularity" and "thoroughly investigate all possible sources of information, including but not limited to all publicly available relevant information, before filing a complaint." Weiner v. Quaker Oats Co., 129 F.3d 310, 319 (3d Cir. 1997) (quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 285 (3d Cir. 1992)).

Finally, a district court ruling on a motion to dismiss may consider "a document integral or explicitly relied upon in the complaint . . . without converting the motion [to dismiss] into one for summary judgment." In re Burlington, 114 F.3d at 1426 (alteration in original) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)). Likewise, in resolving a motion to dismiss, "a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint." S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd., 181 F.3d 410, 426 (3d Cir. 1999).

## V. DISCUSSION

### A. Subject Matter Jurisdiction

Defendants argue that this Court does not have subject matter jurisdiction over the action because Impala's RICO claim fails as a matter of law. Because the Court is denying Defendants' motions to dismiss Impala's RICO claim, the Court has federal-question subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Nonetheless, even had the Court determined that Impala merely had RICO standing but that Impala's RICO claim nonetheless failed to state a cause of action, this Court would still have subject matter jurisdiction over the case.[3]

### B. Standing

Defendants challenge Impala's standing to pursue its claims for breach of fiduciary duty, deepening insolvency, and RICO violations. In addition, though Defendants do not directly challenge Impala's conversion claim for lack of standing, the arguments Defendants raise in their briefs implicate standing concerns. The Court addresses each of these arguments in turn.

#### 1. Breach of Fiduciary Duty

Under Pennsylvania law, corporate directors owe fiduciary duties to the corporation and its shareholders. 15 Pa. Cons. Stat. §§ 512(a), 1712(a). These duties extend to a creditor of the

---

[3]     The Third Circuit Court of Appeals has stated:

> The rule that legal insufficiency of a federal claim generally does not eliminate the subject matter jurisdiction of a federal court has been reaffirmed and clarified by both the Supreme Court and this Court on several occasions: "[D]ismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'"

Growth Horizons, Inc. v. Delaware County, Pa., 983 F.2d 1277, 1280-81 (3d Cir. 1993) (quoting Kulick v. Pocono Downs Racing Ass'n, 816 F.2d 895, 899 (3d Cir. 1987)). The Third Circuit continued: "A district court has federal question jurisdiction in any case where a plaintiff with standing makes a non-frivolous allegation that he or she is entitled to relief because the defendant's conduct violated a federal statute." Id. at 1281. Here, Impala's RICO claim, even if legally insufficient, is not so completely devoid of merit that the Court would have had subject matter jurisdiction over the case and supplemental jurisdiction over Impala's remaining state law claims.

11

corporation when the corporation is insolvent.  In re Forman Enters., Inc., 281 B.R. 600, 610 (Bankr. W.D. Pa. 2002).  In the event of a breach of these fiduciary duties, the right to enforce is directed by statute.  Section 1717 of the Pennsylvania Business Corporation Law provides that an action for breach of fiduciary duty may only be brought by the corporation directly, or in the alternative, indirectly by a shareholder through a derivative action brought on behalf of the corporation.  In re Forman, 281 B.R. at 610; see also 15 Pa. Cons. Stat. § 1717.  A shareholder, creditor, or any other person or group is prohibited from bringing a direct action against the directors for a breach of their fiduciary duties.  15 Pa. Cons. Stat. § 1717.

In this framework, standing to bring a direct claim against a director exists only if the claimant sustained a personal injury which is independent of any injury suffered by the corporation.  Hill v. Ofalt, 85 A.3d 540, 548 (Pa. Super. Ct. 2014).  If the creditor's alleged injuries cannot be readily distinguished from those of the corporation, it does not give rise to a separate cause of action.  To make this determination, the court must examine the nature of the allegations and the relief available to the plaintiff if it prevails:

> The action is derivative if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent dissipation of its assets. . . . If damages to a shareholder result indirectly, as the result of injury to the corporation, and not directly, the shareholder cannot sue as an individual.

Hill, 85 A.3d at 549 (alteration in original).

It is not enough to establish that a recovery will yield a benefit to the creditor; rather, a direct claim requires proof that the creditor's injury is unique and unrelated to any damage sustained by the corporation or other creditors.  In re Bruno, 553 B.R. 280, 286 (Bankr. W.D. Pa. 2016).

12

Impala argues that it has standing to pursue a direct claim against Defendants as directors of A-1. Impala relies primarily on Robar Development Corp. v. Minutello, 408 A.2d 851 (Pa. Super. Ct. 1979). In Robar, the Pennsylvania Superior Court held that the primary stockholders and officers of an insolvent corporation owed a fiduciary duty to the other creditors of the company to protect their interests. Id. at 853. The court went on to hold that the fact that the officers caused the insolvent corporation to first pay the debts to the officers rather than the corporations other creditors, no matter how legitimate the debt to the officers, was a preferential payment and therefore a breach of fiduciary duty. Id.

In addition to shareholders, directors of an insolvent corporation owe fiduciary duties to the corporation's creditors. See Official Comm. Of Unsecured Creditors ex rel. Estate of Lemington Home for Aged v. Baldwin (In re Lemington Home for Aged) (Lemington I), 659 F.3d 282, 290 (3d Cir. 2011), as amended (Oct. 20, 2011); Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims, 160 F.3d 982, 987–88 (3d Cir.1998); Brown v. Presbyterian Ministers Fund, 484 F.2d 998, 1005 (3d Cir.1973).

In Travelers Casualty & Surety Co. v. Irex Corp., No. 02-2142, 2002 WL 32351176 (E.D. Pa. May 31, 2002), a creditor's (Traveler's) claim for breach of fiduciary duty against the sole shareholder (Irex) of an insolvent corporation (ACandS) survived a motion to dismiss. The court reasoned that the fiduciary relationship that was created between the creditor and the corporation's sole shareholder upon the corporation's insolvency provided the creditor standing to bring a claim against the sole shareholder. Id. at *3; see also Sugartown Worldwide LLC v. Shanks, No. 1405063, 2015 WL 1312572, at *12 (E.D. Pa. Mar. 24, 2015) (finding creditor's breach of fiduciary duty claim against the officers directors and controlling shareholders of an

13

insolvent corporation survived motion to dismiss despite failure to specifically allege that the corporation was insolvent).

Here, Impala asserts breach of fiduciary duty claims against the Khoslas for causing an insolvent A-1 to pay them, in breach of their duty to protect the interests of Impala as A-1's creditor. This is the same scenario as is presented in Travelers. Because Impala sufficiently alleges that A-1 was insolvent at the time of the Khoslas alleged breaches, Impala has standing for its breach of fiduciary duty claim.

The cases cited by Defendants do not persuade the Court otherwise. Those cases stand for the general proposition that shareholders of corporations bring derivative claims, and not direct claims for breach of fiduciary duty brought by creditors of insolvent corporations. See In re Forman Enters., Inc., 281 B.R. 600, 610 (Bankr. W.D. Pa. 2002) (noting shareholders may only bring claims derivatively); B.T.Z., Inc. v. Grove, 803 F. Supp. 1019, 1022 (M.D. Pa. 1992) (same). These cases do not provide a bar against claims of breach of fiduciary duty brought by creditors of insolvent corporations.

Impala has standing to bring claims for breach of fiduciary duty against the directors and officers of A-1 because Impala is bringing a claims based on duties it was owed as a creditor of an insolvent corporation. In addition, for the reasons the Court provides below in determining that Impala has stated a claim under the PUFTA for actual and constructive fraudulent transfer, Impala has likewise stated a claim for breach of fiduciary duty against the Khoslas.

### 2. Conversion

Conversion is the "deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." Universal Premium Acceptance Corp. v. York Bank & Trust Co., 69 F.3d 695,

704 (3d Cir. 1995).  Money may be the subject of conversion in certain circumstances.  Francis J.
Bernhardt, III, P.C. v. Needleman, 705 A.2d 875, 878 (Pa. Super. Ct. 1997).  However, failure to
pay a debt is not conversion.  Binns v. Flaster Greenberg, P.C., 480 F. Supp. 2d 773, 781 (E.D.
Pa. 2007) ((citing Petroleum Mktg. Corp. v. Metro. Petroleum Corp., 151 A.2d 616, 619 (Pa.
1959) (explaining that a creditor has not "lost" use of any property when a debtor fails to pay a
debt, as it retains the right to collect on the debt)).  If, however, a plaintiff has a specific property
interest in money, then it can be the subject of a conversion claim.  Bernhardt, 705 A.2d 875,
878-79 (distinguishing between a common debt and a property interest that an attorney has in
settlement proceeds from a contingent fee case).

  As Defendants point out, Impala faces a significant hurdle in establishing "ownership" of
the money which they claim to have been deprived.  Impala does not argue this point, but instead
argues that their conversion claim is intended to defend A-1's property interest, and that Impala
is essentially stepping into A-1's shoes to bring this claim.  (Impala Opp'n at 33) ("Impala's
conversion claim is based on the defendants' conversion of A-1's assets").  Framing the issue
this way raises a question of standing.  That is, does Impala have standing to bring a conversion
claim on behalf of A-1?

  Impala recognizes this, and addresses the issue of standing in this context.  Impala
characterizes the conversion context as equivalent to standing to bring its fiduciary duty claim.
However, the questions in the conversion context are fundamentally different than those
discussed above.  In its breach of fiduciary duty claim, Impala asserts a claim based on a duty
that A-1's directors owe Impala as a creditor of an insolvent corporation.  Said differently,
Impala is enforcing its own rights.  Conversely, in the conversion context, Impala is attempting
to assert A-1's rights.  That is, by Impala's own characterization, it bases its conversion claim on

the conversion of *A-1*'s assets.  Impala's theory of recovery is akin to a derivative action, rather than a direct action.

The cases that Impala cites in support of its ability to bring the conversion claim on behalf of A-1 are in the bankruptcy context.  For example, in In re Crown-Globe, Inc., 107 B.R. 60, 62 (Bankr. E.D. Pa. 1989), the bankruptcy court held that the creditor had standing to bring a conversion claim on behalf of the debtor, because the debtor was complicit in the conversion of its assets.  The bankruptcy context is necessarily different, however, because the very nature of that court's process is geared toward others acting on behalf of the debtor, and the court has a role in authorizing these activities.  Cf. In re Crown-Globe, 107 B.R. at 62 ("[I]f a creditor asserts a colorable claim and the debtor or trustee fails to act, *the court may authorize* the creditor to institute the action on behalf of the debtor or trustee") (emphasis added).  The Third Circuit has made clear that this power to confer derivative standing to creditors is a function and result of the statutory purpose of bankruptcy proceedings.  See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 568 (3d Cir. 2003).

This is not a bankruptcy court.  Indeed, it is fundamental to Impala's theory of the case that this action is not proceeding pursuant to the laws of bankruptcy.  Outside of the bankruptcy context, without the statutory purpose of, and mechanism for, asserting claims on behalf of a debtor, the question of whether a creditor can assert a claim on behalf of an insolvent corporation is different.  The scenario in this case is therefore more akin to a derivative action.  The question is, then, can a creditor assert a derivative action on behalf of an insolvent corporation?

The Pennsylvania statute authorizing derivative actions authorizes such actions for shareholders and those who hold beneficial interests in the shares of a corporation, and does not

16

mention creditors. See 15 Pa.C.S. § 1782. The exclusion of creditors from this statute suggests that creditors do not have standing to bring derivative actions. See, e.g., Keeley v. Loomis Fargo & Co., 183 F.3d 257, 265-66 (3d Cir. 1999) (applying the established rule of statutory construction of *expressio unius est exclusio alterius*). The Third Circuit has agreed with this conclusion. See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 348 (3d Cir. 2001).

In view of the foregoing, Impala lacks standing to bring its conversion claims. The Court therefore will grant Defendants' motion and will dismiss Impala's claim for conversion.

### 3. *Deepening Insolvency*

The Third Circuit has recognized a cause of action for deepening insolvency. R.F. Lafferty & Co., 267 F.3d at 348 (concluding committee of unsecured creditors had standing to recover damage to debtor's property from 'deepening insolvency'); see also In re Lemington Home for Aged v. Baldwin (Lemington III), 781 F.3d 675, 676 (3d Cir. 2015) (Jordan, J., concurring).

Alliance and Kumar argue that Impala does not have standing to pursue its claim of deepening insolvency as an unsecured creditor. (Alliance Br. at 21). Impala disagrees, contending that it has standing to pursue its claim for deepening insolvency for the same reasons that it has standing to pursue its claim for breach of fiduciary duty, namely that it has satisfied the requirements imposed by section 7.01(d) of the ALI Principles of Corporate Governance which permits certain derivative claims to proceed as direct claims. (Impala Opp'n at 70-71).

In R.F. Lafferty, the Third Circuit "don[ned] the soothsayer's garb and predict[ed]" that the Pennsylvania Supreme Court would recognize deepening insolvency as a cause of action. R.F. Lafferty & Co., 267 F.3d at 349. While it is true that the Third Circuit has recently

17

questioned the continued viability of deepening insolvency as a cause of action, Lemington III, 781 F.3d at 676 (Jordan, J., concurring) (noting "much has changed in the acceptance of deepening insolvency since Lafferty," and that "[w]hat had appeared to our Court then to be a plausible argument gaining increasing acceptance has since been widely repudiated."), Lafferty nonetheless remains the law of the Third Circuit, In re Lemington Home for Aged (Lemington II), 777 F.3d 620, 630 n.2 (3d Cir. 2015) (affirming jury's verdict on deepening insolvency and stating "we continue to be bound to follow Lafferty unless it is overturned by our Circuit sitting en banc."). Therefore, "[i]n the absence of an authoritative ruling from the Pennsylvania Supreme Court, the court is compelled to follow the Third Circuit's lead." Dommel Props., LLC v. Jonestown Bank & Trust Co., No. 11-2316, 2013 WL 1149265, at *14 (M.D. Pa. Mar. 19, 2013).

At this stage in the litigation, the Court refuses to read Lafferty's recognition of deepening insolvency as a cause of action in the narrow sense proposed by Defendants. While it is true that the plaintiff in Lafferty was a committee of unsecured creditors and not an individual creditor, as is the case here, the Court determines that Impala has standing to bring its claim for deepening insolvency as a creditor of A-1.[4]

In addition, for the reasons the Court provides below in determining that Impala has stated a claim under the PUFTA for actual and constructive fraudulent transfer, Impala has likewise stated a claim for deepening insolvency against the Khoslas.

---

[4]     The Court's determination that Impala has standing to pursue its claims for breach of fiduciary duty and deepening insolvency is coherent, particularly as a claim for breach of fiduciary duty is "a suitable substitute for the purpose of examining who holds the right to pursue a deepening insolvency claim." In re Bruno, 553 B.R. 280, 285-86 (Bankr. W.D. Pa. 2016). For claims of both deepening insolvency and breach of fiduciary duty, a creditor's standing to bring a claim is predicated on the extension of a close relationship at a certain point in time—when the corporation becomes insolvent. This is different from conversion, which concerns not a close relationship of trust or confidence between the parties but a defined property interest.

18

### *4. RICO*

RICO "provides a private civil action to recover treble damages for injury 'by reason of a violation of' its substantive provisions." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 481 (1985) (quoting 18 U.S.C. § 1964(c)). This "far-reaching civil enforcement scheme" contains a standing requirement:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's fee, . . .

18 U.S.C. § 1964(c).

### (i) <u>Injury to Business or Property</u>

To meet the injury requirement, a plaintiff must allege "a concrete financial loss and not mere injury to a valuable intangible property interest." Maio v. Aetna, Inc., 221 F.3d 472, 483 (3d Cir. 2000). This requirement can be satisfied by "allegations and proof of actual monetary loss, i.e., an out-of-pocket loss." Id.

Impala alleges that it has incurred substantial legal fees and costs in order to prevent the continuation of the Khoslas' and Alliance's RICO violations. (Am. Compl. ¶ 177). "While there is some debate about whether legal fees can ever suffice as 'injuries' under RICO, the Third Circuit's focus on out-of-pocket expenses leads to the conclusion that the payment of legal fees can be actionable injuries under RICO." Walter v. Palisades Collection, LLC, 480 F. Supp. 2d 797, 804 (E.D. Pa. 2007) (citation omitted). Therefore, Impala has satisfied the first RICO standing requirement.

19

### (ii) **"By Reason Of"**

The Supreme Court has interpreted RICO's "by reason of" requirement to mean that the defendant's RICO violation must be the proximate cause of the plaintiff's injury. Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006); see also Holmes v. SIPC, 503 U.S. 258, 266-68 (1992). To meet this proximate cause requirement, the plaintiff must allege "some direct relation between the injury asserted and the injurious conduct alleged." Holmes, 503 U.S. at 268. A showing that the RICO violation was a "but for" cause of the injury is insufficient. Id.

The parties dispute whether or not Impala needs to plead reliance in order to satisfy the proximate cause requirement. Impala has alleged mail and wire fraud. As the Supreme Court stated, "one can conduct the affairs of a qualifying enterprise through a pattern of such acts [e.g., mail fraud] without anyone relying on a fraudulent misrepresentation. . . . Moreover, a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 649 (2008). Defendants argue that at least *some* reliance, even third party reliance, must be pleaded in order to satisfy the proximate cause requirement. This is incorrect. While the Supreme Court acknowledged "it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation," Bridge, 553 U.S. at 659, the Court did not hold that it was a requirement for doing so, particularly at the pleading stage.

Impala has alleged that Defendants' RICO violations have caused direct monetary loss in terms of legal fees and frustration of Impala's ability to collect on its judgment against A-1. Impala has satisfied the RICO pleading standard.

20

## C. Recovery Period for Pennsylvania Statutory and Common Law Claims

Defendants argue that many of Impala's statutory and non-statutory state-law claims are barred by the applicable statutes of limitations. Impala disagrees, countering that the record before the Court is insufficient to provide a clear recovery period for its claims under equitable tolling principles, specifically fraudulent concealment.

Under the fraudulent concealment doctrine, the statute of limitations may be equitably tolled where "through fraud or concealment the defendant causes the plaintiff to relax his vigilance or deviate from the right of inquiry." Bohus v. Beloff, 950 F.2d 919, 925 (3d Cir. 1991). To toll the statute of limitations, the plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence. Id. (citing Molineux v. Reed, 532 A.2d 792 (Pa. 1987)). Like fraud, fraudulent concealment is subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), and must be pleaded with particularity. See Byrnes v. DeBolt Transfer, Inc., 741 F.2d 620, 626–27 (3d Cir. 1984); see also Davis v. Grusemeyer, 996 F.2d 617, 624 (3d Cir. 1993).

Fraudulent concealment by a defendant may be unintentional or intentional, but it cannot be done through mistake, misunderstanding, or lack of knowledge. Bohus, 950 F.2d at 925 (citing Nesbitt v. Erie Coach Co., 204 A.2d 473 (Pa. 1964)). In order to sufficiently plead fraudulent concealment, a plaintiff must allege an "affirmative and independent act of concealment" by defendant that had the effect of diverting or misleading the plaintiff from discovering the injury. Mest v. Cabot Corp., 449 F.3d 502, 517 (3d Cir. 2006). Silence or failure to disclose a fact can constitute an "affirmative act" only if the defendant had a duty to disclose due to a fiduciary relationship or other relationship of trust and confidence between the parties. Id. (citing Chiarella v. United States, 445 U.S. 222, 227–28 (1980)).

21

The "affirmative act" must have been done by the defendant—an act done by a third

party cannot be the basis of fraudulent concealment. Davis v. Grusemeyer, 996 F.2d 617, 624

(3d Cir. 1993), overruled on other grounds by Rolo v. City Investing Co. Liquidating Trust, 155

F.3d 644 (3d Cir. 1998). Further, if a plaintiff is on notice of a potential claim, then fraudulent

concealment does not come into play, no matter what actions the defendant may have taken to

conceal its wrongs. Id. In addition, the plaintiff's failure to discover the injury must be

reasonable, and must not be due to a lack of diligence on its part. Bohus, 950 F.2d at 925.

Many of Impala's claims "sound[] inherently in fraud or deceit" which, pursuant to the

Third Circuit's decision in Beauty Time, Inc. v. VU Skin Systems, Inc., 118 F.3d 140, 144 (3d

Cir. 1997), automatically tolls the statute of limitations until such time as the fraud has, or should

have, been revealed. However, recognizing that some of Impala's claims are governed by a

statute of repose, rather than limitations, the Court addresses each type of claim separately.

### 1. Recovery Period for Impala's PUFTA Claims

The PUFTA provides:

> A cause of action with respect to a fraudulent transfer or obligation
> under this chapter is extinguished unless action is brought:
>
> (1) under section 5104(a)(1) (relating to transfers fraudulent as to
> present and future creditors), within four years after the transfer
> was made or the obligation was incurred or, if later, within one
> year after the transfer or obligation was or could reasonably have
> been discovered by the claimant; or
>
> (2) under section 5104(a)(2) or 5105 (relating to transfers
> fraudulent as to present creditors), within four years after the
> transfer was made or the obligation was incurred.

12 Pa. Cons. Stat. § 5109.

In In re Jamuna Real Estate, LLC, 365 B.R. 540, 567 (Bankr. E.D. Pa. 2007), the Bankruptcy

Court for this District recognized that Section 5109 of the PUFTA provides a statute of repose

22

and not a statute of limitations.  The bankruptcy court noted that, in quoting section 5109 in full,

it emphasized the word "extinguished" because Pennsylvania courts recognize that "statutes of

repose are substantive in nature because they *extinguish* a cause of action and preclude its

revival."  Id. (quoting Miller v. Stroud Twp., 804 A.2d 749, 752 (Pa. Commw. Ct. 2002)).

 The Supreme Court of Pennsylvania has recently provided guidance as to when a

statutorily mandated limitations period is a statute of limitations or a statute of repose.  In Gilbert

v. Synagro Cent., LLC, 131 A.3d 1, 10 (Pa. 2015), the appellants argued that the statute in

question, section 954(a) of the Right to Farm Act, was a jurisdictional statute of repose, while the

appellees contended it was a statute of limitations, as indicated by the section's title.  Id. at 13

(citing 3 Pa. Cons. Stat. § 954 ("Limitation on public nuisances.").  The Supreme Court of

Pennsylvania explained the difference between a statute of limitations and a statute of repose

thusly:

> A statute of repose . . . limits the time within which an action may
> be brought and is not related to the accrual of any cause of action;
> the injury need not have occurred, much less have been discovered.
> Unlike an ordinary statute of limitations which begins running
> upon accrual of the claim, the period contained in a statute of
> repose begins when a specific event occurs, regardless of whether
> a cause of action has accrued or whether any injury has
> resulted. . . . While a statute of limitations merely bars a party's
> right to a remedy, a statute of repose completely abolishes and
> eliminates a party's cause of action.

Id. at 15 (citations omitted) (alteration in original).

 In determining that section 954(a) was a statute of repose and not limitation, the Supreme

Court of Pennsylvania noted that the section "permits a nuisance action to be brought within one

year after a certain event occurs, *i.e.*, after the defendant has acted, regardless of when the harm

is alleged to have occurred.  Therefore, although the section is titled '*Limitation* on public

nuisances,' in essence, it operates as a statute of repose and is thus jurisdictional." Id. (citations
omitted).

Likewise, section 5109 of the PUFTA permits a fraudulent transfer action to be brought
within four years after a certain event occurs, namely, either when the transfer occurs or the
obligation at issue was incurred. 12 Pa. Cons. Stat. § 5109. Merely because section 5109
provides its own discovery rule in the case of claims for actual fraudulent conveyance does not
militate against finding that the section is a statute of repose. See Westinghouse Elec.
Corp./CBS v. Workers' Comp. App. Bd. (Korach), 883 A.2d 579, 588 n.11 (Pa. 2005) (stating
that, with respect to statutes of repose, "[a]t the end of the time period specified in the statute, the
cause of action ceases to exist, unless the claimant can bring himself within any tolling provision
enunciated in that statute.").

Accordingly, this Court agrees with the bankruptcy court in In re Jamuna and finds that
section 5109 of the PUFTA is a statute of repose and not a statute of limitations.[5]  Therefore, the
recovery period is limited to the section's four-year lookback period, aided only by the one-year
discovery period for claims of actual fraudulent conveyance. For claims seeking avoidance of
fraudulent transfers under the PUFTA, no other doctrine of equitable tolling can revive claims
beyond the period specified in its statute of repose. See id. Thus, to the extent the statute of
repose includes a one-year discovery toll for claims of actual fraudulent transfer, Impala may be

---

[5]      And, as the Supreme Court of Pennsylvania reasoned, the terminology employed in the bar association
commentary to section 5109 is beside the point. Thus, the Court is untroubled by the Superior Court of
Pennsylvania's decision in K-B Bldg. Co. v. Sheesley Constr., Inc., 833 A.2d 1132, 1133 n.1 (Pa. Super. Ct. 2003),
where it noted "[t]he language of the provision," meaning Section 5109, "which involves the extinguishment of a
cause of action rather than a limitation of the action, would appear to be labeled properly as a statute of repose.
However, the comment to section 5109 refers to that provision as imposing a statute of limitations." Accordingly,
the Superior Court of Pennsylvania "refer[red] to the section in accordance with the comment" without holding that
section 5109 imposed a statute of limitations rather than of repose. Id. Furthermore, Sheesley was decided before
the Supreme Court of Pennsylvania decided Gilbert.

24

able to take advantage of that provision. Finding that section 5109 imposes a statute of repose and not statute of limitations, the Court therefore determines it will limit

- Any recovery under the PUFTA's constructive fraudulent transfer provision to damages for injuries on or after March 23, 2012; and

- Any recovery under the PUFTA's actual fraudulent transfer provision to damages for injuries Impala **discovered or should have discovered on or after March 23, 2012.**[6]

As an example, claims against Om, Leena, and Kumar, based on the following transactions, are barred:

- Shareholder distributions from March 2010-February 2012 to Suresh, Kumar, Om, and Leena totaling $15,250,000 (Am. Compl. ¶ 40(a))

- Shareholder distributions enumerated in the Amended Complaint which were made *before* March 23, 2012 (Am. Compl. ¶ 40(b)

Claims against Om, Leena, and Kumar, based on the following transactions occurring after March 23, 2012, survive:

- Transfers pursuant to the Bucks County, Burlington County, and EDPA Settlements, all of which were executed after March 23, 2012

- Some of the shareholder distributions and salary payments would survive, specifically:

---

[6]     The Court has phrased this recovery period carefully. The language takes into account both Impala's argument that discovery may lead to additional claims of actual fraudulent transfers, and likewise Defendants' counterargument that some of Impala's claims are clearly barred by the PUFTA's statute of repose. For claims of actual fraudulent transfer, the discovery period is tolled "one year after the transfer or obligation was or could reasonably have been discovered by the claimant." 12 Pa. Cons. Stat. § 5109. "The Supreme Court of Pennsylvania has made clear that both the 'discovery rule' and the doctrine of fraudulent concealment rest upon the same 'knew or should have known' standard, therefore, the inquiries are the same." State Farm Mut. Auto Ins. Co. v. Cordua, 834 F. Supp. 2d 301, 306 (E.D. Pa. 2011) (quoting Urland ex rel. Urland v. Merrell-Dow Pharms., Inc., 822 F.2d 1268, 1271 (3d Cir. 1987)); see also K-B Bldg. Co. v. Sheesley Const. , Inc., 833 A.2d 1132, 1136 (Pa. Super. Ct. 2003) (stating section 5109 "provides that an action must be brought within one year of the date the transfer could have been discovered through the exercise of reasonable diligence or within four years of the transfer."). Accordingly, if Impala wishes to bring additional claims for actual fraudulent transfer based on transfers revealed in discovery, it may do so, but it must also show that it neither knew, nor should have known, about the transfers.

- o   $620,000 in shareholder distributions to Kumar (Alliance Br. at 12)
- o   $640,000 in shareholder distributions to Om (Om Br. at 18)
- o   $640,000 in shareholder distributions to Suresh (Bucks County Compl. Ex. B)
- o   $100,000 in shareholder distributions to Leena (Bucks County Compl. Ex. B)
- o   Salary payments made after March 23, 2012 to Om, Leena, Suresh, and Kumar
- •   Excessive rent payments from A-1 to Slogam, which Impala alleges started after March 23, 2012, specifically in the fall of 2012 and between January-December of 2013 (Am. Compl. ¶¶ 40(h))

As for the shareholder distributions A-1 made to Kumar, which were then transferred to Sudhir Chopra (allegedly) so that Kumar could acquire control of Alliance (the "Chopra Transfers"), the Court agrees with Kumar that most of these transactions occurred outside of the recovery period. Kumar asserts that the $15 million transfer was effected by the following series of shareholder distributions:

- •   January 20, 2012: $1 million
- •   January 23, 2012: $4 million
- •   January 25, 2012: $2 million
- •   January 27, 2012: $1 million
- •   January 30, 2012: $2 million
- •   March 26, 2012: $2 million
- •   March 27, 2012: $2 million
- •   March 30, 2012: $1 million

Kumar argues that only the last two transactions are within the recovery period because they happened after March 23, 2012, the rest are extinguished because the transactions occurred *before* that date. Impala argues that the entire transaction is really a single transaction completed *after* March 23, 2012, but offers no legal authority for this position. The Court agrees with

Defendants that the Chopra Transfers cannot be collapsed into a single transaction such that certain transfers outside of the limitations period are brought within the limitations period. See PUFTA § 5101(b) (defining "transfer" as "[e]very mode, direct or indirect, absolute or condition, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset. The term includes payment of money, release, lease and creation of a lien or other encumbrance."). Here, each of the eight (8) Chopra Transfers was its own "transfer" under the PUFTA. Therefore, six of the eight Chopra Transfers are barred by the PUFTA statute of repose, and only the last two (2) transfers, specifically on March 27, 2012 and March 30, 2012, are within the applicable recovery period.[7]

The recovery period for A-1, Slogam and Suresh is different only with respect to those transactions that were expressly included in Impala's 2013 Amended Complaint. In that 2013 Amended Complaint, Impala brought claims for actual and constructive fraudulent transfer against Suresh and A-1, but *only* with respect to the excessive rent payments Suresh allegedly caused A-1 to make to Slogam, and then transferred from Slogam to himself. Thus, any excessive rent payments from A-1 to Slogam reaching back four (4) years from August 1, 2013, to **August 1, 2009**, would be recoverable. To the extent Impala's Amended Complaint in *this* action contains claims for fraudulent transfers against A-1, Slogam and Suresh which are *not* related to the excessive rent payments, such claims are subject to the same recovery period for Om, Leena, and Kumar outlined above.

### 2. Recovery Period for Impala's Common Law Claims

Impala's remaining state-law claims are subject to Pennsylvania's two (2)-year statute of limitations. 42 Pa. Cons. Stat. § 5524. The Court will impose the same framework utilized

---

[7]     The record before the Court is insufficient to determine, as a matter of law, whether the Chopra Transfers constitute a "loan" to Kumar that could be "forgiven" under the EDPA Settlement.

above in the recovery period outlined for claims of actual fraudulent transfer.  Accordingly, Impala's claims for breach of fiduciary duty and deepening insolvency are limited to conduct occurring on or after **March 23, 2014**.

Again, the only exception is for Suresh, against whom claims for breach of fiduciary duty may include conduct occurring on or after **August 1, 2011**.  This exception is limited to the conduct expressly included in Impala's 2013 Amended Complaint, namely the excessive rent payments to Slogam.

This recovery period for Impala's common-law claims is afforded the same caveat as that for actual fraudulent transfers; thus if Impala wishes to bring additional claims for breach of fiduciary duty or deepening insolvency based on information revealed in discovery, it may do so, but it must also show that it neither knew, nor should have known, about the conduct.  And, as discussed above, Impala "has the burden of proving fraudulent concealment by 'clear, precise and convincing evidence.'"  Miller v. Janney Montgomery Scott Inc., No. 96-8709, 1998 WL 398146, at *2 (E.D. Pa. June 24, 1998) (quoting Bohus, 950 F.2d at 925)).

### D. Claims Brought Under the PUFTA

#### *1. Parties Contentions as to Impala's Claims under the PUFTA*[8]

As to claims for both actual and constructive fraudulent transfer, Alliance and Kumar contend that the last two of the Chopra Transfers, amounting to $5 million, was fully remedied by Kumar, as evidenced by Kumar's $5.5 million note to A-1, and so no fraudulent conveyance claim lies.  (Alliance Br. at 15).  In addition, Suresh and Leena, in their motion to dismiss Impala's PUFTA claims, argue that Impala has failed to plead either constructive or actual fraud with the required specificity.  (S&L Br. at 6).

---

[8]      In their moving briefs, both Slogam (Slogam Br. at 5) and A-1 (A-1 Br. at 5) incorporate by reference the arguments made by Individual Defendants in moving for dismissal of Impala's PUFTA claims.

### (i) **Actual Fraudulent Transfer**

Alliance and Kumar argue that Impala has failed to sufficiently plead a claim for actual fraudulent conveyance under section 5104(a)(1) of the PUFTA because, though the law requires a "goodly" number of the eleven (11) badges of fraud to support a claim of actual fraudulent intent, Impala has only alleged two (2) badges of fraud. (Alliance Br. at 13-14).

In response, Impala contends that it has alleged a substantial number of badges of fraud, relying on both those enumerated in the PUFTA § 5104(b) and those articulated in an Eastern District of Pennsylvania Bankruptcy Court case, In re Dawley, No. 01-32215, 2005 WL 2077074, at *11 (Bankr. E.D. Pa. Aug. 10, 2005) (listing factors "similar to the factors set forth in § 5401(b) of the UFTA."). Specifically, Impala argues that it has pleaded the factors set forth in § 5104(b)(1)-(2), (4)-(5), (8)-(10); and Dawley badges nos. 2, 7-8, 10. Thus, Impala claims, it has alleged nearly a dozen badges of fraud, which is sufficient to overcome Defendants' motions to dismiss. (Impala Opp'n at 3-8).

Impala disagrees with Defendants' contention that Impala has failed to plead its allegations of intentional fraudulent transfer with the requisite specificity. First, Impala proffers that it is entitled to a relaxation of the heightened pleading requirements for allegations of fraud because the information regarding the challenged transactions is within Defendants' knowledge and control. (Impala Opp'n at 10, 12). Second, Impala asserts that it nonetheless pleaded its allegations of fraud with sufficient specificity, noting that its Amended Complaint details Suresh's transfer of A-1's assets to Slogam in amounts that greatly exceeded the amounts of rent due. (Impala Opp'n at 11-12). Impala also claims that it has discovered (though it does not revel

when) another complaint filed by Kumar in Bucks County, Pennsylvania, which attaches copies of checks Suresh caused Slogam to issue to himself.[9]  (Impala Opp'n at 12).

Impala likewise disagrees with Defendants' accusation that it has insufficiently alleged A-1's insolvency for purposes of the PUFTA.  In its Amended Complaint, Impala alleges that A-1's liabilities have exceeded its assets since at least 2012, and furthermore that A-1 stopped making payments required under the July MOU.  (Impala Opp'n at 13).  These latter failed payments, Impala argues, are "contingent liabilities" that qualify as debts for purposes of determining A-1's insolvency under the PUFTA.  (Id.).

### (ii)  Constructive Fraudulent Transfer

As for Impala's claims of constructive fraudulent transfer, Defendants argue that Impala has failed to sufficiently allege that the challenged transfers—shareholder distributions, payments under the Settlement Agreements, and salaries—were achieved at the expense of A-1's receiving less than a reasonably equivalent value.[10]  (Om Br. at 21-23).  Alliance and Kumar also argue that Impala has insufficiently pleaded a claim for constructive fraudulent conveyance under sections 5104(a)(2) and 5105 of the PUFTA because Impala has failed to sufficiently allege that A-1 was either undercapitalized or insolvent.  (Alliance Br. at 14-15).

Impala finds fault with both of these arguments.  First, Impala notes that the Court must evaluate the reasonableness of the equivalent value a debtor receives in a transaction according to a "totality of the circumstances" approach.  (Impala Opp'n at 22).  Accordingly, Impala argues that the settlement payments Om and Leena received fail this test because even though neither

---

[9]  Impala attached to its Opposition Brief a copy of Kumar's complaint in this action.  (Impala Opp'n Ex. A).
[10]  In their first motion to dismiss Impala's complaint (ECF 23), Leena and Suresh argued that Impala failed to allege how a payment from A-1 to Slogam, a nonparty, and then from Slogam to Suresh could be the basis of a fraudulent transfer claim.  (ECF 23 at 11).  Leena and Suresh incorporated this argument by reference in their pending motion to dismiss.  (L&S Br. at 6).  For purposes of deciding Leena and Suresh's current motion, the Court will consider the balance of their arguments in their first motion to dismiss, making allowance for the fact that Slogam is now a party to the action.

Om nor Leena asserted claims against A-1 in the Bucks County Action, the Bucks County Settlement nevertheless provided for substantial payments to Om and Leena in the amount of $10 million and $1.5 million, respectively.[11]   (Impala Opp'n at 23).   Impala's Amended Complaint also alleges that A-1's shareholders received salaries that greatly exceeded the value of any services they provided to A-1 and, as such, were not given for reasonably equivalent value.   (Id.).   Second, Impala incorporated by reference its arguments as to the sufficiency of its pleading A-1's insolvency; those arguments provided that A-1's assets exceeded its liabilities since at least 2012.   (Impala Opp'n at 23 (citing 13-14)).

### 2. *Impala States Claims for Actual and Constructive Fraudulent Transfer*

#### (i) Impala States a Claim for Actual Fraudulent Transfer

Section 5104(a) states that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay or defraud any creditor of the debtor."   Section 5104(b) then lists a number of factors—the "badges of fraud"—that may be considered in determining "whether the debtor had an actual intent to hinder, delay or defraud one or more creditors."   PUFTA § 5104 cmt. 5.   These section 5104(b) factors include:

> (1)  the transfer or obligation was to an insider;
>
> (2)  the debtor retained possession or control of the property transferred after the transfer;
>
> (3)  the transfer or obligation was disclosed or concealed;
>
> (4)  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

---

[11]      Impala proffers that the security interests Om and Leena received from A-1 were also fraudulent transfers, both because the security interests were rendered for no consideration and were meant for the sole purpose of excluding A-1's legitimate creditors from recovery.   (Impala Opp'n at 23).

  (5) the transfer was of substantially all the debtor's assets;

  (6) the debtor absconded;

  (7) the debtor removed or concealed assets;

  (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

  (9) the debtor was insolvent shortly after the transfer was made or the obligation was incurred;

  (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

  (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

PUFTA § 5104(b).  "Proof of the existence of any one or more of the factors enumerated in subsection (b) may be relevant evidence as to the debtor's actual intent but does not create a presumption that the debtor has made a fraudulent transfer or incurred a fraudulent obligation." PUFTA § 5104 cmt. 5.  The court should take into account all of the relevant circumstances in applying these statutory factors.  Klein v. Weidner, 729 F.3d 280, 284 (3d Cir. 2013) (citing PUFTA § 5104 cmt. 6).  However, as the statute makes clear by its own terms, the enumerated badges of fraud are simply factors that "may be considered" and the statute specifically acknowledges that there are other unenumerated factors that a court may consider.  12 Pa. Cons. Stat. § 5104(b) ("In determining actual intent under subsection (a)(1), consideration *may be given, among other factors*, to [the factors listed].") (emphasis added); see also Fell v. 340 Assocs., LLC, 125 A.3d 75, 82 (Pa. Super. Ct. 2015).

  Contrary to Defendants' assertion, the Amended Complaint contains more than a sufficient number of badges of fraud to infer A-1's actual fraudulent intent.  The Amended

Complaint adequately alleges at least the following seven (7) badges of fraud. First, Impala alleges that the Khoslas caused A-1 transferred its assets to insiders. (Am. Compl. ¶¶ 78, 79). As alleged in the Amended Complaint, Om, Leena, Suresh and Kumar are A-1's sole shareholders. (Am. Compl. ¶ 78). Om and Leena are officers and directors of A-1. (Id.). According to the Amended Complaint, Kumar has been CEO or co-CEO of A-1 until at least February of 2016, and was A-1's CEO and Board Chairman when A-1 negotiated and entered into the settlement agreements in May and September of 2015. (Id.). Impala also alleges that Slogam, like A-1, is controlled by the Khoslas, insofar as Slogam is owned by Suresh, Kumar, and Om, and Suresh is the President of Slogam's General Partner entity. (Id.). Likewise, Impala alleges that Alliance is owned and controlled solely by Kumar. (Id.).

The PUFTA has adopted a "common sense" approach to determining whether individuals are insiders. In re Zambrano Corp., 478 B.R. 670, 692 (Bankr. W.D. Pa. 2012) ("Pursuant to 11 U.S.C. § 101(31)(B), the term "insider includes, if the debtor is a corporation, a director, officer, or general partner of the debt, a person in control of the debtor, a partnership in which the debtor is a general partner, or a relative of a general partner, director, officer or person in control of the debtor."). Impala's allegations as to Om, Leena, Suresh, and Kumar satisfy this common sense definition. In their brief, Impala notes that liability for actual fraudulent transfer is based on the intent of the transferor and not the transferee. (Impala Opp'n at 2). Nonetheless, Impala's theory of the case is that the Khoslas conspired to strip A-1 of its assets in order to make A-1 judgment proof from Impala's final arbitration award. (See, e.g., Am. Compl. ¶¶ 66, 87-91). Accordingly, the Court construes Impala's argument as one seeking to impute the Khoslas' intent to A-1 because they were "insiders" of A-1.

The Khoslas' intent will be imputed to A-1 for purposes of PUFTA § 5104(a)(1) if "(1) they dominated or controlled [A-1]; (2) with respect to the disposition of [A-1's assets], and (3) intended to hinder, delay, or defraud [A-1's] creditors." In re Atomica Design Grp., Inc., --- B.R. ---, No. 12-17235, 2016 WL 4385409, at *23 (Bankr. E.D. Pa. Aug. 12, 2016).  According to the Amended Complaint, the Khoslas controlled and dominated A-1 with respect to the disposition of its assets as either its controlling officers and directors at the time of the transfers (e.g., Om and Leena (Am. Compl. ¶ 78)), CEO or co-CEO of A-1 (e.g., Kumar (Id.)), or owner and relative of the officers and directors (e.g., Suresh (Id.)).  Therefore, the Khoslas' intent relative to the challenged transfers may be imputed to A-1 if they intended to hinder, delay, or defraud A-1's creditors.

Impala's Amended Complaint provides an additional six (6) badges of fraud.  Allegedly, A-1 retained possession or control of the assets after the challenged transfers, by virtue of the various settlement agreements (Am. Compl. ¶ 80); the transfers were concealed from Impala because they were contained in confidential settlement agreements only disclosed to Impala in February of 2016 (Am. Compl. ¶ 81) and this concealment was for the benefit of A-1's insiders at Impala's expense (Am. Compl. ¶ 96); the Defendants only entered into these settlement agreements after Impala sued A-1, and in anticipation of Impala's being awarded a significant arbitration award in the LCIA (Am. Compl. ¶¶ 82-83); the settlement agreements effected transfers of substantially all of A-1's assets (Am. Compl. ¶ 84); the value of consideration A-1 received in these transfers was not reasonably equivalent to the value of the assets A-1 transferred or the obligations A-1 incurred (Am. Compl. ¶¶ 85, 87-89, 91); A-1 was insolvent or became insolvent shortly after the transfers were made or the obligations were incurred (Am.

Compl. ¶¶ 33-39, 77, 92-93); and the challenged transfers occurred shortly before or shortly after A-1 incurred a substantial debt (Am. Compl. ¶ 83).

In addition, Impala's Amended Complaint alleges the dates and circumstances of the precise transfers that are alleged to be fraudulent, and therefore meets the heightened pleading standard imposed by Rule 9(b). (Am. Compl. ¶¶ 66, 79, 85, 89). To the extent that Impala has identified transfers for which it does not provide the "the who, what, when, where, and how of the events at issue," In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002) (internal quotation marks omitted), Impala is entitled to a relaxation of the Rule 9(b) requirements because the information is peculiarly within the knowledge and control of Defendants, something Impala has adequately alleged. (See, e.g., Am. Compl. ¶ 99).

Under these circumstances, the Amended Complaint plausibly alleges the facts and circumstances of the alleged fraud. For this reason, the Court rejects Defendants' argument that the Amended Complaint does not satisfy the pleading requirements set forth in Rule 9(b) in connection with Impala's actual fraudulent transfer claims. Accordingly, the Court denies Defendants' motions subject to the limitations imposed by the recovery period outlined above.

### (ii) Impala States a Claim for Constructive Fraudulent Transfer

The constructive fraud standards are set forth in the PUFTA sections 5104(a)(2) and 5105. Under section 5104(a)(2), a transfer by a debtor is fraudulent as to its creditors if the debtor did not receive "reasonably equivalent value in exchange for the transfer" and

> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

35

PUFTA § 5014(a)(2).  Under section 5105, a transfer by a debtor is fraudulent as to its creditors

if the debtor did not receive "reasonably equivalent value in exchange for the transfer" and "was

insolvent at that time or . . . became insolvent as a result of the transfer."  PUFTA § 5105.  In the

Third Circuit, under either of the above standards, evaluating reasonably equivalent value

requires two steps: (1) the court must determine whether the debtor received "any value at all"

from the challenged transaction, In re R.M.L., Inc., 92 F.3d 139, 149 (3d Cir. 1996); (2) if the

court finds that a debtor received at least some value, it must then decide whether the value

received was "roughly the value it gave," In re Fruehauf Trailer Corp., 444 F.3d 203, 212-13 (3d

Cir. 2006).

   "In assessing whether reasonably equivalent value was received, the court should look to

the 'totality of the circumstances,' including (1) the 'fair market value' of the benefit received as

a result of the transfer; (2) 'the existence of an arm's-length relationship between the debtor and

the transferee' and (3) the transferee's good faith."  Image Masters, Inc. v. Chase Home Fin., 489

B.R. 375, 387 (E.D. Pa. 2013) (quoting In re R.M.L., 92 F.3d at 148-49).  While the Third

Circuit has not decided the issue, "most Courts in the Circuit recognize that constructive

fraudulent transfer claims are not analyzed under the heightened Rule 9(b) pleading standard."

In re Transcontinental Refrigerated Lines, Inc., 438 B.R. 520, 522 (Bankr. M.D. Pa. 2010).

   The section 5105 test addresses "balance sheet insolvency," pursuant to which "[a] debtor

is insolvent if, at fair valuations, the sum of [its] debts is greater than all of [its] assets."  PUFTA

§ 5102(a) & cmt. 1.  "[D]ifferent methods of determining value on any particular basis may be

appropriate" in different circumstances.  PUFTA § 5102 cmt. 1.  Though "fraudulent transfer law

does not presume insolvency and so it must be pled," a court "can reasonably infer that [a

debtor's] financial health was either tenuous at the time of, or irreparably harmed by, the

transfer" even where "no specific financial information is alleged on this point." <u>In re Covenant Partners, L.P.</u>, 531 B.R. 84, 93 (Bankr. E.D. Pa. 2015).

Contrary to Defendants' assertions, the Amended Complaint sufficiently alleges that, about the time A-1 began to effect the challenged transfers, its assets exceeded its liabilities. (Am. Compl. ¶¶ 33-39). According to the Amended Complaint, A-1 transferred large sums of money in the form of shareholder distributions, excessive rent payments, unearned salaries and, ultimately, the loan forgiveness and transfers effected by the Burlington County, Bucks County, and EDPA Settlements—all transfers of A-1's assets for which A-1 did not receive reasonably equivalent value in return. (<u>Id.</u> ¶¶ 40, 66, 104, 106-11). Impala also alleges that A-1 was insolvent at the time of, and as a result of, the transfers. (<u>See, e.g.</u>, Am. Compl. ¶ 110-12) (alleging that A-1's rent payment to Slogam "greatly exceeded the amounts of rent payments due," were made "without A-1 receiving a reasonably equivalent value in exchange," and were made at a time when "A-1 was insolvent, or became insolvent as a result of the transfers.").

Though Alliance and Kumar contend that Impala only alleges A-1's insolvency as of December 31, 2012 (Alliance Br. at 14), the Court can, and does, infer from Impala's allegations that A-1's financial health was tenuous both at the time A-1 was negotiating the July MOU with Impala and when A-1 began making the allegedly fraudulent shareholder distributions to the Khoslas. For instance, though the Amended Complaint alleges that, "[a]t the end of 2011, A-1 represented that it had total assets of $693,008,301, and current liabilities of $564,677,350." (Am. Compl. ¶ 34). A-1, on this proverbial financial precipice, at the behest of the Khoslas, nevertheless transferred large sums of money out of its coffers and into the hands of its shareholders, officers, and directors. (<u>Id.</u> ¶ 40). And, the Amended Complaint alleges, A-1 did so when it could reasonably anticipate liability to Impala under the 2012 MOU. (<u>Id.</u> ¶ 28-31).

Finally, to the extent Defendants argue for dismissal of Impala's constructive fraudulent conveyance claims based on the Burlington County, Bucks County, and EDPA Settlement Agreements because A-1 received reasonably equivalent value for the terms it agreed to thereunder, "[t]he Court rejects this argument since whether a transferee gave value for the transfer is . . . a question of fact not amenable to review on a motion to dismiss." United States v. Rocky Mountain Holdings, Inc., No. 08-3381, 2009 WL 564437, at *7 n.5 (E.D. Pa. Mar. 4, 2009).[12]

Therefore, because the Amended Complaint satisfies sections 5104(a)(2)(i)-(ii) and 5105, the Court will deny Defendants' motion to dismiss Impala's claim for constructive fraudulent transfer, subject to the recovery period outlined above.

## E. RICO

### 1. Summary of Impala's Allegations

Count VI of the Impala Amended Complaint, alleging RICO violations, is filed against all the individual defendants and Alliance. Impala has not filed RICO claims against A-1, which it alleges was an "enterprise" under 18 U.S.C. § 1961(4), or Slogam. Impala has brought their RICO claim pursuant to 18 U.S.C. § 1962(c), which prohibits racketeering and unlawful debt collection, and 18 U.S.C. § 1962(d), which prohibits conspiring to violate one of the other RICO sections. The Court thus considers whether Impala has properly stated violations under § 1962(c), (d).

Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly

---

[12] For this reason, the Court declines to determine at this stage, as a matter of law, whether Kumar's repayment of the two recoverable Chopra Transfers, amounting to $5 million, were transfers for which A-1 received "reasonably equivalent value" when Kumar agreed to repay pursuant to a $5.5 million promissory note to A-1.

> or indirectly, in the conduct of such enterprise's affairs through a
> pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Thus, in order to plead a violation of § 1962(c), Impala must allege

"(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." In re Ins.

Brokerage Antitrust Litig., 618 F.3d 300, 362 (quoting Lum v. Bank of Am., 361 F.3d 217, 223

(3d Cir. 2004)).

### 2. The Parties' Contentions as to Impala's RICO Claim

Alliance and Kumar argue that Impala has failed to state a claim for RICO violations for

a myriad of reasons. First, Defendants argue that the filing of settlement documents, UCC

statements, and other papers in connection with the related lawsuits do not constitute predicate

acts of a RICO conspiracy. (Alliance Br. at 7). Second, Impala has not sufficiently pleaded an

"enterprise" under RICO. (Alliance Br. at 6 n.5). Suresh and Leena likewise attack the

sufficiency of Impala's RICO allegations, noting that Impala's allegations of predicate acts on

the part of Defendants' counsel cannot be imputed to their clients. (S&L Br. at 14). In addition,

Suresh and Leena argue that Impala has failed to plead its claims of mail and wire fraud with the

requisite specificity.[13] (S&L Br. at 16).

In response, Impala argues that it has sufficiently pleaded all of the elements for a RICO

claim: the "enterprise" is A-1; the Khoslas, with the aid of Alliance, conducted A-1's affairs

through a "pattern" of racketeering; that the Khoslas and Alliance committed at least eighteen

(18) predicate acts of mail and wire fraud in furtherance of their "continuous," open-ended

racketeering activity. (Impala Opp'n at 42-43).

---

[13]     Om incorporates by reference the arguments made in support of dismissing Impala's claims for RICO
violations in Alliance and Kumar's moving brief, as well as in Suresh and Leena's moving brief. (Om Br. at 16).

### 3. *Impala States a Claim for RICO Violation*

#### (i) **Conduct**

The Supreme Court has held that the "conduct or participate" element in a § 1962(c)

claim requires a defendant to "have some part in directing those affairs." Reves v. Ernst &

Young, 507 U.S. 170, 179 (1993). Thus, "one is not liable under [§ 1962(c)] unless one has

participated in the operation or management of the enterprise itself." Id. at 183. Furthermore,

"[a]n enterprise is 'operated' not just by upper management but also by lower rung participants

in the enterprise who are under the direction of upper management." Id. at 184. Accordingly,

"outsiders" can meet this test if they "exert control over" the enterprise if they have "conducted

or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." Id. at 184-

84.

#### (ii) **Enterprise**

As noted above, Impala has alleged that A-1 was the enterprise. As noted, A-1 is a

defendant in this case on many of the counts, but has been omitted as a defendant on the RICO

count. As noted below, the law is well settled that the enterprise must be distinct from any other

"persons" and/or defendants.

As recognized by the Supreme Court and the Third Circuit, "[t]he RICO statute

'describes two categories of associations that come within the purview of the enterprise

definition. The first encompasses organizations such as corporations and partnerships, and other

legal entities. The second covers any union or group of individuals associated in fact although

not a legal entity.'" In re Ins. Brokerage Antitrust Litig., 618 F.3d at 364 (quoting United States

v. Turkette, 452 U.S. 576, 581-82 (1981)). Proving the enterprise element is less difficult where

the enterprise alleged is a legal entity. Id. (citing Webster v. Omnitrition Int'l, Inc., 79 F.3d 776,

40

786 (9th Cir. 1996)). Where the enterprise alleged is association-in-fact, it must exhibit three "structural features": (1) "a purpose"; (2) "relationships among those associated with the enterprise"; and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946 (2009). But association-in-fact enterprises do not need to have "a name, regular meetings, dues established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." Id. at 949. Put simply, "an association-in-fact enterprise is 'a group of persons associated together for the common purpose of engaging in a course of conduct.'" Id. at 946 (quoting Turkette, 452 U.S. at 583).

The Third Circuit has developed a rule of distinctiveness regarding RICO enterprises. In B.F. Hirsch v. Enright Refining Co., 751 F.2d 628 (3d Cir. 1984), the Third Circuit concluded that "the language [of § 1962(c)] contemplates that the 'person' must be associated with a separate 'enterprise' before there can be RICO liability on the part of the 'person.'" Enright, 751 F.2d at 633. Accordingly, a plaintiff may not name a single corporation as both defendant and enterprise under § 1962(c). Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 268 (3d Cir. 1995). The Third Circuit has "conclude[d] that the essential holding of Enright remains undisturbed—a claim simply against one corporation as both 'person' and 'enterprise' is not sufficient. Instead, a viable § 1962(c) action requires a claim against defendant 'persons' acting through a distinct 'enterprise.' But, alleging conduct by officers or employees who operate or manage a corporate enterprise satisfies this requirement." Id.

The sufficient amount of "separateness" required to establish that the "person" was distinct from the "enterprise" was described in Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 160-66 (2001). There, the Supreme Court recognized that one person, president, employee and sole shareholder (Don King) can be distinct from the closely held corporation

41

(Don King Productions). Id. at 160. The Supreme Court explained that "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that. . . . [L]inguistically speaking, the employee and the corporation are different 'persons,' even where the employee is the corporation's sole owner. After all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." Id. at 163 (citations omitted). Thus, RICO simply requires a formal legal distinction between the "person" and "enterprise." Id. at 166. "Courts have also recognized that an 'association-in-fact' enterprise can exist—and satisfy the 'distinctiveness' requirement—when it is comprised of members that are a mixture of persons and 'entities that they control.'" United States v. Bergrin, 650 F.3d 257, 266 (3d Cir. 2011).

Here, however, Impala has not alleged an association-in-fact, but rather that the association is a legal entity: A-1. Although the Court was initially of the view that A-1's presence in the case was inconsistent with the requirement of distinctiveness, the fact that A-1 is not named as a defendant in the RICO count requires some pause in considering the sufficiency of Impala's RICO allegations. Considerable research has not yet shown any precedential case in which an entity, which was a defendant in the case, albeit not a defendant in the RICO claim, was either approved or not approved as the "enterprise." Perhaps subsequent research will disclose a precedential ruling on this issue. In the absence of a precedential ruling, the Court has decided to allow the RICO claim go forward with A-1 as the alleged enterprise. Furthermore,

discovery and/or summary judgment motions may show that the continuation of the RICO claim with A-1 as the enterprise is improper.

### (iii) Pattern

A "pattern" of racketeering activity must consist of two or more "predicate acts." Banks v. Wolk, 918 F.2d 418, 424 (3d Cir. 1990). The two predicate acts must (1) have occurred within ten years after the commission of one another; (2) be related; and (3) "amount to or pose a threat of continued criminal activity." Bergrin, 650 F.3d at 267 (quoting H.J., Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)). The Supreme Court has interpreted the "related" requirement to mean that "predicate acts are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Tabas v. Tabas, 47 F.3d 1280, 1292 (quoting H.J., Inc., 492 U.S. at 240). The Supreme Court interpreted the second, continuity, prong to mean "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." Id. (quoting H.J., Inc., 492 U.S. at 241).

### (iv) Racketeering Activity

Section 1961(1) lists the "criminal activities that constitute predicate acts for purposes of RICO." Warden v. McLelland, 288 F.3d 105, 114 (3d Cir. 2002). Such activity includes mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and a long list of specifically enumerated "predicate acts." See Annulli v. Panikkar, 200 F.3d 189, 200 (3d Cir. 1999) (noting that § 1961(1)'s "list of acts constituting predicate acts of racketeering is exhaustive"), abrogated on other grounds by Rotella v. Wood, 528 U.S. 549 (2000).

43

Section 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. 6 1962(d). The elements of a claim under § 1962(d) therefore include: (i) an agreement to commit the alleged predicate acts, and (ii) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b), or (c)." Freedom Med. Inc. v. Gillespie, 634 F. Supp. 2d 490, 515 (E.D. Pa. 2007).

In its questions to counsel prior to and at the oral argument on the Defendants' Motion to Dismiss, the Court was clearly troubled by the RICO allegations in this case, which seem largely different from the RICO precedents by the Supreme Court and the Third Circuit which this Court must follow. Most, but not all, of the predicate acts and other allegations concern topics which have been the subject matter of litigation between the parties in this Court, and in the Bucks County and Burlington County state law proceedings, which have been settled. There are some other allegations that have come forward that were not subsumed in these litigations. There does not appear to be any precedential RICO case where so much in-court court litigation conduct has been approved as a predicate act or as a racketeering act, particularly when the prior litigation filings encompass so much of the Amended Complaint's current allegations.

Notwithstanding the unique nature of Impala's allegations, the Supreme Court and the Third Circuit have given RICO liberal interpretation and the Court believes that these precedential cases thus require denial of the motion to dismiss. The Court may revisit this when dispositive motions are filed.

## F. Civil Conspiracy

Alliance and Kumar move to dismiss Impala's claim for civil because, first, such claim is duplicative of Impala's PUFTA claims, and second, because Impala's contention that Defendants

44

engaged in a coordinated conspiracy to disadvantage Impala, through years of expensive and highly contentious litigation amongst themselves, belies both common sense and the pleading requirements of Iqbal and Twombly.  (Alliance Br. at 22-23).  Suresh and Leena argue additionally that Impala's conspiracy claim is barred to the extent such claim is based on underlying claims which are themselves time-barred.[14]  (S&L Br. at 17).

The elements for a claim of civil conspiracy in Pennsylvania are: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." General Refractories Co. v. Fireman's Fund Ins., 337 F.3d 297, 313 (3d Cir. 2003) (quoting Strickland v. Univ. of Scranton, 700 A.2d 979, 987-88 (Pa. Super Ct. 1997)).  "Proof of malice is an essential part of a cause of action for conspiracy, and malice requires that the conspirators act with the sole purpose of injuring the plaintiff." Sarpolis v. Tereshko, 625 Fed. App'x 594, 601 (3d Cir. 2016) (citations omitted); see also Becker v. Chi. Title Ins. Co., No. 03-2292, 2004 WL 228672, at *13 (E.D. Pa. Feb. 4, 2004). Thus, "where the facts show that a person acted to advance his own business interests, and not solely to injure the party injured, those facts negate any alleged intent to injure." Id.

Recently, the Third Circuit affirmed a district court decision dismissing a claim for civil conspiracy where the plaintiff's complaint "explicitly" averred that "all parties reaped financial or career benefits" at the plaintiff's expense as a result of the alleged conspiracy. Sarpolis v. Tereshko, 26 F. Supp. 3d 407, 423 (E.D. Pa. 2014), aff'd, 625 Fed. App'x 594, 601 (3d Cir. 2016). The district court thus determined that because by the plaintiff's "own admission the intent of the conspiracy was not to harm" the plaintiff, but for the defendants "to advance their

---

[14]    Om incorporates by reference the arguments made in support of dismissing Impala's claim for civil conspiracy in Alliance and Kumar's moving brief, as well as in Suresh and Leena's moving brief. (Om Br. at 16).

respective personal and business interests," the plaintiff had not, nor could not allege that the defendants solely intended to harm the plaintiff. Id. at 423-24.

Similarly, here Impala alleges in its claim for civil conspiracy that, "[i]*n addition to*" rendering A-1 judgment proof from Impala's claims as a creditor, Defendants "enrich[ed] themselves." (Am. Compl. ¶ 183 (emphasis added)). Accordingly, Impala has failed to state a civil conspiracy claim because it did not sufficiently plead that Defendants had the sole purpose of injuring it. In addition, the Court agrees with Alliance that Impala's civil conspiracy claim is duplicative of the PUFTA claims, which survive Defendants' motion subject to the outlined recovery period. As a consequence, the Court will grant Defendants' motion and dismiss Impala's claim for civil conspiracy.

## G. Aiding and Abetting

Alliance and Kumar argue that Impala's claims for aiding and abetting breach of fiduciary duty and conversion must be dismissed for three reasons. First, dismissal is warranted because many of the underlying claims are time-barred. Second, Impala's aiding and abetting claims must be dismissed because Impala lacks standing to assert the underlying claims of breach of fiduciary duty and conversion. And third, Impala's allegation of substantial assistance on the part of Defendants to help each other in wasting A-1's assets to avoid satisfying Impala's claims fails under the federal pleading requirements, particularly in light of the years Defendants spent in acrimonious and contentious litigation with one another. (Alliance Br. at 17 n.11). Suresh and Leena make these same arguments in their motion to dismiss. (S&L Br. at 9-11).[15]

The elements for a claim of aiding and abetting are: "(1) the commission of a wrongful act; (2) knowledge of the act by the alleged aider-abettor; and (3) the aider-abettor knowingly

---

[15]     Om incorporates by reference the arguments made in support of dismissing Impala's aiding and abetting claims in Suresh and Leena's moving brief. (Om Br. at 16).

and substantially participating in the wrongdoing." Morganroth & Morganroth v. Norris,

McLaughlin & Marcus, P.C., 331 F.3d 406, 415 (3d Cir. 2003). Here, Impala alleges that

Defendants aided and abetted the wrongful acts of breach of fiduciary duty and conversion.

Because the Court is dismissing Impala's claim for conversion, so too will the Court dismiss

Impala's claim for aiding and abetting conversion. In addition, because Impala's claim for

aiding and abetting breach of fiduciary duty is duplicative and may be sufficiently addressed in a

jury charge, the Court will dismiss Impala's claim for aiding and abetting breach of fiduciary

duty.

## H. Declaratory Judgment Act

Om has moved to dismiss Impala's Declaratory Judgment claim because, since the

underlying claims must be dismissed for either failure to state a claim or for being time-barred,

there is no basis for this Court's granting a declaratory judgment in favor of Impala. (Om Br. at

17). Impala did not oppose this argument in its opposition brief.

The federal Declaratory Judgment Act provides that "[i]n a case of actual controversy

within its jurisdiction, . . . any court of the United States . . . *may* declare the rights and other

legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a) (emphasis

added). The U.S. Supreme Court has declared that "[d]istrict courts possess discretion in

determining whether and when to entertain an action under the Declaratory Judgment Act, even

when the suit otherwise satisfies subject matter jurisdictional prerequisites." Wilton v. Seven

Falls Co., 515 U.S. 277, 282 (1995). The Court further explained that the Declaratory Judgment

Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right

upon the litigant." Id. at 287 (internal quotation marks and citations omitted). The Third Circuit

Court of Appeals has concluded that a court may *sua sponte* exercise its discretion not to hear a

case under the Declaratory Judgment Act. <u>State Auto Ins. Cos. v. Summy</u>, 234 F.3d 131, 136 (3d Cir. 2000).

To gain Article III standing, which is required in order to establish a justiciable case or controversy, a plaintiff must identify "(1) a cognizable injury that is (2) causally connected to the alleged conduct and is (3) capable of being redressed by a favorable judicial decision." <u>Williams v. BASF Catalysts LLC</u>, 765 F.3d 306, 327 (3d Cir. 2014) (quoting <u>Pa. Family Ins., Inc. v. Black</u>, 489 F.3d 156, 165 (3d Cir. 2007)). However, "[e]ven when a case falls within these constitutional boundaries, a plaintiff may still lack standing under the prudential principles by which the judiciary seeks to . . . limit access to the federal courts to those litigants best suited to assert a particular claim." <u>Gladstone Realtors v. Village of Bellwood</u>, 441 U.S. 91, 99-100 (1979). In order to establish prudential standing, a plaintiff must show, among other things, that she is asserting her "own legal interests rather than those of third parties." <u>Phillips Petroleum Co. v. Shutts</u>, 472 U.S. 797, 804 (1985).

Under the circumstances of this case, the Court declines to exercise its discretion to hear a declaratory judgment action against Defendants. Impala lacks prudential standing because it seeks a declaration about third parties' legal interests rather than its own. Accordingly, the Court will grant Om's motion and dismiss Impala's Declaratory Judgment Act claim.

## VI. CONCLUSION

For the foregoing reasons the Court grants in part and denies in part Defendants' Motion. An appropriate Order follows.

O:\CIVIL 16\16-1343 Impala v. A-1\Memo re Motion to Dismiss Am Compl.docx

48