## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IMPALA PLATINUM HOLDINGS LIMITED, et al.**<br><br>v.<br><br>**A-1 SPECIALIZED SERVICES AND SUPPLIES, INC., et al.** | **CIVIL ACTION**<br><br>**NO.  16-1343** |

Baylson, J.                                                                          March 3, 2017

### MEMORANDUM RE: MOTIONS FOR SUMMARY JUDGMENT

Several motions for summary judgment may mark a closing coda in related disputes that have spanned many years and spawned at least four other lawsuits.  Defendants Om P. Khosla ("Om"), Leena Khosla ("Leena"), Ashok Kumar Khosla ("Kumar"), Suresh Khosla ("Suresh") (collectively, "Individual Defendants"), Alliance Industries Limited ("Alliance"), A-1 Specialized Services & Supplies, Inc. ("A-1") (collectively, with Om, Leena, Kumar, and Suresh, "Defendants"), Slogam Limited Partnership ("Slogam"), Michael O'Hayer, and Impala Platinum Holdings Limited and Impala Refining Services Limited (collectively, "Impala") all move for summary judgment.

Fundamental to an understanding of the Court's determination of the genuine issues of material fact that preclude summary judgment on all but one of the pending claims, is the following:

1.      A-1, owned by Individual Defendants in varying percentages, and at one time having enjoyed revenues of close to $1 billion for its precious metals processing operations, was insolvent at least beginning in 2012 and perhaps earlier.

2.      Defendants were aware of their indebtedness to Impala, the South African entity that had loaned approximately $200 million to A-1 (on an unsecured basis), and was seeking repayment.

3.      Defendants were aware that they were subject to pending arbitration in London, on which Impala had a high chance of success and which would have likely led to a judgment in this

1

Court enforceable against A-1.

4.     Defendants had bona fide disputes among themselves which they alleged in lawsuits filed in the Bucks County Court of Common Pleas, in the Superior Court in Burlington County, New Jersey, and in a prior case in this Court.  These lawsuits were settled via agreements that a jury could find were arrived at, at least in substantial part, to derive the maximum assets of A-1 for the benefit of Defendants, rather than for the benefit of Impala.

5.     There is substantial evidence in the record of disproportionate distributions to the various shareholders, which were allegedly remedied by the settlements.  Although Defendants contend that the ultimate results of the settlements, together with the earlier distributions, may reflect a concept of "fair value," Impala has shown substantial facts that could lead a jury to the contrary; that is, that the distributions were designed to, surreptitiously, secretly, and in substantial dollar amounts, divert funds from A-1 to Defendants that would have otherwise been available to satisfy the debt owed to Impala.

6.     Impala has also shown that the settlements resulted in the receipt of secured interests on A-1's assets by certain Defendants, which they were not entitled to under any corporate document or by virtue of their position as shareholders.  A jury could find that the secured interests were given to Defendants so they would have a better legal position vis-à-vis Impala, which was an unsecured creditor of A-1.

## I.     Facts

The factual bases for this case have been the subject of two lawsuits before this Court – the instant one, and Alliance Industries Limited v. A-1 Specialized Services & Supplies, Inc., No. 13-2510.  We have, therefore, already written about them at length, and will only summarize them here to

the extent necessary for ruling on the pending motions.[1]

### A. Relationship between A-1 and Impala

At the crux of this case is the relationship, once strong, now soured, between two corporations: A-1 and Impala.  A-1, a closely-held Pennsylvania corporation, has been in the business of recycling salvaged autocatalyst from catalytic converters since the 1980s and has enjoyed great success throughout its existence, reaching peak profits in the hundreds of millions of dollars.  This success is partially due to A-1's relationship with Impala, the shorthand designation for two South African companies which focus on the mining, smelting, and refining of platinum group metals ("PGM").  ECF No. 259, Defs.' Counterstatement of Facts and Additional Facts in Support of Defs.' Mot. for Summary Judgment ("DCF") ¶¶ 19-20.  PGM are the material contained within automobiles' catalytic converters that reacts with the cars' exhaust fumes in such a way as to reduce harmful exhaust emissions prior to their discharge into the environment.  Id. ¶¶ 9-11.  PGM are therefore a necessary component in catalytic converters.  They are, in addition, able to be recycled over and over if successfully extracted from used catalytic converters.  Id. ¶ 12.

Beginning in 1998, A-1 and Impala worked together to purchase used catalytic converters and smelt and refine the PGM materials they held, such that the PGM could then be sold on the open metals market and to car companies.  Id. ¶ 43.  At the core of the relationship was Impala's advance to A-1 of significant sums of money to fund A-1's operations.  Id. ¶¶ 41, 55, 57.  The arrangement between the parties seemingly worked to the advantage of both until the financial crisis of 2008, which greatly diminished the market value of PGM and therefore hindered A-1's ability to repay Impala for the advances Impala had made.  Id. ¶¶ 58, 67.  The companies made several attempts at normalizing business relations, specifically by entering into various agreements to address both A-1's need for

---

[1] Interested parties who seek further information on the facts underlying these claims are directed to <u>Impala Platinum Holdings Limited, et al. v. A-1 Specialized Services & Supplies Inc., et al.</u>, No. 16-1343, 2016 WL 8256412 (E.D. Pa. Sept. 16, 2016) and <u>Alliance Industries Limited v. A-1 Specialized Services & Supplies, Inc.</u>, No. 13-2510, 2015 WL 4943471 (E.D. Pa. Aug. 19, 2015).

advances in order to continue its operations and Impala's concomitant need for repayment on its loans. See, e.g., id. ¶¶ 69, 76.  Notwithstanding these efforts, the relationship between A-1 and Impala deteriorated beyond repair and, in April 2013, Impala initiated litigation to attempt to collect on A-1's debt, the result of which was an award of over $200 million entered by the London Court of International Arbitration ("LCIA") in December 2015.  Id. ¶¶ 157, 165; ECF No. 218, Pls.' Statement of Undisputed Facts in Support of Mot. for Partial Summary Judgment ("PSOF") ¶ 11.  That award was entered as a judgment in this Court on April 26, 2016.  Impala Holdings Ltd., et al. v. A-1 Specialized Servs. & Supplies, Inc., No. 13-2930, ECF No. 79.[2]

### B. Individual Defendants

The four individuals whose liability is the focus of this case are Individual Defendants Kumar, Suresh, Om, and Leena.  Kumar is a 31% shareholder of A-1, has been co-CEO since May 29, 2015, and was a director until February 2016.  PSOF ¶ 5.  Suresh is a 32% shareholder and a director of A-1, and was an officer (President) of A-1 until he resigned in June 2014.  Id. ¶ 3.  Om is a 32% shareholder and a director of A-1.  Id. ¶ 4.  Leena is the wife of Suresh, a 5% shareholder and a director of A-1.  Id. ¶¶ 2, 6.  Therefore, it is undisputed that Kumar, Suresh, Om, and Leena were all shareholders and directors when the purportedly fraudulent settlement agreements were executed, in May and September 2015.

### C. Litigations

#### a. Burlington County Action

On March 20, 2013, A-1 filed suit against Kumar in the Superior Court of New Jersey, Burlington County ("Burlington County Action") in which it sought repayment of a $15 million transfer made from A-1 to Kumar in 2012.  PSOF ¶ 35, Ex. V (Burlington County Complaint).  Kumar had used those funds to purchase the shares of another individual, Sudhir Chopra, in Alliance and

---

[2] The cited case, civil action number 13-2930, involves the same parties and same disputes as those at issue in the instant matter and was consolidated by Order of this Court with the instant action on August 15, 2016.  See ECF No. 48.

Alliance Industries FZC, owners of precious metals.  See Alliance v. A-1, 2015 WL 4943471, at *1.

Kumar contended, and still maintains, that the money transferred to him was a shareholder distribution,

while A-1 characterized it as a loan.  DCF, Ex. A (Kumar Aff.) ¶ 30; PSOF, Ex. V ¶ 1.

### b.  Alliance Action

On May 7, 2013, Alliance filed a complaint against A-1 in this Court ("Alliance Action"),

alleging breach of contract and unjust enrichment in regard to certain precious metal leases entered into

between itself and A-1.  PSOF, Ex. X (Alliance Complaint, No. 13-2510) ¶ 1.  Alliance Industries FZC

was later added as a plaintiff.  Alliance v. A-1, 2015 WL 4943471, at *2.

### c.  Bucks County

On June 19, 2013, Om filed suit against Kumar, Suresh, and A-1 in the Bucks County Court of

Common Pleas ("Bucks County Action"), alleging breach of fiduciary duty, breach of contract,

conversion, and unjust enrichment, arising out of A-1's failure to pay him distributions in proportion to

his ownership interest in A-1 from 2000 to 2012.  PSOF, Ex. G (Bucks County Complaint) ¶ 52.

Although Leena was not a party to the case, it is undisputed that she stood in a similar situation to Om

in that she, too, was not paid proportionate distributions by A-1 for at least 2008, and possibly prior

years.  DCF ¶ 201.

### D.  Settlements

### a.  Bucks County Settlement

On May 29, 2015, the parties executed a settlement agreement ("Bucks County Settlement")

resolving the claims at issue in the Bucks County Action.  PSOF, Ex. NN.  Pursuant to the agreement:

- A-1 agreed to pay Om $10 million, with $3.5 million payable immediately
  and $6.5 million payable in 21 monthly installments of $300,000.  DCF ¶
  244.

- A-1 gave Om a promissory note and security interest in all of its assets and

inventory in order to secure the $6.5 million owed.  Id. ¶ 245.

- A-1 agreed to pay Leena $1.5 million.  Id. ¶ 248.

- Kumar agreed to pay Om $2.5 million.  Id. ¶ 251.

- Suresh agreed to pay Om $2.5 million.  Id. ¶ 252.

    **b. Alliance Settlement**

On September 15, 2015, the parties entered into a settlement agreement which concluded both the Alliance Action and the Burlington County Action ("Alliance Settlement").  Id. ¶ 329; PSOF, Ex. VV.  Pursuant to the agreement:

- A-1 agreed to pay Alliance $5.6 million upon the retirement of A-1's debt to Om and Leena under the Bucks County Settlement, or in June 2017, whichever was sooner.  PSOF ¶ 110(a).

- A-1 gave Alliance a security interest to secure payment of the $5.6 million. Id. ¶ 110(b).

- A-1 agreed to pay Alliance $10 million on a monthly basis, with a balloon payment of the balance plus interest due in 2030.  Id. ¶ 110(c).

- A-1 gave Alliance a promissory note which authorized Alliance to confess judgment against A-1 for the amount due under the note upon the occurrence of an event of default, including A-1 becoming insolvent.  Id. ¶ 110(d).

- A-1 consented to the entry of a $20 million judgment in favor of Alliance, and agreed that Alliance could execute on the judgment in the event Impala sought to enforce an arbitration award against A-1.  Id. ¶ 110(e).

- A-1 gave Leena a security interest to secure payment of the $1.5 million that A-1 agreed to pay her in the Bucks County Settlement.  Id. ¶ 110(f).

- A-1 agreed to reduce its $15 million claim against Kumar from the

Burlington County action, by:

- o $2.5 million based on Kumar's agreement to pay Om $2.5 million in the Bucks County Settlement;

- o $1 million for expenses allegedly incurred by Kumar; and

- o $6 million as cancelled indebtedness income.  Id. ¶ 110(g).

- Kumar agreed to pay A-1 $5.5 million on a monthly basis, with a balloon payment of the balance plus interest due in 2030.  Id. ¶ 110(h).

### E.  Receiver Appointed

On June 21, 2016, by Order of this Court, Charles Persing was appointed as Receiver for A-1, "to take control, custody, and management of the tangible personal property and assets of A-1, as well as A-1's accounts receivable."  ECF No. 22, Receivership Order ¶ 2.

## II.   Procedural History

We refer to our opinion dated September 16, 2016 for the procedural history of this case from its filing in 2013.  See Impala v. A-1, 2016 WL 8256412, at *3.  Since that opinion, the parties have engaged in extensive discovery, and the Court has heard several oral arguments relating to discovery motions as well as motions to establish the status in this case of Defendants Rajesh Seth and Michael O'Hayer.  See e.g. ECF Nos. 93, 124, 139 (hearing transcripts).  On January 20, 2017, pursuant to this Court's scheduling Order dated October 24, 2016 (ECF No. 129), all parties submitted motions for summary judgment.  See ECF No. 211 (Slogam); ECF No. 213 (Defendants); ECF No. 216 (Michael O'Hayer); ECF No. 217 (Impala).

Each party moved for summary judgment on all counts except for Impala, which only moved on Count I (actual fraudulent transfer), Count II (constructive fraudulent transfer), and Count III (breach of fiduciary duty).  On February 7, 2017, the Court entered an Order in which it granted Rajesh Seth's Motion to Extend Stay of Proceedings and held that the claims against Mr. Seth would be the

subject of separate, prompt proceedings.  See ECF No. 246.  Therefore, this memorandum does not

address the claims against Mr. Seth.  Additionally, in the February 7, 2017 Order, the Court allowed

Mr. O'Hayer to withdraw as counsel for A-1 and held that because no party is seeking damages against

A-1, A-1 was a nominal party and had no need for counsel.  See id.  On February 10, 2017, all parties

submitted responsive briefs on the pending motions for summary judgment.  See ECF Nos. 249, 250,

252 (Impala); ECF No. 256 (O'Hayer); ECF No. 258 (Defendants).  On February 17, 2017, all parties

submitted reply briefs.  See ECF No. 266 (Slogam); ECF Nos. 267, 270 (Defendants); ECF No. 268

(Michael O'Hayer); ECF No. 276 (Impala).  Extensive oral argument was held on February 27, 2017.

      As stated in our February 28, 2017 Order ruling on these motions, the claims against Michael

O'Hayer are severed and stayed and his motion for summary judgment will be held under advisement

pending the trial.  See ECF No. 284.  Therefore, the discussion below does not affect claims against Mr.

O'Hayer.  We additionally decided in our February 28, 2017 Order that the motion of Suresh would be

under advisement pending receipt of his medical report.  Having considered the report, we held on

March 3, 2017 that Leena, as Guardian for Suresh, shall be substituted in the caption for him as his

representative in this matter and that Suresh will not be required to appear at trial as a witness.  See

ECF No. 288.  The case against Suresh nevertheless continues, and the findings below apply to him

equally as they do to the other defendants.

## III.    Legal Standard

      A district court should grant a motion for summary judgment if the movant can show "that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing

law."  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, "by citing to particular parts of materials in the record" set out specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(c)(1)(A).  "Speculation and conclusory allegations do not satisfy [the non-moving party's] duty."  Ridgewood Bd. of Educ. V. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999) (superseded by statute on other grounds as recognized by P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. 2009)).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Id.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

## IV.    Analysis

We start by noting that our September 16, 2016 decision on Defendants' Motion to Dismiss the Amended Complaint contained extensive discussion of the legal standards at issue in the motions currently before the Court.  See Impala v. A-1, 2016 WL 8256412.  Consequently, we will not restate those aspects of the applicable law.  Instead, we heed the mandate of Rule 56 to identify the "genuine dispute[s] as to . . . material fact" that preclude summary judgment on all claims except those under Count VI for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  Fed. R. Civ. P. 56.

### A.  Count III – Breach of Fiduciary Duty

The Court begins its analysis on the motions for summary judgment with Impala's claim against each Individual Defendant for breach of fiduciary duty.  As the discussion of Pennsylvania law in the Court's memorandum on Defendants' Motion to Dismiss shows, corporate directors have a very high obligation which settled precedent has extended to corporate creditors.  It is not possible, on the present record, to ignore Impala's evidence that Individual Defendants knew, or should have known, that A-1 was insolvent, most certainly after 2012, if not before.  With this knowledge, Impala has valid arguments, which may or may not be accepted by a jury, that Individual Defendants countenanced the distribution of very large amounts of money, and received security interests in the assets of A-1, handicapped with the knowledge that A-1 was insolvent and the likelihood of its becoming solvent was remote.

In support of this, we point to one document in particular, the significance of which we cannot determine as a matter of law.  On May 27, 2015, two days prior to the execution of the Bucks County Settlement, attorneys for Kumar and Om, in a string of emails, discussed whether to include in the settlement a statement that A-1 is solvent.  <u>See</u> PSOF, Ex. MM.  The attorneys' communication could be inferred by a jury to show certain defendants' knowledge of A-1's insolvency prior to signing the Bucks County Settlement, which provided for the transfer of significant funds to company insiders.

We further find a disputed issue of fact regarding the disclosure of the material terms of both the Bucks County and Alliance Settlements to Impala.  <u>Compare</u> PSOF, Ex. L (Dep. Tr. of O'Hayer) at 169-170 (stating that copies of the settlements were not provided to Impala until January 2016) <u>with</u> DCF ¶ 274, Ex. A (Kumar Aff.) ¶¶ 44, 46 (material terms of Bucks County Settlement were provided to Brenda Berlin on May 20, 2015 and on June 12, 2015), Ex. T (O'Hayer Aff.) ¶ 39 (transcript associated with Bucks County Settlement is available for public inspection in office of Prothonotary of Bucks County).  Additional factual disputes as to the issue of Impala's knowledge were the subject of

argument on February 27, 2017.

### B. Count VIII – Deepening Insolvency

The circumstances of this case are such that Impala's claim for deepening insolvency is closely related to its cause of action for breach of fiduciary duty. We find sufficient fact issues to preclude summary judgment on this claim, as well.

To bring a cause of action for deepening insolvency, the plaintiff must show "an injury to [a debtor's] corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 347 (3d Cir. 2001). As stated in Lafferty, and reiterated in In re CitX Corp., Inc., 448 F.3d 672 (3d Cir. 2006), the plaintiff must allege fraudulent, not merely negligent, conduct led to the company's worsened financial state. See Lafferty, 267 F.3d at 349; CitX Corp., Inc., 448 F.3d at 681. Whether fraudulent transfers under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA") are capable of satisfying the fraud aspect of a deepening insolvency claim is not at all clear, contrary to Defendants' arguments. See ECF No. 267, Defs.' Reply at 10. While the court in the seminal case of In re Lemington Home for the Aged, 659 F.3d 282 (3d Cir. 2011) cited the common-law definition of fraud when it described the type of claim necessary to support a deepening insolvency cause of action, it nowhere foreclosed the possibility that other types of fraudulent conduct could also support such a claim. See id. at 294. Our conclusion on this point is further bolstered by the Supreme Court's recent decision in Husky International Electronics, Inc. v. Ritz, 136 S.Ct. 1581 (2016) holding that "actual" fraud" as defined in the bankruptcy code's discharge exception "encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." Id. at 1586. Although Husky does not directly bear on the instant matter, it evidences a jurisprudential trend towards a broadened conception of "fraud" and therefore supports a finding that a fraudulent conveyance can be the basis for a deepening insolvency claim.

11

We further disagree with Defendants' contention that Impala has failed to show a dispute as to whether the settlements resulted in a quantifiable injury to A-1's corporate property.  We do not read either Lemington Home or the subsequent decision of In re Lemington Home for the Aged, 777 F.3d 620 (3d Cir. 2015) as requiring Impala to identify a specific dollar amount lost as a result of the allegedly fraudulent transactions in order to survive summary judgment.  Rather, with the limited precedent that exists on this cause of action, we conclude that Impala has shown disputed issues of fact regarding Defendants' intent in entering into the Bucks County and Alliance Settlements and whether the settlements, and Defendants' subsequent conduct, caused A-1 to incur additional debt that worsened its insolvency.[3]

### C.  Count VI – Racketeer Influenced and Corrupt Organization Act ("RICO")

The RICO claim presents the most difficult analysis of those at issue in the motions before the Court.  Impala has brought its RICO claim pursuant to 18 U.S.C. § 1962(c), which prohibits racketeering and unlawful debt collection, and 18 U.S.C. § 1962(d), which prohibits conspiring to violate one of the other RICO sections.  Only Suresh, Kumar, Om, Leena, and Alliance ("RICO Defendants") are named defendants on this claim.

The precedents have clearly established that despite its noted intent of curbing organized crime, RICO, by virtue of the broad language used by Congress, has been construed to hold "routine" business transactions as subject to RICO liability if the statutory elements have been met.  See Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497-98 (1985) ("RICO is to be read broadly.  This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'") (internal citations omitted) (quoting Pub. L. 91-452, § 904(a), 84 Stat. 947).  We note that neither any

---

[3] We note that four judges on the Third Circuit have recently stated that Lafferty's recognition of a deepening insolvency cause of action "is problematic, and at the earliest appropriate opportunity its conclusion should be revisited."  Lemington Home for the Aged v. Baldwin, 781 F.3d 675, 677 (3d Cir. 2015).  But, until and unless that takes place, we are bound to apply the law as established in Lafferty.  See Lemington, 777 F.3d at 630 n.2 (affirming jury's verdict on deepening insolvency and stating "we continue to be bound to follow Lafferty unless it is overturned by our Circuit sitting en banc").

counsel in this case nor the Court has been able to find a decision with facts arguably close to the facts of this case, in which a RICO claim is either permitted to proceed or dismissed.

The Court will engage in the RICO analysis by closely examining the three statutory elements that are in dispute – "enterprise," "racketeering activity" (i.e. predicate acts), and "pattern." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 362 (3d Cir. 2010) (in order to plead a violation of § 1962(c), the plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity").

### i. Enterprise

Impala alleges that A-1 was the enterprise through which RICO Defendants perpetrated their racketeering activities. As recognized by the Supreme Court and the Third Circuit, "[t]he RICO statute 'describes two categories of associations that come within the purview of the 'enterprise' definition. The first encompasses organizations such as corporations and partnerships, and other 'legal entities.' The second covers any union or group of individuals associated in fact although not a legal entity.'" In re Ins. Brokerage Antitrust Litig., 618 F.3d at 364 (quoting U.S. v. Turkette, 452 U.S. 576, 581-82 (1981)). Proving the enterprise element is less difficult where the enterprise alleged is a legal entity. Id. A-1 is indisputably an "enterprise" insofar as it is a legal entity, but it may not be sufficiently distinct from RICO Defendants in order to qualify as an "enterprise" under RICO. See ECF No. 213, Defs.' Mot. for Summary Judgment ("Defs.' Mot.") at 10-12.

### a. Distinctiveness

Under Third Circuit precedent, "a viable § 1962(c) action requires a claim against defendant 'persons' acting through a distinct 'enterprise.'" Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 268 (3d Cir. 1995). Therefore, a plaintiff "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). This

distinctiveness requirement was elucidated in <u>Cedric Kushner</u>.  There, the Supreme Court recognized that one person, president, employee and sole shareholder (Don King) could be distinct from the closely held corporation (Don King Productions).  <u>Id.</u> at 160.  The Court explained that

> "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that. . . . [L]inguistically speaking, the employee and the corporation are different 'persons,' even where the employee is the corporation's sole owner.  After all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs."  <u>Id.</u> at 163 (citations omitted).

Thus, RICO simply requires a formal legal distinction between the "person" and "enterprise."  <u>Id.</u> at 166.  Here, Impala alleges that A-1 is a RICO enterprise, through which RICO Defendants conducted a "pattern of racketeering activity," including the negotiation of, and entry into, the Bucks County and Alliance Settlements.  ECF No. 40, Amended Cmplt. ¶¶ 166, 169; ECF No. 273, Pls.' Counterstatement of Additional Material Facts in Opp'n to Defs.' Mot. ("PCF") ¶¶ 49, 50, 53, 55, 56.  RICO Defendants argue that, when one takes a holistic view of Impala's claims, there is no distinction between themselves and A-1 because the RICO claim depends on the settlement agreements being fraudulent conveyances, and that conclusion would rest on A-1's culpability.  Defs.' Mot. at 11 ("The fact that A-1 would be the culpable party under PUFTA for the very same conduct on which . . . RICO Defendants would then be the culpable parties under RICO is where the issue of 'distinctiveness' comes to a head.").  Impala responds that there is no rule "maintaining that a RICO enterprise cannot be a defendant on any count, including non-RICO counts" and states that it does not "cast [A-1] as the 'victim' in the RICO Count and as the 'perpetrator' in the PUFTA Counts."  ECF No. 250, Impala Opp'n to Defs.' Mot. for Summary Judgment ("Impala Opp'n") at 10-11 (emphasis omitted).  Rather, Impala argues that its theory of the case is consistent throughout: "the Khoslas and Alliance looted A-1's assets and took them for themselves."  <u>Id.</u> at 11.

We were initially dubious of Impala's allegation that A-1 was an enterprise due to the

distinctiveness issue, but, after a thorough review of the law, came to the conclusion in our last opinion that there was no "precedential case in which an entity, which was a defendant in the case, albeit not a defendant in the RICO claim, was either approved or not approved as the 'enterprise.'" Impala v. A-1, 2016 WL 8256412, at *21. After engaging in this research anew for purposes of ruling on these motions, we come to the same conclusion. Indeed, RICO Defendants primarily rely on Cedric Kushner, which this Court already found insufficient to dismiss Impala's claims and which allows for a very minimal, and formalistic, concept of distinctiveness. See id. RICO Defendants further base their contention on In re Yelverton, No. 09-414, 2014 WL 7141938 (Bankr. D.D.C. Dec. 12, 2014), but this case is neither precedential nor persuasive. In Yelverton, the court dismissed the plaintiff's RICO claim against a bankruptcy estate because the plaintiff had failed to allege that the estate was "comprised of persons associated together for a common purpose" other than the purpose to "commit fraud and thereby 'loot' the . . . estate." Id. at *13. Such a purpose was clearly not shared by the estate, as the plaintiff himself had filed it and he did not allege that "the purpose of his bankruptcy was fraudulent." Id. At issue in the instant matter is a wholly different question: whether A-1 is distinctive from RICO Defendants. Whereas in Yelverton the entity lacked an identifiable purpose, here A-1 certainly had a purpose shared by the persons who comprised it – the maintenance of a successful autocatalyst recycler business. Indeed, A-1 is "a legitimate business or organization," meaning that "the need to allege and prove the existence of enterprise structure can be met without great difficulty." In re Ins. Brokerage Antitrust Litigation, 618 F.3d at 364. Yelverton does not support RICO Defendants' position on the distinctiveness issue.

We cannot declare as a matter of law that A-1 cannot be an enterprise under RICO while simultaneously named as a defendant under the PUFTA claims. This is especially true being that there have been no further Supreme Court or Third Circuit cases since Cedric Kushner that address a similar situation.

### ii. Racketeering Activity – Predicate Acts

Section 1961(1) enumerates various statutes, the violation of which can constitute a predicate act and therefore "racketeering activity" for purposes of RICO.  Included in the list of offenses are mail fraud and wire fraud, and these are the only predicate acts alleged by Impala.  18 U.S.C. § 1961(1); PCF ¶¶ 49, 50, 53, 55, 56.

### a. Draft MacMinn Email to O'Hayer[4]

We start with a discussion of the possible import of the email dated December 17, 2014 ("MacMinn Email").  See PSOF, Ex. EE.  Impala has alleged that this email, authored by William MacMinn and sent to Mr. O'Hayer at a time when Mr. MacMinn represented Suresh, was the first in a series of predicate acts.  The Court heard extensive discussion about this document at oral argument and now rejects Impala's suggestion that it can constitute a predicate act in this case.

Initially, it is undisputed that the email is a draft prepared for possible future transmission to Suresh, Mr. MacMinn's client.  Although defense counsel contends that the document was privileged, inadvertently produced, and is subject to "claw back," the Court refuses to characterize it as containing privileged communications.  The email relates facts gained by Mr. MacMinn from discussions with other counsel, including counsel for Om and Kumar; however, it does not indicate that it is being drafted in response to Suresh having requested advice.  In the last paragraph, Mr. MacMinn is clear that he had not, as of the date of the document, discussed these issues with Suresh.  Thus, the document can only be characterized as attorney work product, and because it contains significant facts about Mr. MacMinn's discussions with other counsel which led up to the Bucks County Settlement, and other actions that were taken, some of which Impala claims support its RICO allegations, the Court rejects any claim of privilege in the email's contents.  We therefore conclude that it may be admissible

---

[4] The Court notes that the case relied on by Impala to show that discussions between and among counsel can be imputed to Defendants and relied on to hold Defendants liable, Link v. Wabash Railroad Co., 370 U.S. 626 (1962), is factually inapposite.  Nevertheless, we need not decide the issue of imputation of counsels' communications to Defendants at this juncture.

for certain purposes.

That said, the Court does not find this document can be construed as a predicate act in support of Impala's RICO claims.  The MacMinn Email reflects Mr. MacMinn's prefatory thoughts about strategy to achieve a settlement.  The Court rejects any allegation by Impala that the institution of the Bucks County, Burlington County, or Alliance Actions was ipso facto fraudulent, or otherwise improper.  The record is undisputed that legitimate and significant disagreements existed among the shareholders of A-1, which they had been unable to resolve among themselves.  The American system of justice provides courts to hear such disputes.  There is no precedent to allow a judge to conclude that the mere filing of litigation, when necessary to resolve legitimate bona fide disputes among the shareholders of a company, can itself be turned into a predicate act under RICO merely because the documents were emailed to other attorneys.  Thus, the fact that a resolution of these lawsuits resulted in a potentially favorable situation for the shareholders of A-1 vis-à-vis Impala, as an unsecured creditor, does not make the initial filing and/or the settlement of the lawsuits improper racketeering or "predicate" acts.  Impala stretches too far in its citations to the contrary.  It is certainly true that Impala has found cases in which lawsuits were fraudulently filed, or conduct within ongoing litigation was considered a predicate act for RICO, but Impala has shown no precedent to allow this Court to conclude that the initial filing of these three lawsuits itself, and their settlements, can be in any way considered improper.

We note that Impala's position on a similar issue was previously rejected.  Impala had contended that the Court should hold that communications between Defendants and their attorneys were not privileged communications due to the so-called "crime-fraud exception."  See ECF No. 150, Impala's Motion to Compel.  Impala argued that any such communications that reflected counsels' desire to improve their client's positions, to Impala's detriment, qualified as satisfying the crime-fraud exception.  In a memorandum previously filed, this Court rejected Impala's position, and cited a

17

number of cases establishing, as settled precedent, that to satisfy the crime-fraud exception, the movant must show that the communications themselves were furthering criminal or fraudulent activity. See ECF No. 239, Memorandum Re: Crime-Fraud Exception. There was no such communication in the large sampling of documents that this Court reviewed *in camera*, and the Court rejected Impala's position.

Likewise, Impala's argument as to what constitutes a predicate act under RICO is overly broad. Defendants knew that Impala was coming after them, through the London arbitration and a possible judgment entered in this Court against A-1. As one possible motivation to settle, Defendants wanted to try to resolve their internal disputes before having to face the Impala judgment. Indeed, there is evidence in the record that Impala refused to negotiate a settlement with Defendants until and unless they had settled their issues among themselves. See DCF, Ex. FF (email dated April 17, 2015 from Impala's CFO, Brenda Berlin, to A-1 stating that one requirement of any settlement proposal from Impala would be "confirmation of a resolution of claims between A-1 and its shareholders"). Thus, Impala's conduct reflects an inherent inconsistency. On the one hand, Impala demanded these settlement agreements as a condition precedent for its entering into settlement discussions with Defendants. And now, after Defendants did indeed settle, Impala asserts that their conduct can be a RICO "predicate act." This cannot be. Impala cannot burn a single candle at both ends, by using the same conduct which it had demanded from Defendants as a basis for a RICO case. Perhaps the legal doctrine of equitable estoppel should apply, but regardless, in the total context of the case, Impala is at least guilty of plain old "chutzpah" that will not fly over this RICO landscape.

Under the RICO statute, communications and settlements conducted in judicial chambers, law offices, A-1's office, or through court filings cannot be predicate acts. Holding that the mere filing and settlement of litigation could be considered predicate acts, absent significant proof of fraudulent misrepresentation, even assuming the jurisdictional requirements of the use of the mail or wire, would

have far reaching and ominous consequences.  Furthermore, finding the MacMinn Email to be a predicate act would not only be beyond the scope of the RICO statute but would also be contrary to public policy.  Attorneys must have the freedom to ruminate, verbally or in writing or by email, about how to structure a settlement or otherwise conduct litigation.  Our justice system encourages settlements, and achieving them should not put a lawyer on the brink of RICO litigation.  Nothing in the settlement record of these cases shows that there was any fraudulent act, or use of the mail or wire to accomplish a fraud, such as backdating, fictitious names, dates, or amounts, e.g., that Impala can point to as constituting a predicate act.

### b.  Other Predicate Acts

The Court views Defendants' conduct after the settlement agreements had been reached in a different light.  As noted above, as a result of these settlements, certain of the defendants received secured interests in the assets of A-1, which they did not previously have.  Viewing the evidence in the light most favorable to Impala, as we must on Defendants' motion for summary judgment, we consider the acquisition of these secured interests as possible predicate acts, to the extent they were effectuated via interstate mail or the wires.  Our finding is based on the fact that Defendants, through the secured interests, obtained a decided advantage over Impala, an unsecured creditor, as to future collection actions that might be taken against A-1.  Therefore, we hold that Impala has shown factual disputes supporting its claims as to the secured interests that Defendants acquired, and these claims may fit into a RICO landscape.

Under the mail fraud statute, 18 U.S.C. § 1341, the elements necessary to establish the offense are: "(1) a scheme or artifice to defraud for the purpose of obtaining money or property and (2) use of the mails in furtherance of the scheme." U.S. v. Yusuf, 536 F.3d 178, 187 (3d Cir. 2008).  The mailing need not be "an essential part of the scheme" but it must be made for the "purpose of executing the scheme." Id. (quoting Kann v. U.S., 323 U.S. 88, 94 (1944)).  Under the wire fraud statute and

19

relevant precedent, the inquiry similarly involves a determination that the defendant used the wires, including email communications, "for the purpose of executing [a] scheme or artifice [to defraud]."  18 U.S.C. § 1343; U.S. v. Georgiou, 777 F.3d 125, 138 (3d Cir. 2015).

Here, Impala asserts several predicate acts, the majority of which are communications among counsel for Defendants negotiating the two settlements.  See PCF ¶¶ 49, 50, 53, 55, 56.  As discussed above in the context of the MacMinn Email, we cannot hold that these communications are mail or wire fraud for purposes of RICO, where no precedent exists for finding that attorney discussions of pending litigation and attempts at the resolution of bona fide cases constitute predicate acts capable of sustaining a RICO claim.  In Swistock v. Jones, 884 F.2d 755 (3d Cir. 1989), relied on by Impala, the situation was markedly different.  There, the plaintiffs alleged that the defendants had falsely represented, via use of the postal service and the wires, the state of certain property in order to induce the plaintiffs' execution of a lease agreement.  Id. at 756-57.  The court held the communications to be predicate acts under RICO.  Id. at 759.  In the instant matter, however, the purported "predicate acts" consist of conversations among counsel alone, without the participation of any defendant, in which the various parties discuss proposed settlement terms.  Even if these communications could be said to reflect Defendants' nefarious intentions regarding Impala and therefore may bear on the other claims at issue, they are distinguishable from the letters sent in Swistock, which were intended to induce the plaintiffs' entry into agreements under false pretenses and via misrepresentation.  See id. at 759. Swistock presents textbook examples of fraud in the inducement, and does not govern the instant situation.

Putting aside the emails exchanged among counsel leading up to the Bucks County and Alliance Settlements, Impala cites other conduct that we hold may in fact constitute predicate acts of wire fraud:

- 6/1/2015 – Om files UCC Financing Statement to perfect security interests in A-1 assets granted to him as part of Bucks County Settlement.  PCF, Ex. 6.

- 11/5/2015 – Leena files UCC Financing Statement to perfect security interests in A-1 assets granted to her as part of Bucks County and Alliance Settlements.  Id.

- 11/16/2015 – Wire transfers from A-1 to Alliance.  Id., Ex. 35 (Wire Records).

- 12/7/2015 – Wire transfers from A-1 to Alliance.  Id.

- 1/5/2016 – Wire transfers from A-1 to Alliance.  Id.

- 2/5/2016 – Wire transfers from A-1 to Alliance.  Id.

- 3/7/2016 – Wire transfers from A-1 to Alliance.  Id.

### iii.  Pattern

Having determined that Impala has pointed to a genuine dispute that certain instances of wire fraud took place, we must determine whether a "pattern" has been identified, as the RICO statute demands.  In order to satisfy the statutory requirement of a "pattern of racketeering activity," Impala "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989) (emphasis omitted).

### a.  Related

Impala has shown that the predicate acts identified fulfill the relatedness requirement, as they involve the same parties and facts and allegedly had the same purpose.  See H.J. Inc., 492 U.S. at 240 (conduct is related for purposes of RICO's pattern analysis "if it embraces . . . acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events").

### b.  Continuous

The continuity prong presents a more difficult hurdle for Impala.  "'Continuity' is both a

closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." H.J. Inc., 492 U.S. at 241.

### i.    Closed-Ended Continuity

A plaintiff can demonstrate closed-ended continuity of racketeering activities "by proving a series of related predicates extending over a substantial period of time." H.J. Inc., 492 U.S. at 242. Specific dictates are hard to glean from the governing law, but it is clear that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." Id. In the Third Circuit, for acts occurring within a closed period of time to constitute continued racketeering activity, there must be more than twelve months between the first and the last act. See Tabas, 47 F.3d at 1293. Because the earliest predicate act Impala has identified occurred on June 1, 2015 and the latest one occurred on March 7, 2016, Impala has failed to show "a closed period of repeated conduct" under governing precedent. See H.J. Inc., 492 U.S. at 241.

### ii.    Open-Ended Continuity

Impala has further failed to show that any defendant engaged in a "pattern of racketeering activity" under the open-ended continuity theory. In H.J. Inc., the Supreme Court described this type of pattern as one that involves "past conduct that by its nature projects into the future with a threat of repetition." H.J. Inc., 492 U.S. at 241. Although the Court was clear that there is no bright line test to establish this sort of pattern, it did offer certain guideposts. For one, it held that a threat of continuity exists "where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." Id. at 242-43. Legitimate enterprises can also satisfy the continuity requirement where the plaintiff can show that "the predicates are a regular way of conducting [the] defendant's ongoing legitimate business." Id. at 243. It is clear that neither such situation applies in the instant case, where Impala neither alleges that A-1 was a criminal, or even

fraudulent enterprise, nor that A-1 regularly conducted its business by defrauding creditors.  Rather, Impala rests its argument on the fact that the payments due under both settlements would have continued several years into the future.  See Impala Opp'n at 7-9.

In support of this contention, Impala cites cases such as Harmelin v. Man. Fin., Inc., No. 06-1944, 2007 WL 2874043 (E.D. Pa. Oct. 2, 2007), in which this Court denied summary judgment on a RICO claim because the fraudulent conduct would have continued had it not been halted by an injunction.  Id. at *4.  There is no analogue between the sort of involuntary termination of a RICO scheme at issue in Harmelin and the situation here, where the parties mutually agreed to stop making payments under the settlement agreements and to wind up A-1's operations.  See ECF No. 22, Receivership Order.  Impala further relies on Seneca Insurance Co. v. Commercial Transportation, Inc., 906 F. Supp. 239 (M.D. Pa. 1995), in which the court considered whether the plaintiff had sufficiently alleged continuity under RICO.  In Seneca, the plaintiff insurers claimed that the defendants had knowingly submitted false information in order to secure lower rates than those to which they were entitled.  Id. at 241.  Importantly, for purposes of establishing a "pattern of racketeering activity," the plaintiffs pointed to the defendants' continuation of their fraud by "repeat[ing] the same misrepresentations in securing reduced rates on the . . . [p]olicy in [the subsequent year]."  Id. at 243.  The court found that the defendants' decision to commit the same fraudulent acts two years in a row supported the reasonable assumption that "but for [the] [p]laintiffs' discovery of the fraud, the conduct would have continued into the future."  Id.  That stands in contrast to the instant situation, where Impala has not shown that any defendant had designs on perpetrating fraud on Impala, or any creditor of A-1, following the execution of the Alliance Settlement.  Most importantly, the settlements' provisions for payment on a continuing basis is not equivalent to a novel round of fraudulent activity, such as occurred in Seneca, because it is entirely speculative that such payments would have taken place.

We further find distinguishable <u>County of El Paso, Texas v. Jones</u>, No. 09-119, 2009 WL 4730305 (W.D. Tex. Dec. 4 2009), cited by Impala, in which the court considered whether the acts of an alleged enterprise constituted a "pattern of racketeering activity" under RICO.  The defendants were three men who ran an operation which "would offer bribes and other benefits to County officials to secure favorable resolutions for clients doing, or seeking to do, business with the County."  <u>Id.</u> at *1 (internal quotations omitted).  Several predicate acts were identified and the court found that the acts "[gave] rise to a threat of continued criminal activity" due to the defendants' "ongoing relationship with County officials, and [the] [d]efendants' alleged ability to use their network of corrupt officials to benefit their clients."  <u>Id.</u> at *14.  There is no allegation here, nor any evidence showing, that A-1 regularly operates in a criminal or fraudulent manner, or that it poses a threat of continued fraudulent activity separate and apart from its effectuation of the two challenged settlement agreements.  It is clearly plausible that an enterprise like that in <u>Jones</u>, with a fraudulent goal and the means to accomplish it, would pose a threat of continued racketeering; here, in contrast, A-1 is neither alleged to be a fundamentally fraudulent operation nor is it seemingly capable of pursuing any further fraud, as it is being wound-up and is in the hands of a court-appointed Receiver.  For these reasons, <u>Jones</u> does not persuade us that Impala has shown a pattern via the open-ended continuity doctrine.

In sum, the scheme at issue cannot be described as one that establishes a "threat of continued racketeering activity" where the allegedly fraudulent activity occurred within a nine month time span and where Impala's allegations of a continued future threat are speculative at best.  <u>H.J. Inc.</u>, 492 U.S. at 239.  Because Impala has failed to point to a genuine dispute regarding RICO Defendants' participation in a "pattern of racketeering activity," we grant summary judgment as to Count VI.

### D.  Count I – Actual Fraudulent Transfer

We now consider Impala's assertion of a claim for actual fraudulent transfer under PUFTA Section 5104(a)(1) against Defendants and Slogam based on the Bucks County Settlement and the

24

Alliance Settlement.  In this Court's memorandum on Defendants' Motion to Dismiss, we addressed the relevant legal standard for this claim.  See Impala v. A-1, 2016 WL 8256412, at *16.

As to Defendants, we find that Impala has pointed to genuine disputes of material fact regarding whether the settlements at issue constituted actual fraudulent transfer under PUFTA. Specifically, Impala has shown disputes regarding:

- Whether the settlements' terms were concealed from it (PSOF, Ex. L (Dep. Tr. of O'Hayer) at 169-170 (stating that copies of the Bucks County and Alliance Settlements were not provided to Impala until January 2016));

- Whether disbursements under the settlements were made to insiders of A-1 (PSOF ¶¶ 3-6 (stating that Kumar, Suresh, Om, and Leena are shareholders and directors of A-1));

- Whether A-1 was insolvent when it made the payments and distributions under both settlements (PSOF ¶ 30, Ex. P (Dep. Tr. of Meena Jerath) at 196-197 (stating that A-1 was insolvent in 2012));

- Whether the settlements were executed shortly before A-1 expected to incur a substantial debt (PSOF ¶¶ 59, 108, Exs. EE, FF, UU (communications discussing likelihood of Impala's victory in the LCIA and of the judgment being confirmed by this Court)).

### E.  Count II – Constructive Fraudulent Transfer

Impala further asserts claims for constructive fraudulent transfer under PUFTA Section 5104(a)(2) against Defendants and Slogam.  This claim is based on the Bucks County Settlement and the Alliance Settlement.  In this Court's memorandum on Defendants' Motion to Dismiss, we addressed the relevant legal standards for this claim.  See Impala v. A-1, 2016 WL 8256412, at *17-18.

As to Defendants, we find that Impala has pointed to genuine disputes of material fact

regarding whether the settlements at issue constituted constructive fraudulent transfer under PUFTA. Specifically, Impala has shown disputes regarding whether A-1 received reasonably equivalent consideration in exchange for the payments made under both settlements and that such payments were made at a time when A-1 was insolvent.

### F. Slogam

Slogam is named as a defendant in Impala's claims for actual and constructive fraudulent transfer under PUFTA. Amended Cmplt. at 21, 28. Slogam is a Pennsylvania limited partnership that has Om, Suresh, and Kumar as its three limited partners. ECF No. 212, Slogam Statement of Uncontested Facts in Support of Mot. for Summary Judgment ("Slogam SOF") ¶ 1. Slogam owns the property on which A-1 operates its business, and leases that property to A-1 pursuant to a written lease which has required A-1 to pay a monthly rent since 2009 ranging between $65,000 and $80,000. Id. ¶¶ 2-3. The only allegation Impala levels against Slogam is that "Suresh caused A-1 to transfer A-1's funds to Slogam in amounts that greatly exceed the amounts of rent payments due." Amended Cmplt. ¶¶ 91, 110. Impala supports this allegation in its opposition to Slogam's Motion for Summary Judgment by pointing to the following facts:

    i. The lease in effect between Slogam and A-1 from September 29, 2009 to September 29, 2014 required A-1 to make monthly payments of $65,000, for a total annual payment of $780,000. PCF ¶ 37, Ex. 19 (Lease).

    ii. In 2012, A-1 paid Slogam rent of $80,000 per month, for a total annual payment of $960,000. Id. ¶ 38, Ex. 21 (Slogam's profit and loss statement for 2012 showing rental income of $960,000).

    iii. In 2013, A-1 paid Slogam $1,040,000 in rental payments, $260,000 more than was due under the lease. Id. ¶ 39, Ex. 22 at 3 (A-1 balance sheet as of December 31, 2013 showing rent debit of $1,040,000).

iv.  In 2013, Suresh issued seven checks to himself from Slogam for an amount totaling $1,000,000.  Id. ¶ 40, Ex. 23.

Slogam responds that the only transfers A-1 made to Slogam were for rent, and that the rent paid reflected fair market value.  Slogam Mot. at 2, 5.  Because Impala has shown that A-1 made payments to Slogam, which has three A-1 insiders as its limited partners, in excess of the rent payments due under the lease agreement, we find that a genuine dispute exists as to whether such payments were in violation of both the actual and constructive fraud provisions of PUFTA.

## V.    Conclusion

For the foregoing reasons, we grant summary judgment as to all RICO Defendants on Count VI (RICO), and deny summary judgment as to all other claims.

O:\CIVIL 16\16-1343 Impala v. A-1\16cv1343 Memo re SJ.docx