**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| _____ : | |
| IMPALA PLATINUM HOLDINGS LIMITED, : | |
| et al., : | |
| Plaintiffs, : | |
| v. : | |
| : | Civ. A. No. 16-1343-MMB |
| A-1 SPECIALIZED SERVICES : | |
| & SUPPLIES, INC., et al., : | |
| Defendants. : | |
| _____ : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO KUMAR'S MOTION
TO ALTER OR AMEND THE JUDGMENT AND STAY EXECUTION**

**INTRODUCTION**

In his Motion to Alter or Amend, Kumar seeks to reduce the size of the jury's verdict from $16 million to $2.82 million, as well as other relief. As shown below, there are multiple reasons why this effort should be rejected. Kumar is responsible to pay 59% of $16 million – (or $9,440,000) – not $2.82 million.

**STATEMENT OF PERTINENT FACTS**

On Friday, March 17, 2017, at a settlement conference mediated by the Court, all of the remaining parties with the exception of Kumar and Alliance entered into a settlement on the record. At the time of the settlement, Impala had four claims before the jury, and was seeking relief worth more than $90 million dollars, plus punitive damages. As part of the settlement, the settling defendants agreed in the aggregate to pay $10,575,000 to Impala, along with other terms.

At the March 17 settlement conference, a *pro rata* apportionment, with percentages to be determined by the jury, was agreed to. (3/17 Settlement Conf. Tr. at 20-21.) This agreement was later confirmed in open court on March 21, 2017, during a colloquy between counsel and the Court.

(3/21 Tr. at 1193.)

The jury returned its verdict on March 23, 2017 in the amount of $16,000,000. The Jury Verdict Form showed that $11.5 million of this was attributed to the Bucks County Settlement, for which the jury considered Kumar and the settling defendants to be liable.  The jury ruled that Kumar did not act in good faith in connection with the Bucks County Settlement.  No liability was attached to the Alliance Settlement.  The sole non-settling defendant held liable by the jury was Kumar.  The jury concluded that an additional $4.5 million in damages was attributable to transactions other than the Bucks County and Alliance Settlements, for a total of $16 million.  The Jury Verdict form instructed the jury to assign a percentage of liability to each party, and cautioned that the numbers should add up to 100%.  The *pro rata* apportionment by the jury assigned a total of 41% of the liability to the various settling defendants, and 59% liability to Kumar.  Under well-established law discussed below, this resulted in a reduction or setoff of $6,560,000, requiring Kumar, the sole, liable, non-settling defendant, to pay $9,440,000 of the $16 million verdict.

## ARGUMENT

## I.   A PARTY SEEKING TO ALTER OR AMEND A JUDGMENT BY REDUCING THE JURY'S AWARD OF DAMAGES BEARS A DIFFICULT BURDEN.

Although Kumar neglects to mention it, "[t]he standard for obtaining relief under Rule 59(e) is a difficult one to meet." *Reynolds v. Barnhart,* 2005 WL 004620 at *1 (E.D.Pa. Apr. 27, 2005) (Baylson, J.)  "A judgment may be altered under Rule 59(e) if the party seeking reconsideration shows at least one of the following: '(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion ...; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice.'" *In re Vehicle Carrier Servs. Antitrust Litig.,* 846 F.3d 71, 87 (3d Cir. 2017) (ellipsis in original), *quoting Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.,* 602 F.3d 237, 251 (3d Cir. 2010).

Given the "extraordinary" nature of this remedy, *RLI Ins. Co., v. Bennett Composites, Inc.,* 2006 WL 263627 at *3 (E.D.Pa. Feb. 1, 2006) (Baylson, J.), "[m]ere dissatisfaction with the Court's ruling is not the basis for such a reconsideration, nor can such a motion be used as a means to put forth additional arguments which could have been made but which the party neglected to make," *citing  Waye v. First Citizen's Nat'l Bank,* 846 F.Supp. 310, 314 (M.D.Pa.), *aff'd,* 31 F.3d 1175 (3d Cir.1994).  *See also Elliott v. Kiesewetter*, 112 Fed. Appx. 821, 825 (3d Cir. 2004) (post-trial motion attacking verdict form is waived if not preserved before verdict).

A finding of clear error requires a "'definite and firm conviction that a mistake has been committed.'"  *United States v. Jasin,* 292 F.Supp.2d 670, 676 (E.D. Pa. 2003), *quoting* *Easley v. Cromartie,* 532 U.S. 234, 242 (2001).

"Where the basis of the motion for reconsideration is to correct a manifest injustice, the party must persuade the court not only that its prior decision was wrong, 'but that it was clearly wrong and that adherence to the decision would create a manifest injustice.'" *Broadcast Music, Inc. v. Crocodile Rock Corp.,* 2014 WL 3953182 at *1 (E.D.Pa. Aug. 12, 2014) (Baylson, J.), *quoting In re City of Philadelphia Litig.,* 158 F.3d 711, 720–21 (3d Cir.1998).

Even more stringent standards apply when the motion to alter or amend the judgment seeks a reduction in a jury's award of damages. The determination of damages by a jury is "'entitled to great deference.'"  *Dee v. Borough of Dunmore,* 474 Fed. Appx. 85, 87 (3d Cir. 2012), *quoting Spence v. Bd. of Educ.,* 806 F.2d 1198, 1204 (3d Cir. 1986).  Such a reduction, or *remittitur,* "is utilized when the trial judge finds that a decision of the jury is excessive or clearly unsupported by the evidence."  *Dee, supra.*

Stated in the affirmative, "[a] jury's damages award will not be upset so long as there exists sufficient evidence on the record, which if accepted by the jury, would sustain the award."

*Thabault v. Chait,* 541 F.3d 512, 532 (3d Cir. 2008).  *Accord Grant Heilman Photography, Inc. v. McGraw-Hill Cos.,* 115 F.Supp.3d 518, 527 (E.D.Pa. 2015) (Baylson, J.) ("The general rule is that a court is to uphold an award of damages if there is a reasonable basis to do so") (internal quotation marks omitted).  Moreover, in assessing the reasonableness of the jury's award of damages, the court must "view[] the facts in the light most favorable to the verdict winner."  *Id.*, 115 F.Supp.3d at 527.  "A court must not vacate or reduce a damages award merely because it would have granted a lesser amount of damages."  *Id.*; *accord Motter v. Everest & Jennings, Inc.,* 883 F.2d 1223, 1230 (3d Cir. 1989). "For the court to disturb a jury verdict, 'the damages assessed by the jury must be so unreasonable as to offend the conscience of the Court.'" *Motter, quoting Murray v. Fairbanks Morse,* 610 F.2d 149, 152 (3d Cir. 1979).

When a district court is asked to mold a verdict, based on jury verdict interrogatories, as Kumar is asking here, the Third Circuit has applied a very pro-jury standard.  "[A]ll reasonable inferences in favor of the verdict winner" must be drawn.  *Kiesewetter*, *supra,* 112 Fed. Appx. at 824.  Further, the Court must give effect to the jury's answer to special interrogatories "when there is *any view* of the case which reconciles the various answers."  *Id. quoting Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1159 (3d Cir.), *cert. denied*, 493 U.S. 993 (1989).  A jury's damages award must accordingly be preserved so long as there is a "minimally plausible" view of the case that would support it.  *Id.*

## II.     UNDER SETTLED PENNSYLVANIA LAW, THE DECISION OF THE SETTLING PARTIES TO ADOPT A *PRO RATA* APPORTIONMENT CONTROLS.

### A.      The Uniform Contribution Among Tortfeasors Act.

Pennsylvania long ago adopted the Uniform Contribution Among Tortfeasors Act ("UCATA"), 42 Pa.C.S. § 8321, *et seq.,* which, among other things, determines the effect of a

release upon the settling plaintiff's remaining claims in joint and/or several liability situations.[1] Under section 8326 of that statute, the General Assembly left it to the settling parties to decide what the effect of the settlement would be on the plaintiff's remaining claims against the non-settling parties.  Section 8326 allows the settling parties broad discretion:  it provides a default option – that the claim against the remaining tortfeasors will be reduced "in the amount of the consideration paid for the release" (often called a "*pro tanto*" release).  It then continues:  "or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid."

As a result, if the parties do not address the issue, the reduction is *pro tanto.* If, as in this case, the parties select a different "amount or proportion" such as a *pro rata* reduction to govern the offset, then the reduction applied is *pro rata.*[2]

In a series of decisions over the last several decades, the Pennsylvania Supreme Court has established that when the settling parties choose an apportionment method that results in a "windfall" – *i.e.,* where the amount of the settlement, when combined with the verdict against the non-settling defendants duly reduced, exceeds the total amount of the jury's verdict – the "windfall" goes to the plaintiff, not to the non-settling defendant. As the Court cogently explained in *Charles v. Giant Eagle Markets,* 522 A.2d 1, 4 (Pa. 1987), this rule is essential to the important public policy of encouraging settlements:

> The respective obligations between parties to a lawsuit can be finally determined either by way of a bona fide settlement or through trial. Settlement is a valuable tool in our arsenal of dispute resolution and it should not be undermined.

---

[1] UCATA applies to joint and/or several liability.  42 Pa.C.S. § 8322.

[2] The clause in § 8326:  "or in any amount or proportion by which the release provides that  the total claim shall be reduced if greater than the consideration paid" means "provided that the total claim is greater than the consideration paid."  *See Charles v. Giant Eagle Markets,* 522 A.2d 1, 4 (Pa. 1987) (where jury awarded $31,000, the consideration paid in settlement was $22,500, and the non-settling defendant was found 40% liable (*i.e.,* $12,400), the *pro rata* settlement controlled, the non-settling defendant was required to pay the full $12,400 the jury found it owed, and plaintiff was entitled to a total of $34,900, which was $3,900 more than the verdict.)

The obligation of a tortfeasor as determined by settlement with the plaintiff should not be affected by a subsequent verdict against any of the remaining defendants. The inducements for a defendant to settle are the certainty of the agreed-upon obligation and the avoidance of the vagaries of trial. The finality of the settlement agreement is crucial. Any subsequent trial against the remaining defendants should not disturb the resolution reached between the plaintiff and the settling tortfeasor. *It would be an equal disservice to a supportive settlement policy to provide a windfall to a non-settling tortfeasor where the settlement proves to be more generous than the subsequent verdict.* [Emphasis added.]

Subsequent Supreme Court decisions have adhered to *Charles,* both with respect to the handling of "windfalls" and the need for fidelity to the releases agreed upon by the settling parties. Thus, in *Walton v. Avco Corp.,* 610 A.2d 454, 460-61 (Pa. 1992), the Supreme Court observed: "Our conclusion [in *Charles*], that the 'non-settling tort-feasor [remains] liable for his full proportionate share' of the damage award *regardless of the amount paid by settling defendant,* is controlling in this case." (Emphasis added.) *See e.g., Maloney v. Valley Medical Facilities, Inc.,* 984 A.2d 478, 487 (Pa. 2009) ("parties to a [joint tortfeasor] settlement should be afforded latitude to effectuate their express intentions"); *Taylor v. Solberg,* 778 A.2d 664, 668-69 (Pa. 2001) (confirming *Charles* and the importance of adhering to the language of the release signed by the settling parties).

The Third Circuit has applied the *Charles* decision in multiple cases. *Weber v. GAF Corp.*, 15 F.3d 35, 37-38 (3d Cir. 1994) (approving *Charles* and applying its rule that "a non-settling tortfeasor is liable for its full *pro rata* share of the verdict regardless of whether a settling tortfeasor paid more than its *pro rata* share"); *see also Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1453 (3d Cir. 1996) (citing *Charles* and describing the Pennsylvania rule as "verdict amount against litigating defendants shall be reduced by amount of settling defendants' apportioned share of liability, regardless of amount received by plaintiff in settlement").

The provisions of UCATA apply not just to negligence cases, but also to intentional torts and other torts where negligence is not a factor. *Moran v. G. & W. H. Corson, Inc.*, 586 A.2d 416,

420 (Pa. Super. 1991), *appeal denied*, 602 A.2d 860 (Pa. 1992) (UCATA applies to joint

tortfeasors "regardless of the basis upon which they are found liable"); *EuroMotorcars

Germantown, Inc. v. Manheim Remarketing, Inc.*, 2015 WL 798969 at *10 (E.D. Pa. Feb. 15, 2015)

(UCATA applies to intentional tortfeasors); *Alexander v. Hargrove*, 1994 WL 444728 at *4 (E.D.

Pa. Aug. 16, 1994) (UCATA not limited to torts based on negligence).[3]   It follows that the *pro

rata* apportionment by percentages method agreed to by the settling parties in this case, and applied

by the Court in the Jury Instructions and the Jury Verdict Form, was consistent with controlling

Pennsylvania law.

### B.     The Fair Share Act as Amended Leads to the Same Result as UCATA.

In 2011, the General Assembly overhauled section 7102 of the Judicial Code, known as

the "Fair Share Act," 42 Pa.C.S. § 7102, to do away with joint liability, with certain exceptions.

The revisions took effect on June 28, 2011 and apply to claims accruing after that date.  Subsection

a.1(1) of the revised statute provides:

> [w]here recovery is allowed against more than one person, including
> actions for strict liability, and where liability is attributed to more
> than one defendant, each defendant shall be liable for that proportion
> of the total dollar amount awarded as damages in the ratio of the
> amount of that defendant's liability to the amount of liability
> attributed to all defendants and other persons to whom liability is
> apportioned under subsection (a.2).  [42 Pa.C.S. § 7102(a.1)(1).][4]

Where applicable, subsection (a.1) on its face makes *pro rata* apportionment mandatory.

Subsection (a.1)(2) of the Fair Share Act eliminates most joint liability, and subsection

(a.1)(3) sets out five exceptions to that elimination, including one for intentional torts.  To date,

there is no Pennsylvania appellate law applying the Fair Share Act to cases that accrued after its

---

[3] Indeed, Kumar concedes that constructive fraudulent transfers under PUFTA are subject to section 8326 of UCATA.

[4] The reference to subsection (a.2) concerns the procedure to be followed in settlement situations for having the trier of fact apportion liability to the released parties or non-parties.

effective date of June 28, 2011.

In an effort to escape the Fair Share Act's mandatory *pro rata* apportionment, Kumar contends that a constructive fraudulent transfer under PUFTA fits under § 7102's intentional tort exception.[5]  Plaintiffs find this notion a puzzling one, since an intentional tort typically requires intent as an element of the tort, and PUFTA's constructive fraudulent transfer provisions expressly do not require proof of intent.

However, the result in this case under the Fair Share Act would be the same as the result under UCATA.  Under both statutes, proportional, *i.e., pro rata,* apportionment is required for non-joint but severally liable defendants where, as here, *pro rata* apportionment has been selected. There is no dispute that Kumar is severally liable for the transfers to Om and Leena as part of the Bucks County Settlement – Kumar now concedes as much.  (Kumar Br. at 4, 5.)  As discussed below, he is also at least severally liable for the $4.5 million in other transfers on which the jury based its verdict.  Thus, the jury's determination that Kumar is 59% liable for the damages assessed is also consistent with the Fair Share Act's commands.[6]

### C. Kumar's Apportionment Arguments Are All Without Merit.

Kumar's attack upon the jury's apportionment of damages is misleading as well as incoherent.  It is misleading because Kumar distorts the language of section 8326 of UCATA, so as to make it appear that § 8326 requires a joint tortfeasor release to reduce the claim against the non-settling tortfeasors by the amount of the consideration paid in settlement.  (Br. at 4.)  However, this is not what section 8326 says.

---

[5] Trial Brief (ECF 334) at 2-3; Motion to Alter or Amend (ECF 346) at 5-6.

[6] Cases interpreting the prior version of § 7102 concluded that it was limited exclusively to negligence cases. *See, e.g., McMeekin v. Harry M. Stevens, Inc.,* 530 A.2d 462, 464 (Pa. Super. 1987). Manifestly, however, this is no longer the case – the statute as revised now explicitly imposes rules on negligence, strict liability, and intentional tort cases. *See* 42 Pa.C.S. §§ 7102 (a.1)(1), (2), (3), (4), and (a.2).

Section 8326 of UCATA provides in full as set forth below.  The bolded, italicized portion has been deleted by Kumar in multiple presentations to this Court:[7]

> A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid *for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.*

The language repeatedly deleted by Kumar is crucial – on its face, it gives the plaintiff and settling defendants the choice to decide what "amount or proportion" shall govern the reduction of a judgment against the non-settling defendant.  Here, the settling parties agreed on a *pro rata* reduction.  In accordance with that decision, the Jury Verdict Form properly asked the jury to apportion percentages of liability among all defendants.  As set forth above, the law of this Commonwealth (and in the Third Circuit's Pennsylvania cases) is that the settling parties' choice of an apportionment method controls, and that where, as here, the settling defendants agree before the verdict to pay an amount that turns out to be greater than the share of liability a jury subsequently apportions to them, the "windfall" goes to the plaintiff.  It does not go to the non-settling defendant.  *Charles, Walton, Taylor, Maloney; accord Weber, Koppers.*

Kumar's submission is also incoherent because, after truncating section 8326 to limit it to *pro tanto* releases, he then argues without any apparent authority that a *pro rata* release reduces the verdict by the consideration paid or the *pro rata* apportionment, whichever is greater.  (Br. at 4-5.)  He further contends that allowing a jury to allocate damages on the basis of percentages is improper and that "traditional joint and several liability standards" should be applied instead, as though those traditional standards did not allow for *pro rata* apportionment.  Elsewhere, he

---

[7] Motion to Alter or Amend, ECF 346, p. 4; Trial Brief, ECF 334 p. 5.

contends that it is irrelevant whether a release provides for *pro rata* or *pro tanto* apportionment. (Br. at 4-5.)  And, for the first time, Kumar now contends that his liability should instead be apportioned in equal thirds with Om and Leena.  These various and conflicting arguments cannot withstand scrutiny.

Contrary to Kumar's Brief at p. 4, it is not true that under the Supreme Court's decision in *Walton,* a *pro rata* release somehow provides for a reduction of Kumar's liability by the greater of the consideration paid in settlement or by the settling parties' proportionate share of liability based upon equal-share apportionment.  The Supreme Court's decision in *Walton,* on which Kumar solely relies, provides no support for this proposition. That case heartily endorsed the decision in *Charles*, noting that *Charles* "crystallized the importance of encouraging settlements and stressed the necessity of respecting their finality," and announcing that the Court "remain[ed] committed to promoting the policies that fueled our decision" in *Charles*.  *Id.* at 461.  610 A.2d at 461.  The *Walton* Court also gave special emphasis to the holding in *Charles* that "'[t]he actual amount of the release . . . is of no consequence in the satisfaction of the judgment of the remaining defendants; . . . [t]here is no basis for concluding the jury verdict must serve as a cap on the total recovery that a plaintiff may receive.'"  *Id., quoting Charles,* 522 A.2d at 3.

Although *Walton* announced a rule of equal-share apportionment between strictly liable defendants, that rule is of no benefit to Kumar.  Kumar has never claimed that constructive fraudulent transfer under PUFTA imposes strict liability and equal-share apportionment on defendants.  Instead, he has consistently maintained that constructive fraudulent transfer is an intentional tort that cannot be subject to any apportionment at all.  *See* Trial Brief (ECF 334) at pp. 2-5; Objection to Jury Verdict Form (ECF 338) at p. 1.  He cannot now belatedly raise new arguments in a *post hoc* effort to challenge the jury's verdict. *Kiesewetter, supra.*

Moreover, apportionment of damages for intentional torts has long proceeded on percentage shares as determined by jurors. *See, e.g., Tunis Bros., Inc. v. Ford Motor Co.*, 952 F.2d 715, 721 (3d Cir. 1992) (appeal from this court's judgment (Bechtle, C.J.), apportioning compensatory damages against various Ford entities for fraud claim, *inter alia*); *Smith v. Renaut,* 564 A.2d 188, 191 (Pa. Super. 1989) (action for fraud against seller of house, real estate salesman and real estate agency where jury apportioned damages between all three in varying percentages).

Kumar's contention that Pennsylvania law requires application of the larger of the setoffs obtained through either a *pro tanto* or a *pro rata* reduction is also fallacious. If that were true, then the Supreme Court's seminal decision in *Charles* would have had the opposite outcome. There, the jury announced a $31,000 verdict. One defendant had settled for $22,500. A *pro tanto* setoff would therefore have yielded a $22,500 reduction of the $31,000 verdict. This was larger than the *pro rata* reduction agreed by the settling parties, since the jury apportioned 60% of liability to the settling tortfeasor, which created a setoff of only $18,600. The Supreme Court enforced the smaller *pro rata* setoff on which the parties agreed, holding that under § 8326, the limiting phrase – "if greater than the consideration paid" – means "provided that the *total claim* [$31,000] is greater than *the consideration paid* [$22,500]." *Charles*, 522 A.2d at 4. (emphasis added).

Similarly, in this case, the total claim found by the jury of $16 million was larger than the setoff obtained by a *pro rata* approach, which equaled $6,560,000 (41% of $16 million). Because the parties selected the *pro rata* reduction, under *Charles* and subsequent cases, including *Walton*, it must be upheld. The fact that a *pro tanto* release would have yielded a greater reduction than the *pro rata* release actually agreed to, is, in the Supreme Court's words, "'of no consequence in the satisfaction of the judgment of the remaining defendants.'" *Walton, quoting Charles.*

III. **KUMAR'S "DOUBLE RECOVERY" ARGUMENTS BASED ON THE SETTLEMENT ARE CONTRARY TO PENNSYLVANIA LAW.**

In an effort to escape from the revised Fair Share Act and the long-settled principles governing apportionment under UCATA, Kumar seeks to portray PUFTA as a special case, for which the Court ought to invent unique new rules of damages apportionment. Without this, he claims, a forbidden double recovery will result. This attempt is without merit.

At the outset, Kumar is wrong to treat the settlement payments as limited to Count Two's claim for constructive fraudulent transfer. The settlement was entered into on March 17, 2017, at a time when the settling defendants were facing joint and/or several liability on four separate counts, for which the claimed damages exceeded $90 million, plus potential punitive damages. The settlement resolved all four of these claims, and also averted the need to pay the substantial attorney's fees and expenses that the settling defendants would have incurred had they continued to litigate.

It follows from this that there is no equating the payments called for by the settlement, and the monies for which the jury held Kumar liable solely under Count Two. There is no "double recovery" of any kind here.

Kumar cites a bankruptcy decision, *In re Polichuk*, 506 B.R. 405, 435 (Bnkr. E.D. Pa. 2014), for the notion that a cause of action for a fraudulent transfer of an asset under PUFTA is nullified by a ***voluntary*** return of the asset to the estate. The return of property to the debtor in *Polichuk* took place before the bankruptcy proceeding or any litigation had begun – not as a part of a settlement in a pending legal proceeding.

Here, there was no voluntary return of the transferred assets to A-1 in this case before the litigation to recover them began. And the present lawsuit was pending for a year before the settlement took place in mid-trial. Moreover, the settlement will not return the assets to the

12

transferor, A-1; it will pay them to a creditor – Impala – that had to go to great expense and effort to obtain that settlement. There accordingly is no double recovery from the same party within the sense intended by *Polichuk*, a decision which, in any event, is not binding on this Court. Moreover, *Polichuk* did not involve a settlement at all, let alone a settlement that also resolved non-fraudulent transfer claims and potential punitive damages.

Kumar's reliance on *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 640 (2d Cir. 1995), is similarly to no avail. In *HBE Leasing*, the Second Circuit reversed the dismissal of fraudulent transfer claims against a group of attorneys who received payment of legal fees for services they provided. The reason for reversal was that the district court failed to consider whether the payments were made with actual fraudulent intent. The Second Circuit also reversed a related ruling avoiding a mortgage in real property on the grounds that the transferor may have used the mortgage proceeds for legitimate purposes to the extent they were used to pay for the same attorney's fees at issue in the claim against the attorneys. In summarizing these holdings, the Court noted, on remand, that if the transfers to the attorneys were made with actual fraudulent intent, the appellants could recover the proceeds from either the mortgage holder or the attorneys, but not both. The case is inapposite, since it has nothing to do with apportioning liability in a litigation in which some but not all of the defendants settle with *pro rata* releases.[8]

Kumar's touting of an Eleventh Circuit case is likewise misplaced. The case cited – *In re Prudential of Florida Leasing, Inc.,* 478 F.3d 1291, 1300-1303 (11th Cir. 2007) – rejected the application of Florida law, holding that federal law controls the application of the Bankruptcy

---

[8] *In re Prosser,* 534 Fed. Appx. 126, 130-131 (3d Cir. 2013), also cited by Kumar, is likewise inapplicable. There, the appellant sought to bar a fraudulent transfer claim based upon judicial estoppel and the election of remedies doctrine. The Third Circuit found both doctrines inapplicable, noting that the relief sought under the theories pleaded in the alternative was different under each theory, and concerned two separate 50% interests owned by two different people, and therefore did not amount to a double recovery. *See Id.* at foonote 1.

Code's "single satisfaction" rule.  In *Florida Leasing*, a bankruptcy trustee obtained a partial settlement of fraudulent transfer claims against certain defendants in a prior lawsuit.  The trustee then brought a second suit against a new defendant who was an initial transferee of some of the same fraudulent transfers settled in the first case.  The trustee sought further damages contending that the settlement in the first action only partially satisfied her claims.  In this unusual setting, the court held that the single satisfaction rule required the bankruptcy court to attempt a *post hoc* allocation of the settlement in the prior proceeding.

The case is distinguishable on several grounds.  First, the present case is controlled by PUFTA, a state law that, unlike the Bankruptcy Code at issue in *Florida Leasing*, does not contain an analog to the "single satisfaction" rule of 11 U.S.C. § 550(d).  Second, Pennsylvania law does not require a *post-hoc* allocation of settlements as in *Florida Leasing*.  Instead, Pennsylvania courts historically have relied upon UCATA and the apportionment method chosen by the settling parties, in keeping with section 8326 of that statute.  Third, the case at bar does not involve two separate actions against different defendants; there is only one case, in which the settling defendants and the non-settling defendant were sued.  There is accordingly no occasion to rewrite Pennsylvania case law governing settlements to suit an ordinary multiple-tortfeasor settlement situation.

For all these reasons, Kumar's arguments for treating PUFTA claims differently from all other claims under the Fair Share Act and UCATA should be rejected.

## IV.   KUMAR'S ATTRIBUTION OF THE SETTLEMENT PAYMENTS TO THE BUCKS COUNTY SETTLEMENT IS CONTRARY TO PENNSYLVANIA LAW AND INCOMPLETE.

In part IV of his Brief, Kumar seeks reduction of the verdict on the basis of the amount of money payments and other relief agreed to by Om and Leena as part of the March 17 settlement.  Based on this reasoning, he concludes that the $11.5 million in liability that the jury attributed to the Bucks County Settlement must be reduced by 81%, or $9.3 million, down to $2.2 million.  This

attempt at *remittitur* lacks any basis in Pennsylvania law, and flies in the face of Pennsylvania Supreme Court precedent.

At the time that settlement was forged with the Court's help, the settling defendants, it bears repeating, were facing four separate counts, not just a count for constructive fraudulent transfer.  Impala was seeking to hold each of them jointly and/or severally liable for damages potentially totaling more than $90 million dollars, as well as punitive damages.  The settling defendants could not know which counts would meet with the jury's favor and which, if any, would not.  Nor could they divine how much in damages the jury would award.  They entered into a settlement because it would protect them from the entire case against them, not just the one claim that, with hindsight, Kumar now would have the Court treat as the settlement's sole concern.

As demonstrated above, Pennsylvania law does not allow a non-settling defendant to dictate to the settling parties the size or the method of calculating the reduction in a jury verdict he will receive from a settlement he declined to join.  Section 8326 of UCATA leaves that decision to the settling parties.  *Charles, Walton, Taylor, supra.*  Here, the *pro rata* reduction method chosen by the settling parties and applied by the jury will provide Kumar with a total setoff of $6,560,000. That is the only reduction to which Kumar is entitled under Pennsylvania law.  His argument for a setoff of $9.3 million based solely on the damages the jury attributed to the Bucks County Settlement should be rejected.

In addressing the Bucks County Settlement, Kumar's exclusive focus on Om and Leena diverts attention away from the roles played by Kumar and Suresh, to whom the jury assigned a greater level of culpability than to Om and Leena.

The evidence showed that Kumar was principally responsible for refusing to make Om and Leena whole after Meena Jerath discovered the underpayments in the distributions they received.

In October, 2012 (P-59), Jerath calculated the amounts owed to Om and Leena by Kumar (approximately $4.9 million), and by Suresh (approximately $4 million). On November 6, 2012, Suresh wrote to Kumar, stating "You and I have to pay Om's and Leena's AAA discrepancy amounts as soon as possible." (P-59) Suresh was willing to pay his $4 million share, but Kumar refused to pay anything. Due to his brother's intransigence and refusal to disgorge the excessive distributions, Om then brought the Bucks County suit. (3/15 (afternoon) Tr. at 366-7; 3/13 Tr. at 64.) As a result of the Bucks County Settlement, both Kumar and Suresh were relieved of this debt, paid for by A-1's assets, rather than their own. Needless to say, A-1 received no value for this debt relief, and there is no question that A-1 was insolvent at the time.

Also as part of the Bucks County Settlement, Kumar was appointed the co-CEO of A-1[9] and A-1 Board Chairman. In addition to the substantial salary provided, this appointment afforded Kumar a valuable benefit he had long sought – becoming the person in charge of A-1's business. The evidence showed that Kumar lost no time in exercising his new authority, by directing A-1's bookkeeper not to pay A-1's attorneys and experts in the Alliance litigation. (3/15 (afternoon) Tr. at 350.)

Kumar does not deny that he faces joint and several liability for the constructive fraudulent transfers involved in the Bucks County Settlement, as an indirect transferee for whose benefit the transfers were made. Indeed, the jury found him not to have acted in good faith in this regard. (Jury Verdict Form, Question 3.)

Based on the evidence the jury heard, the jury can reasonably be assumed to have held Kumar and, to a lesser extent Suresh, responsible for a substantial part of the Bucks County damages. For this reason as well, the Court cannot assume that the settlement concessions by Om

---

[9] Since Rajesh Seth resigned from A-1 prior to the Bucks County Settlement, this appointment in fact made Kumar A-1's sole CEO as of May 29, 2015.

and Leena are attributable solely to the Bucks County Settlement.

**V.    THE EVIDENCE BEFORE THE JURY OF ADDITIONAL FRAUDULENT TRANSFERS WOULD HAVE ALLOWED THE JURY TO ADD MORE THAN $4.5 MILLION TO THE VERDICT, A SUBSTANTIAL PORTION OF WHICH COULD HAVE FAIRLY BEEN ATTRIBUTED TO KUMAR.**

Kumar attempts to persuade the Court that the transfers other than those connected to the two lawsuit settlements totaled no more than $2 million plus the extra rent paid to Slogam and that Kumar can be held responsible for only $620,000 of the total.  (Br. at 10-12.)  He further contends that $1.925 million of the $4.5 million verdict amount for non-Bucks County damages is unaccounted for.  In fact, the evidence allowed the jury to award a much higher total than the $4.5 million, and a significant portion of that higher total could fairly be attributed to Kumar.

Kumar's attempt to persuade the Court to mold the jury's Verdict Form answers by cutting the $4.5 million award for other transfers all the way down to $620,000 ignores the Third Circuit's teachings in this area.  As explained above, a court must draw "all reasonable inferences" in favor of Plaintiffs as the verdict winner.  So long as there is "*any view* of the case" which is consistent with the jury's finding of $4.5 million, *Kiesewetter*, *supra*, the verdict cannot be reduced.  Even a "minimally plausible" view of the evidence will suffice.

When those rules are followed, Kumar's argument falls to pieces.

As demonstrated below, the evidence presented by Impala was more than sufficient to allow the jury to conclude that defendants made constructive fraudulent transfers – in addition to the Bucks County and Alliance Settlements – totaling as much as $8,525,000, and that Kumar could have been held responsible for a substantial portion of that amount.

**A.    The $5,000,000 Transfer to Kumar.**

Kumar's Brief suggests that the cutoff date for other transfers to or for the benefit of A-1's shareholder/directors (*i.e.,* transfers not made as part of the Bucks County or Alliance lawsuit settlements) was May 29, 2012. (Br. at 12.)  In fact, as the Court instructed the jury, (3/22 Tr. at

17

1300) the statute of limitations went back to March 23, 2012 for such transfers.  That date is significant, because after March 23, 2012, A-1 transferred $5 million to Sudhir Chopra for the benefit of Kumar – $2 million on March 26, 2012, another $2 million on March 27, 2012, and a final $1 million on March 30, 2012.  (P57.)

The evidence before the jury as to how to categorize this transfer was in dispute.  A-1 contended that this was a loan to Kumar.  (3/20 Tr. at 1057-58.)  However, Kumar insisted that the $5 million was a distribution to him.  (3/21 Tr. at 1106.)  The jury was entitled to take Kumar at his word.  *See* pp. 2-4, *supra*.

Impala introduced evidence from which the jury could find that A-1 was insolvent at the end of 2011, based on the balance sheet test as well as PUFTA's standard for insolvency – namely, the inability to pay one's debts when due.  The evidence further showed that A-1 remained insolvent after that date.  It is undisputed that Kumar used the late March payments to obtain Sudhir Chopra's shares in Alliance for himself – a transfer from which A-1 derived no benefit.  This $5 million payment thus satisfies the standard for a constructive fraudulent transfer – a transfer at a time when A-1 was insolvent for which A-1 received no benefit, let alone reasonably equivalent value.

Kumar may contend that the Alliance Settlement, in which Kumar agreed to give A-1 a $5.5 million unsecured promissory note to be paid off in late 2030, somehow extinguished any fraudulent transfer claim arising from the $5 million distribution.  This would be incorrect.  The Third Circuit has ruled:  "we are aware of no authority suggesting that any later expenditure from a transferee that happens to confer some value upon the transferor sanitizes, for constructive fraud purposes, a transfer that was fraudulent when made."  *Cardiello v. Arbogast,* 533 Fed. Appx. 150, 158 (3d Cir. 2013).  The Seventh Circuit agrees with that analysis.  In *The Nostalgia Network, Inc.*

*v. Lockwood,* 315 F.3d 717, 720 (7th Cir. 2002), the Court held:  "we think the inquiry [as to whether a transfer was constructively fraudulent] should stop at the first stage of analysis . . . after it is determined that the transfer was not supported by consideration.  If it was gratuitous, the fact that some or for that matter all of it may later have seeped back to the debtor does not legitimize the transfer."

Further, there is no reason to attribute the $5.5 million note to the final $5 million paid to Chopra.  It might just as well have been attributed by the jury to the first $10 million.  For example, lenders usually apply loan payments to the oldest debts first.

Moreover, the $5.5 million note is not worth anything like its face amount.  The payment terms are extremely generous, with the overwhelming portion not due for 15 years.  (3/16 Tr. at 631-32; 3/15 Tr. at 423-24.)  Thus, the jury could reasonably conclude that the fraudulent transfer of $5 million in distributions to Kumar in late March of 2012 has not been returned to A-1.

### B.    The $2,000,000 in Distributions to the Four Shareholders.

The evidence further showed, and Kumar does not dispute, that A-1 paid its four shareholders a total of $2,000,000 in other distributions after March 23, 2012.  (P-59).  Here, as well, the evidence showed that A-1 was insolvent when these distributions were made, and received no value in exchange.

Kumar is wrong to think that the $1.38 million in distributions to his fellow shareholders did not benefit him.  The distributions were made in proportion to each shareholder's percentage of ownership, in order that the company not lose its S corporation status.  That status allowed each of them to benefit from A-1's losses, since they could take those losses as their own, thereby avoiding taxes on personal income from other sources.  The significance of S corporation status was explained to the jury by several witnesses, including Meena Jerath and Impala's expert Dermot O'Neill.  ((Jerath) 3/16 Tr. at 488-92; (O'Neill) 3/17 Tr. at 689-93.)  Thus, Kumar benefitted from

the entire $2,000,000 in additional distributions, not just from the monies paid directly to him, since without the proportionate distributions paid to the others, the payments to him would not have been made, and he would not have had the benefit of claiming A-1's 2012 losses as pass-through losses of an S corporation to offset other income on his personal tax returns.

**C.      $1,030,000 Paid to Kumar in Salary after March 23, 2012.**

Rajesh Seth testified that the salaries of A-1's executives were $40,000 per month as of March 23, 2012, and that Suresh cut these monthly payments in half to $20,000 in mid-2013.  (3/13 Tr. at 149-52; 3/15 Tr. at 221.)  The documents in evidence showed that Kumar was terminated by Suresh in April, 2014, and later returned as CEO of A-1 on May 29, 2015.  (3/15 (afternoon) Tr. at 346) (P-176).  This evidence showed that the total salary paid to Kumar after March 23, 2012 was $1,030,000.  He was paid $40,000 per month until July, 2013 when his monthly salary was reduced to $20,000.  Total payments were as follows:

| | |
|---|---|
| 2012 | $360,000 ($40,000 x 9 months) |
| 2013 | $360,000 ($40,000 x 6 months + $20,000 x 6 months) |
| 2014 | $ 70,000 ($20,000 x 3.5 months) |
| 2015-16 | $240,000 (May 29, 2015 until receivership) |

Evidence presented to the jurors would have allowed them, and possibly even compelled them, to plausibly conclude that A-1 during Kumar's service did not receive reasonably equivalent value for his executive role.  Seth testified that Kumar argued constantly with Suresh in 2012; O'Hayer testified that Kumar was out to destroy A-1 for his own benefit; and Leena testified that his fellow shareholders removed him from the Board because he was acting against A-1's interests. Seth (3/13 Tr. at 148-49); O'Hayer (3/16 Tr. at 583-84); Leena (3/17 Tr. at 795-96.)  On these facts, the jury could reasonably have concluded that all or some of Kumar's salary payments were

fraudulent transfers for less than reasonably equivalent value at a time of insolvency.

**D.    Slogam's Receipt of $495,000 in Inflated Rent Payments after December 31, 2011.[10]**

The evidence showed that Slogam, L.P. had a written lease with A-1 for $65,000 per month in rent.  (P-3)  The evidence also showed that A-1 paid Slogam an extra $15,000 a month.  (D-167)  The jury had sufficient evidence to find that during the relevant time period, Slogam received repeated constructive fraudulent transfers totaling $495,000.

Slogam was a defendant on both the actual fraudulent and constructive fraudulent transfer claims.  Given the jury's assignment of only 1% of liability to Slogam, it appears with hindsight that it overestimated its risk.  At the time it settled, however, Slogam was facing liability for the inflated rents it received plus punitive damages as well as continuing legal expenses.  As with the other settling parties, its settlement payments therefore cannot be presumed to be related solely to compensatory damages, as Kumar wrongly assumes.  Moreover, in light of the evidence before the jury of Suresh's receipt of $1 million from Slogam (3/15 Tr. at 283; 3/16 Tr. at 573-75), and the fact that the rent checks to Slogam in evidence were all signed by Suresh (3/16 Tr. at 575), the Court could well conclude that the jury's allocation of $3.2 million or 20% of liability to Suresh included culpability for the rest of the Slogam overpayments.  No reason exists to conclude that the verdict necessarily held Kumar liable on this particular segment of Plaintiffs' claims.

To summarize – Kumar is mistaken when he contends that he can only be liable for $620,000 of the other transfers, and that $1,925,000 of the awarded damages is missing from the record.  In fact, the jury would have been within its rights to award $8,525,000 in other transfers and to assess Kumar a substantial portion of that amount.  The jurors cannot be faulted nor their

---

[10] The Court instructed the jury that Impala's claims for constructive fraudulent transfer against Slogam were limited to transfers made or obligations incurred after August 1, 2009.  (3/22 Tr. at 1300.)  As explained above, Impala introduced evidence from which the jury could find A-1 was insolvent at the end of 2011.

apportionment questioned because they chose to award less than the maximum amount.  *Ghee v. Marten Transport, Ltd.*, 570 Fed. Appx. 228, 232 (3d Cir. 2014) (finding no error where jury "split the baby" by awarding Plaintiff less than he sought for future lost earnings and evidence was in conflict).

## VI.  PLAINTIFFS DO NOT OBJECT TO REMOVAL OF THE SETTLING DEFENDANTS' NAMES FROM THE JUDGMENT.

Plaintiffs do not object to the removal of the settling defendants from the Judgment, provided that this is understood to be without prejudice to the settlement reached on March 17, 2017; the documentation of that settlement which is still being finalized; and/or Plaintiffs' rights against the non-settling defendants.

## VII.  PLAINTIFFS OPPOSE THE RELIEF REQUESTED BY KUMAR UNDER RULE 59(e).

For the reasons set forth above, Plaintiffs oppose reducing the judgment against Kumar.

Plaintiffs also oppose amending the judgment to show the outcome of the jury's deliberations on a count-by-count basis.  The purpose of a judgment order is to show whether the defendant has been found liable or not and, if liable, the amount of the judgment and any other relief such as the interest owed.  It is not an occasion to provide a blow-by-blow review of the claims and defenses.

## VIII.  PLAINTIFFS OBJECT TO KUMAR'S REQUEST FOR A STAY OF EXECUTION AGAINST IMPALA UNDER RULE 62(b)(3) IN THE ABSENCE OF ACCEPTABLE SECURITY.

F.R.Civ.P. 62(b)(3) provides that in order for the court to stay execution of a judgment during the pendency of a motion to alter or amend judgment, the court must set appropriate terms for the opposing party's security. Kumar apparently seeks a stay, because he argues that the assets in which Alliance has a security interest are "sufficient security to Impala for the requested stay of execution." (Brief, page 15). Implicitly, at the very least, Kumar is representing to the Court that

22

these assets are available as security for the judgment against him. In all likelihood, Kumar will be filing additional post-trial motions, which will again raise the issue of sufficient security for staying execution on the judgment.[11]

Impala is willing to accept the assets of A-1 in which Alliance has a security interest as security for payment of the judgment against Kumar, if this Court accepts Kumar's implicit offer of these assets as security and orders that the assets be held by the Receiver as security for Kumar's payment of the judgment against him, pending further order of the Court. In the alternative, Impala asks that Kumar post a bond to assure Kumar's payment of the judgment against him, to remain in effect through any appeal and through final resolution of this case. Impala submits that the subject of security for a stay should be addressed in advance of this Court's consideration of Kumar's Motion To Alter Or Amend Judgment and Stay Execution, so that Impala's interests are protected as a condition of Impala not proceeding with execution while motions are being considered and through the period of any appeal, until final judgment. See F.Civ.P. 62(d) and (h).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to deny Kumar's Motion to Alter or Amend the Judgment, to the extent set forth above.

---

[11] Impala's attorney asked the attorney for Kumar and Alliance to confirm in an agreement that the assets of A-1 in which Alliance has a secured interest would be security for Kumar's obligation to pay the judgment in this case against him. The attorney for Kumar and Alliance declined to do so. Accordingly, if these assets are to be used for security, as Kumar suggests in his Motion To Alter or Amend, a court order will be necessary. In the absence thereof, Impala submits that a bond should be required.

/s/ Richard L. Bazelon
Richard L. Bazelon, Esq.
PA ID No. 02505
Lisa A. Barton, Esq.
PA ID No. 78139
Michael F.R. Harris, Esq.
PA ID No. 56948
BAZELON LESS & FELDMAN, P.C.
One South Broad Street, Suite 1500
Philadelphia, PA 19107
Tel. (215) 568-1155

**CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2017, a copy of Plaintiffs' Memorandum of Law in Opposition to Kumar's Motion to Alter or Amend the Judgment and Stay Execution was served electronically on all counsel using the Court's ECF system, and is available for viewing and downloading from that system.

/s/ Richard L. Bazelon
Richard L. Bazelon