**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IMPALA PLATINUM HOLDINGS LIMITED, et al.**<br><br>v.<br><br>**A-1 SPECIALIZED SERVICES AND SUPPLIES, INC., et al.** | **CIVIL ACTION**<br><br>**NO. 16-1343** |

Baylson, J.                                                                                      **June 30, 2017**

## MEMORANDUM RE: POST-VERDICT MOTIONS

This vigorously litigated dispute, which culminated in a seven (7) day jury trial in March, 2017, reaches its final coda in this decision on post-verdict motions. Plaintiffs Impala Platinum Holdings Limited and Impala Refining Services Limited (collectively, "Impala") alleged fraud and other claims against the individual defendants and their related business entities, arising out of the operation of a specialty metals business. Four claims proceeded to trial, each premised on allegedly fraudulent transactions by and between the defendants, shareholder-directors of a closely held Pennsylvania corporation. All but one of the individual defendants (Ashok Kumar Khosla, referred to throughout this case as simply "Kumar"), reached a settlement during the trial. The jury found for Impala on one claim: constructive fraudulent transfer under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA").

Following the verdict, both Kumar and Impala moved to alter the judgment—Kumar, to achieve a set-off in the amount of the settlement that had been reached by the other defendants in the midst of trial, and Impala, to add pre- and post-judgment interest to the verdict. (ECF 346, 371.) We dispose of both motions here, and, in so doing, reach a final resolution in this matter.

## I.     Facts and Procedural History

The factual background of this case has been exhaustively narrated by the Court in the opinion disposing of defendants' motions to dismiss (ECF 73), the summary judgment opinion (ECF 289), and the summary judgment opinion rendered in a prior case involving the same underlying facts (<u>Alliance Industries Limited v. A-1 Specialized Services & Supplies, Inc.</u>, No. 13-2510, 2015 WL 4943471 (E.D. Pa. Aug. 19, 2015)).  Consequently, we decline to go into great detail here.  It is sufficient for purposes of this memorandum to state the basic contours of the claims at issue.

At the crux of this case is the business relationship that existed for many years between Impala and Defendant A-1 Specialized Services, Inc. ("A-1"), involving the refining of used catalytic converters such that the precious metals therein could be sold on the open metals market and to car companies.  The financial crisis of 2008 led to the dissolution of that profitable relationship by greatly reducing the value of the extracted metals, which in turn left A-1 unable to repay Impala for unsecured advances totaling more than $200 million, which Impala had made to A-1.  Impala sued A-1 in the London Court of International Arbitration ("LCIA") in December 2015 to collect on A-1's debt and obtained a $200 million judgment.  That award was entered as a judgment in this Court on April 26, 2016.  <u>Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc.</u>, No. 13-2930, ECF 79.

The trial of this case centered on allegedly fraudulent transfers made by and between A-1's shareholder-directors for the purpose of diverting A-1's assets to themselves, so as to leave very little, if any, assets for A-1 to use in the payment of the LCIA verdict and the judgment entered in favor of Impala.  On that theory, Impala initiated proceedings against Defendants Kumar, Suresh K. Khosla ("Suresh"), Om K. Khosla ("Om"), and Leena Khosla ("Leena"), all of

whom are shareholders in A-1 and were directors at the relevant time periods. Impala also named as defendants two entities alleged to have participated in the fraudulent scheme: Slogam Limited Partnership ("Slogam") and Alliance Industries Limited ("Alliance"). Four claims survived dismissal and summary judgment, and proceeded to trial:

(1) Actual fraudulent transfer under PUFTA;

(2) Constructive fraudulent transfer under PUFTA;

(3) Breach of fiduciary duty; and

(4) Deepening insolvency.

Impala's proof at trial centered on settlements of three prior litigations that it alleged were improper because they furthered the fraudulent scheme of the individual defendants.

Bucks County Settlement

First, the settlement of litigation filed in the Bucks County Court of Common Pleas by Om against Kumar, Suresh, and A-1. Om stated claims for breach of fiduciary duty, breach of contract, conversion, and unjust enrichment arising out of A-1's failure to pay him distributions in proportion to his ownership interest in A-1 from 2000 to 2012. On May 29, 2015, the parties executed a settlement agreement ("Bucks County Settlement") resolving Om's claims and requiring A-1 to pay Om $10 million and Leena, who stood in a similar situation to Om, $1.5 million.

Alliance/New Jersey Settlement

The second settlement resolved two separate cases. One case was filed in this Court by Alliance against A-1 (Civil Action No. 13-2510) in which Alliance asserted claims for breach of contract and unjust enrichment in regard to certain precious metal leases entered into between it and A-1. The second case was filed by A-1 against Kumar in the Superior Court of New Jersey,

Burlington County in which A-1 sought repayment of a $15 million transfer made from A-1 to Kumar in 2012. On September 15, 2015 the parties entered into a settlement agreement resolving both cases ("Alliance Settlement"), providing that A-1 would pay Alliance $35.6 million and Kumar would pay A-1 $5.5 million.

The alleged impropriety of the transfers made and obligations incurred by A-1 via these two settlements formed the crux of Impala's case against the defendants at trial. But, Impala also presented evidence intended to establish further bases for its claims of fraudulent transfer, breach of fiduciary duty, and deepening insolvency. Specifically, Impala argued that:

(1) A-1 had fraudulently paid Slogam, which owns the property on which A-1 operates its business and which is owned by Om, Suresh, and Kumar, in excess of rent due under its lease;

(2) A-1 had fraudulently made distributions to Om, Leena, Suresh, and Kumar between May 29, 2012 and August 17, 2012; and

(3) The salaries paid to Kumar, Om, Leena, and Suresh between 2012 and 2016 were fraudulent transfers.

Partial Settlement During Trial

In the midst of trial, Om, Leena, Suresh, and Slogam ("Settling Defendants") reached a settlement with Impala resolving all claims pending against them, for a total consideration of $10,715,000 ("Partial Settlement"). (ECF 434.) The agreement included a provision stating that any judgment for money damages entered against other alleged tortfeasors in this matter shall be reduced by the *pro rata* share of liability the jury apportioned to the Settling Defendants. (Id. at 15.) The jury was not apprised of the Partial Settlement, and trial continued on against Kumar and Alliance. On March 22, 2017, the jury deliberated and reached a verdict in which it found

4

Kumar, Leena, Om, Suresh, and Slogam liable on Impala's claim for constructive fraudulent transfer under PUFTA. (ECF 342, Verdict Form at 2.) On each of the other three claims— actual fraudulent transfer under PUFTA, breach of fiduciary duty, and deepening insolvency— the jury did not impose liability for any defendant. (Id. at 1, 5, 7.) The jury also did not find that any defendant's conduct had been "willful and malicious" and therefore no further proceedings took place regarding punitive damages. (Id. at 11.)

Jury Verdict

The jury imposed a total of $16 million in damages, $11.5 million of which it attributed to transfers arising out of the Bucks County Settlement and none of which it attributed to transfers arising out of the Alliance Settlement. (Id. at 10.) In response to Interrogatory No. 6, which asked the jury to apportion "each defendant's share of liability in terms of a percentage of the total" if it found any defendant liable on Impala's claims for actual fraudulent transfer, constructive fraudulent transfer, or deepening insolvency, the jury responded with the following allocations:

> Alliance Industries Limited: 0%
>
> Kumar Khosla: 59%
>
> Leena Khosla: 4%
>
> Om Khosla: 16%
>
> Suresh Khosla: 20%
>
> Slogam Limited Partnership: 1%

(Id. at 6.) Judgment was entered on March 23, 2017, in favor of Impala and against Kumar, Leena, Om, Suresh, and Slogam in the amount of $16 million. (ECF 345.)

<u>Post-Trial Motions</u>

On March 24, 2017, Kumar moved to alter the judgment pursuant to Federal Rule of Civil Procedure ("Rule") 59(e)[1] and to stay execution pursuant to Rule 62(b)(3). (ECF 346.) The Court granted the motion to stay pending resolution of the Rule 59(e) motion. (ECF 367.) On April 20, 2017, Impala moved to require Kumar to post as security the assets of A-1 in which Alliance has a secured interest. (ECF 370.) Kumar opposed that motion, arguing that security was not required under the relevant law and that if the Court disagreed, the stay should be lifted. (ECF 377.) On May 16, 2017, the Court ordered that Kumar must post security valued at $13 million in order to maintain the stay of execution. (ECF 386.) Kumar's attorney represented at oral argument on May 24, 2017 that Kumar refused to post such security, leading the Court to lift the stay on that date. (ECF 398.) On May 24, 2017, the Court also ordered further briefing on two issues: the evidence introduced at trial that would support the jury's verdict, to be briefed by Impala, and the equitable relief to which Kumar believed he was entitled under PUFTA. (ECF 397.) Impala and Kumar both filed such briefs on June 1, 2017 (ECF 399,[2] 400) and, on June 6, 2017, both filed oppositions (ECF 405, 406.[3])

## II.  Kumar's Motions for Directed Verdict and to Alter the Judgment

### A.  Motion for Directed Verdict

At the close of Impala's case, Kumar and Alliance filed a motion under Rule 50 for entry of judgment. (ECF 329.) Of the seven separate claims that were made, six of them are moot

---

[1] Settling Defendants partially joined in Kumar's motion (ECF 347, 348, 349), seeking their removal from the judgment. On May 1, 2017, the Court granted their motion. (ECF 375.) The Court further ordered that judgment be entered in favor of Alliance and against Impala on all claims Impala made against Alliance in its Amended Complaint. (ECF 376.)
[2] Impala filed an amended version of its brief on June 7, 2017. (ECF 408.)
[3] Impala filed an amended version of its opposition to Kumar's brief on June 7, 2017. (ECF 407.)

after the jury's verdict.  The seventh claim, that Impala did not hold a certificate of authority to permit filing suit, was determined adversely to Kumar and Alliance in a prior Order.

## B.  Motion to Alter Judgment

### 1.  Parties' Arguments

#### i.  Kumar

On March 24, 2017, Kumar filed a motion to alter the judgment pursuant to Rule 59(e) in which he argues that he is entitled to a setoff of the verdict equal to the consideration paid in the Partial Settlement.  (ECF 346, Kumar Mot. to Alter.)  He contends that under PUFTA, Impala is entitled to recover no more than the value of the assets illegally transferred, and that any compensation to Impala over and above that amount would constitute an impermissible double recovery.  (Id. at 4-7.)  Kumar also relies on the Uniform Contribution Among Tortfeasors Act ("UCATA"), 42 Pa.C.S.A. § 8326, contending that it requires the reduction in his liability by the consideration paid in the Partial Settlement.  (Id. at 4-5.)  Finally, Kumar states that the jury's percentage-based liability allocations are irrelevant where no defendant was found liable under a theory of negligence.  (Id. at 5-6.)

Based on the foregoing legal arguments, Kumar proposes ignoring the jury's allocation of liability and reducing the verdict to (1) account for the funds Impala received via the Partial Settlement and (2) reflect only the dollar amounts of the illegally transferred funds that Kumar actually received.  (Id. at 8-13.)  Specifically, Kumar begins by breaking down the $16 million jury award into two pieces: the $11.5 million that the jury apportioned to the Bucks County Settlement, and the remaining $4.5 million which the jury did not allocate to any specific transfer(s).  As for the $11.5 million, Kumar argues that Impala has obtained almost complete relief for that portion of the verdict because the Partial Settlement was intended to, and mostly

did, reimburse Impala for the funds transferred via the Bucks County Settlement.  Therefore, Kumar contends that he should only be responsible for the $2.2 million[4] of the $11.5 million allocated to the Bucks County Settlement for which Impala did not obtain relief in the Partial Settlement.

Kumar goes on to break down the remaining $4.5 million of the jury verdict, arguing that the jury must have found $575,000 in damages for A-1's rent payments to Slogam and $2 million in damages for shareholder distributions.  (Id. at 10-13.)  He contends that the remaining $1.925 million left in the jury verdict cannot be tied to any specific fraudulent transfer at issue in the case.  On these theories, Kumar proposes that judgment should be entered against him for: (1) the $2.2 million that Impala was not reimbursed for the transfers made pursuant to the Bucks County Settlement, and (2) the $620,000 in shareholder distributions received by him.

In his Reply, Kumar maintains his position that he should receive full credit for the value of the Partial Settlement, but rather than arguing that the UCATA leads to this result, he contends that the UCATA is not applicable at all.  (ECF 374, Kumar Reply at 19-23.)  Kumar states that the UCATA requires the existence of joint tortfeasors and, under PUFTA, "the debtor-transferor is the sole tortfeasor, and there are no joint tortfeasors."  (Id. at 19.)  He notes that although Pennsylvania courts have found the UCATA applicable to negligence and strict liability claims, they have never found it operative on common law intentional torts, a category into which he contends constructive fraudulent transfers fall.  (Id. at 20; Kumar Mot. to Alter at 5-6.)  He advocates that neither the UCATA nor the Fair Share Act, 42 Pa.C.S.A. § 7102, applies to PUFTA claims because, as to the former, contribution principles do not apply to intentional torts,

---

[4] The Court presumes that at the time that Kumar filed his motion, he believed that Impala would receive $9.3 million from the Settling Defendants.

and, as to the latter, the Act by its express terms does not apply to intentional torts. (Kumar Reply at 19-23.)

Kumar reiterates his arguments regarding Impala being precluded from obtaining double recovery on its constructive fraudulent transfer claim, stating that, under PUFTA, a transferee's liability must be reduced when the value of the property fraudulently transferred by the debtor is recovered by the creditor. (Id. at 6-10.) He again argues that the terms of the Partial Settlement tracked, and provided Impala with full and partial recoveries for, the constructive fraudulent transfers that he claims the jury found. On that reasoning, Kumar concludes that he can only be liable for the amount of the jury verdict less the amount of the Partial Settlement, plus the $620,000 in shareholder distributions he received.

### ii.    Impala

Impala maintains a consistent position throughout its response (ECF 362, Impala Opp'n) and sur-reply (ECF 380, Impala Sur-Reply). It argues that both the UCATA and the Fair Share Act require the Court to honor the decision of the Settling Defendants to adopt a *pro rata* apportionment, and to hold Kumar responsible for his share (59%) of the total verdict. (Impala Opp'n at 4-8; Impala Sur-Reply at 5-17.) Specifically, under the UCATA, a partial settlement will typically result in the claim being reduced against the non-settling tortfeasors by the amount of the consideration paid, unless the settling parties elect to instead reduce the claim "in any amount or proportion" that they choose. 42 Pa.C.S.A. § 8326. Impala argues that the Settling Defendants selected a different "amount or proportion," in the form of a *pro rata* reduction, to govern the offset, resulting in the verdict's reduction by the amount of liability the jury allocated to the Settling Defendants (41%). (Impala Opp'n at 4-7; Impala Sur-Reply at 12-14.) As for Kumar's arguments that the UCATA does not apply, Impala contends that principles of statutory

construction and relevant case law both support its application to a PUFTA claim.  (Impala Sur-Reply at 7-12.)

Impala maintains that the Fair Share Act offers further support for this result, insofar as it provides for a mandatory *pro rata* apportionment "[w]here recovery is allowed against more than one person, . . . and where liability is attributed to more than one defendant."  42 Pa.C.S.A. § 7102(a.1)(1).  (Impala Opp'n at 7-8; Impala Sur-Reply at 14-16.)  According to Impala, the Act's inapplicability to intentional torts is immaterial because constructive fraudulent transfer is not an intentional tort.  As for Kumar's arguments regarding double recovery, Impala contends that these are unfounded because the Partial Settlement was not solely limited to the claim for constructive fraudulent transfer.  (Impala Opp'n at 12-14; Impala Sur-Reply at 17-20.)  Finally, Impala links the $4.5 million awarded by the jury for transfers not associated with the Bucks County or Alliance Settlements with several transactions that the jury could have found fraudulent, based on the evidence presented at trial.  (Impala Opp'n at 17-22; Impala Sur-Reply at 20-23.)

## 2.   Analysis

### i.   Standard of Review

We begin by noting the heavy burden borne by Kumar in seeking relief under Rule 59. See Lusick v. City of Phila., No. 12-5150, 2013 WL 1187064, at *1 (E.D. Pa. Mar. 21, 2013) (stating that motions under Rule 59(e) "should be granted sparingly" due to the "strong interest [of federal courts] in the finality of judgments").  Because the jury returned a verdict in favor of Impala, "the Court must examine the record in the light most favorable to [Impala], giving [Impala] 'the benefits of all reasonable inferences, even though contrary inferences might reasonably be drawn.'"  Amba v. Rupari Food Servs., Inc., No. 10-4603, 2016 WL 6495514, at

*3 (D.N.J. Oct. 31, 2016) (quoting <u>In re Lemington Home for the Aged</u>, 777 F.3d 620, 626 (3d Cir. 2015)). Nevertheless, Kumar may obtain relief under Rule 59 if he is able to show at least one of the following: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion . . . ; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." <u>In re Vehicle Carrier Servs. Antitrust Litig.</u>, 846 F.3d 71, 87 (3d Cir. 2017) (quoting <u>Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.</u>, 602 F.3d 237, 251 (3d Cir. 2010)). Here, Kumar neither offers new evidence nor argues that there has been a change in controlling law; rather, his arguments fall under the third prong.

Clear error has been committed when, "although there is evidence to support [the finding], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." <u>United States v. Price</u>, 558 F.3d 270, 276-77 (3d Cir. 2009) (quoting <u>United States v. Pelullo</u>, 173 F.3d 131, 135 (3d Cir. 1999)). Manifest injustice, on the other hand, exists when the movant can show "an error in the trial court that is direct, obvious, and observable[;] . . . the record presented must be so patently unfair and tainted that the error is manifestly clear to all who view it." <u>Soly v. Warlick</u>, Nos. 91-0212, 95-84, 2014 WL 1316152, at *7-8 (D.V.I. Mar. 31, 2014) (quoting <u>In re Grasso</u>, 490 B.R. 500, 527 (Bankr. E.D. Pa. 2013)).

Where the movant seeks a reduction in the jury's verdict, as Kumar does here, his burden is even greater. The Third Circuit has held that "the determination of compensatory damages is within the province of the jury and is entitled to great deference." <u>Spence v. Bd. of Educ. of Christina Sch. Dist.</u>, 806 F.2d 1198, 1204 (3d Cir. 1986). As such, the jury's award is only subject to remittitur "when the trial judge finds that a decision of the jury is excessive or clearly unsupported by the evidence." <u>Dee v. Borough of Dunmore</u>, 474 F. App'x 85, 87 (3d Cir. 2012).

Put another way, "[a] jury's damages award will not be upset so long as there exists sufficient evidence on the record, which if accepted by the jury, would sustain the award." Cortez v. Trans Union, LLC, 617 F.3d 688, 718 (3d Cir. 2010) (quoting Thabault v. Chait, 541 F.3d 512, 532 (3d Cir. 2008)). Throughout the analysis, the Court must view the facts in the light most favorable to Impala. See id. at 718-19.

### ii.    PUFTA Remedial Framework

The only claim on which the jury found any defendant liable was constructive fraudulent transfer under PUFTA. A central question the Court faces is whether the jury's verdict, combined with the Partial Settlement, awards Impala in excess of any limits PUFTA imposes on the amount recoverable by a creditor from a transferee.

Under PUFTA, the principle remedy for a constructive fraudulent transfer is the "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." 12 Pa.C.S.A. § 5107(a)(1). The Act also provides for compensatory damages pursuant to Section 5108(b), which states that "to the extent a transfer is voidable in an action by a creditor under section 5107(a)(1) . . . , the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), or the amount necessary to satisfy the creditor's claim, whichever is less." 12 Pa.C.S.A. § 5108(b). Here, the value of the assets transferred is less than the amount necessary to satisfy Impala's claim against A-1, which is for approximately $200 million, so the judgment must be for the value of the assets transferred. Such judgment may be entered against: "(1) the first transferee of the asset or the person for whose benefit the transfer was made; or (2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee." Id. Where the judgment is based upon the value of the asset transferred, "the judgment must be for an amount equal to the value of the asset at

the time of the transfer, subject to adjustment as the equities may require." 12 Pa.C.S.A. § 5108(c).

The jury found Kumar, Suresh, Om, Leena, and Slogam liable on the constructive fraudulent transfer claim, meaning that it either found them transferees of the fraudulently conveyed assets, or "person[s] for whose benefit the transfer[s] [were] made." 12 Pa.C.S.A. § 5108(b); (ECF 361, Trial Transcript at 1294 (Jury was instructed that "[i]f A-1 made a fraudulent transfer directly to one Defendant that indirectly benefited another Defendant, you may find that both Defendants are transferees with respect to that fraudulent transfer. You may hold both transferees liable for that fraudulent transfer."));[5] <u>Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City</u>, 383 F.3d 110, 133 (3d Cir. 2004) ("This Court presumes that the jury followed the Court's instructions."). Kumar argues that the mandatory language of Section 5108(c)—"the judgment **must be** for an amount . . ."—places an express limit on the amount of damages that Impala can recover. He states that Section 5108(c) compels the Court to alter the judgment such that Impala does not receive, through the Partial Settlement and the jury verdict, any more than the value of the assets fraudulently transferred.

In support of this argument, Kumar cites a number of cases in which the plaintiff had been partially or fully compensated on a distinct fraudulent transfer, causing a subsequent verdict on the same transfer to be reduced by the amount the plaintiff had already recovered. <u>See, e.g.</u>, <u>Elliot v. Kiesewetter</u>, 112 F. App'x 821, 822-25 (3d Cir. 2004) (affirming district court's molding of verdict to deduct money that the plaintiffs "had already recovered in prior

---

[5] We note that the quoted jury instruction came verbatim from Kumar's Proposed Jury Instruction No. 22, yet Kumar appears to suggest in his filing regarding the equitable relief to which he believes he is entitled that he is a "non-transferee." (ECF 331, Defendants' Proposed Jury Instructions at 35; ECF 399, Kumar Brief Regarding Equitable Adjustment at 1 (citing <u>In re Total Containment, Inc.</u>, 335 B.R. 589, 616 (Bankr. E.D. Pa. 2005) for the proposition that the "court is not free to expand upon the express provisions of PUFTA by holding non-transferees liable").) As Impala states in its Opposition, by his Proposed Jury Instruction No. 22 Kumar waived any argument that he could not be liable for transfers made to other defendants which the jury found to have indirectly benefited Kumar.

litigation"); In re Polichuk, 506 B.R. 405, 436 (Bankr. E.D. Pa. 2014) (holding that "a fraudulent transfer, otherwise avoidable under § 544(b) and PUFTA may not be avoided if the debtor received the transferred property back from the transferee prior to the commencement of the bankruptcy case"); Favazza v. Path Media Holdings, LLC, No. 12-1561, 2014 WL 1846109, at *10-11 (E.D. Mo. May 8, 2014) (finding the defendants jointly and severally liable for money judgment due to their violation of the Missouri Fraudulent Transfer Act but holding they could not also be liable under the California Fraudulent Transfer Act because to do so would "partially duplicate the money judgment the [plaintiff] had already obtained, in violation of the rule prohibiting double recovery for the same harm") (quoting Renda v. Nevarez, 167 Cal. Rptr. 3d 874, 877 (Cal. Ct. App. 2014)) (internal quotations omitted).

What Kumar fails to contend with in his briefing on this issue is the critical difference between the cases he cites and the facts of this case: the link, present in those cases and absent here, between the plaintiff's earlier recovery and the claims it succeeds on at trial. For example, in Favazza the plaintiff had asserted claims under the fraudulent transfer statutes of two states, leading the court to conclude that entering judgment on both claims regarding the same underlying fraudulent transfers would be "double recovery," while here there is no such nexus between the claims settled by the Partial Settlement and the transfers the jury determined to be fraudulent. See Favazza, 2014 WL 1846109 at *11. That essential linkage between a plaintiff's prior recovery and the court's decision to disallow what would be a clearly duplicative recovery on the same transfers exists in every case cited by Kumar. While we are not blind to the association between the amounts that the Settling Defendants agreed to pay Impala in the Partial Settlement and the amounts transferred via the Bucks County Settlement, that does not compel the conclusion that the Partial Settlement solely resolved Impala's PUFTA claims.

At the time of the settlement, the Settling Defendants faced two counts separate and apart from the fraudulent transfer ones. Kumar characterizes these claims as "completely derivative of the PUFTA claims" because, he contends, "Impala did not seek to recover any specific damages above and beyond the fraudulent transfers themselves with respect to its fiduciary duties claims and deepening insolvency claims." (Kumar Reply at 13.) We disagree. Impala's deepening insolvency claim rested on injuries distinct from those that Impala alleged resulted from the fraudulent transfers, and indeed Impala sought $22 million in damages to compensate it for the amount of losses on A-1's 2014 and 2015 tax returns. (Impala Sur-Reply at 18-19 n.11.) Because the Partial Settlement resolved not only the PUFTA claims but also the breach of fiduciary duty and deepening insolvency ones, it cannot be understood as solely an unwinding of the Bucks County Settlement. For that reason, we decline to engage in the analysis proposed by Kumar, in which he tracks the terms of the Partial Settlement against several of the transfers at issue in the case. (Kumar Reply at 10-14.) Further, we disagree with Kumar's statement that "[i]t is plain as day and beyond dispute that the [Partial Settlement] tracked, and was intended to provide Impala with full and partial recoveries, for these constructive fraudulent transfers." (Id. at 12.) He has pointed to no Pennsylvania precedent for the type of hindsight review proposed, especially where such review would result in a significant reduction in the jury's verdict.

Putting aside the Partial Settlement, we turn to Kumar's arguments regarding the $4.5 million of the verdict that the jury did not allocate to a specific transfer or set of transfers. Kumar argues that the only transfers that could plausibly be the basis for the jury's award of $4.5 million were the shareholder distributions made to Om, Leena, Suresh, and Kumar between May 29, 2012 and August 17, 2012, totaling $2 million. (Id. at 13-14.) He then contends that because

he personally only received $620,000 in shareholder distributions, he can only be responsible for that amount.  (Id. at 14-15.)

To the contrary, there is sufficient evidence in the record from which the jury could conclude that Kumar was a direct or indirect transferee of $4.5 million in constructively fraudulent transfers.  Specifically, Impala introduced evidence showing that A-1 transferred $5 million to Sudhir Chopra, in return for which Kumar obtained Chopra's shares in Alliance and Alliance Industries FZC.  (DX-182 (wire transfer records showing A-1 payments to Chopra in March 2012 totaling $5 million).)  The jury could have found that those transfers were not loans to Kumar, as he argued, but rather distributions at a time when A-1 was insolvent and for which A-1 received no value.  Kumar argues that such a finding is inconsistent with the jury's failure to allocate any damages to the Alliance Settlement because the transferred funds were returned to A-1 via various provisions in the Alliance Settlement.  According to Kumar, "Impala envisions an inconsistent verdict where the jury both believed that the Chopra transfers were properly redressed by the [Alliance Settlement] and that they were not."  (ECF 405, Kumar Opp'n to Impala Evaluation of Jury Verdict at 3.)

But Kumar conflates two analyses: whether the terms of the Alliance Settlement violated PUFTA and whether the Chopra transfers violated PUFTA.  The jury's finding of no liability on the former is not incompatible with a finding of liability on the latter.  That is, an analysis of the terms of the settlement, particularly the provision that Kumar pay A-1 $5.5 million which was apparently intended to undo the Chopra transfers, need not have included a consideration of the transfers themselves.  The jury could have found that the Alliance Settlement did not violate PUFTA (i.e. did not cause an insolvent A-1 to transfer assets for non-reasonably equivalent value), by simply considering the terms of the agreement, without determining whether or not the

Chopra transfers themselves were constructively fraudulent when made. The two conclusions are not mutually exclusive; therefore, sufficient evidence exists in the record to support the jury having found the Chopra transfers constructively fraudulent and having awarded Impala $4.5 million in damages to compensate for those transfers.

For the aforementioned reasons, although we agree with Kumar that PUFTA sets a limit on the amount that a creditor can recover from a transferee, we disagree that the jury's verdict runs afoul of that mandate. Reading the verdict in the light most favorable to Impala, as we must, there is evidence from which the jury could have reasonably concluded that the defendants were transferees of $16 million in constructively fraudulent transfers. Furthermore, neither the concept of double recovery nor the single satisfaction rule compel the conclusion that the Partial Settlement constituted an avoidance of the Bucks County Settlement such that Impala may not collect the $11.5 million in damages allocated to that settlement by the jury.[6]

### iii. The UCATA

Having concluded that PUFTA does not require the Court to reduce the jury's verdict, we turn to Kumar's arguments regarding the inapplicability of the UCATA. The UCATA, promulgated in 1978, lays out the effect of a joint tortfeasor release on the plaintiff's right to recover against any non-settling tortfeasor. It states as follows:

> "A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides, but reduces the claim against the other tortfeasors in the amount of the

---

[6] Kumar makes much of the Third Circuit's opinion in Klein v. Weidner, 729 F.3d 280 (3d Cir. 2013), in which the court held that the Pennsylvania Supreme Court would likely find punitive damages available as a remedy under PUFTA. Id. at 296. Key to Kumar's argument is the court's statement in a footnote that "Sections 5107 and 5108 [of PUFTA] clearly limit the monetary damages that a creditor may recover from a transferee." Id. at 292 n.4. First, Klein's holding relied on Section 5107(a)(3)(iii), not Section 5108(b), which is at issue here. See id. at 291. Second, nothing in our holding here runs contrary to the court's statement—Kumar, as a transferee on certain transfers found fraudulent by the jury, is not being held responsible for any more than the value of those transfers. The fact that Impala was compensated by the Settling Defendants does not conflict with the court's statement in Klein because, as detailed above, the consideration provided by the Partial Settlement was not solely in release of Impala's PUFTA claims.

consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid."  42 Pa.C.S.A. § 8326.

The UCATA eliminated the common law rule that "[a] release of one tortfeasor also necessarily worked a release of all others, regardless of the parties' intent," and in so doing brought about a dramatic shift in the relationship among plaintiffs and tortfeasors.  Mamalis v. Atlas Van Lines, Inc., 522 Pa. 214, 218 (Pa. 1989).  In his motion, Kumar assumed that the UCATA applied to reduce the verdict against him by the amount of the consideration paid in the Partial Settlement, but he changed tack in his Reply, taking the position that "Impala's effort to apply [the] UCATA is . . . misguided."  (compare Kumar Mot. to Alter at 4 with Kumar Reply at 19.)  His modified argument on the issue is that the UCATA does not apply to claims arising under PUFTA because (1) the individual defendants are not joint tortfeasors, (2) constructive fraudulent transfer is an intentional tort, and (3) PUFTA itself provides the exclusive remedies for violations of its provisions.  We address each argument in turn.

### a.  Joint Tortfeasors

Kumar's first argument against applying the UCATA to a PUFTA claim is that application of the statute requires the existence of joint tortfeasors, and that under PUFTA, "the debtor-transferor is the sole tortfeasor, and there are no joint tortfeasors."  (Kumar Reply at 19.)  But that argument is contrary to both precedent and Kumar's own briefing.  The UCATA defines "joint tortfeasor" as "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them." 42 Pa.C.S.A. § 8322.  And, in Kumar's motion he cites In re Blatstein, 260 B.R. 698, 720-21 (E.D. Pa. 2001) for the proposition that "PUFTA provides for joint and several liability." (Kumar Mot. to Alter at 4 (also citing Schwartzman v. Rogue Intern. Talent Grp., Inc., No. 12-

5255, 2014 WL 4055833, at *3 (E.D. Pa. Aug. 13, 2014), <u>Titus v. Shearer</u>, 498 B.R. 508, 522 (W.D. Pa. 2013), and <u>In re Arbogast</u>, 466 B.R. 287, 307 (Bankr. W.D. Pa. 2012) for the same proposition).)  We find substantial authority supports the conclusion that the individual defendants qualify as joint tortfeasors under the UCATA.

The reasoning in <u>Blatstein</u> is persuasive.  There, the district court reviewed the bankruptcy court's conclusion that the transferee of a fraudulent transfer was not jointly and severally liable to the aggrieved creditor.  The district judge reasoned that the case was "analogous to a tort case and that the [husband and wife] should be considered to be joint tortfeasors."  <u>Blatstein</u>, 260 B.R. at 720.  That conclusion rested on two grounds: first, "[a] number of courts have classified fraudulent conveyance claims as torts for purposes of choice-of-law issues," and second, "common law fraud is a tort."  <u>Id.</u> (quoting <u>S.E.C. v. The Infinity Grp. Co.</u>, 27 F. Supp. 2d 559, 564 (E.D. Pa. 1998)).  We agree – the concept of a "tort" is capacious enough to encompass the kind of wrongdoing PUFTA targets and, indeed, neither party has asserted to the contrary.  (Kumar Reply at 18 (noting that "[i]t is certainly true that constructive fraudulent transfers are intentional torts"); Impala Sur-Reply at 9 ("Kumar and the Settling Defendants Were All Joint Tortfeasors.").)

If fraudulent transfer under PUFTA is a tort, then it follows that where the actions of more than one individual combine "to cause a single harm which cannot be apportioned, the actors are joint tortfeasors even though they may have acted independently."  <u>Baker v. AC&S, Inc.</u>, 729 A.2d 1140, 1146 (Pa. Super. Ct. 1999).  Under the instant set of facts, we find this reasoning especially compelling.  Impala's theory of the case was that the individual defendants colluded to perpetrate a fraudulent scheme and that they all played a role in its execution.  Sufficient evidence was introduced to support the jury's finding that the individuals acted jointly

in making the transfers that were deemed fraudulent. Indeed, it is apparent in the jury's apportionment of liability among the defendants that it considered the actions of all defendants other than Alliance contrary to PUFTA. There is nothing in PUFTA that prevents the Court from finding that the individual defendants were joint tortfeasors.[7] And, "if parties are joint tortfeasors, they are 'jointly and severally liable' to the plaintiff for his or her injuries." Blatstein, 260 B.R. at 720 (quoting Baker v. AC&S, Inc., 562 Pa. 290, 300 (Pa. 2000)).

Further support for the imposition of joint and several liability here is evident in the Third Circuit's conclusion in S.E.C. v. Hughes Capital Corp., 124 F.3d 449 (3d Cir. 1997), a securities fraud case, that such liability is appropriate "when two or more individuals or entities collaborate or have close relationships in engaging in the illegal conduct." Id. at 455. There, the defendants had worked together to defraud investors by perpetrating a "bogus initial public offering and the subsequent sale of warrants." Id. Similarly, in the instant case the individual defendants collaborated via the negotiation and execution of the Bucks County Settlement, and "enjoyed a 'close relationship'" with one another during the relevant time period through their directorships in A-1. Id. Although the analysis in Hughes arose in the context of a securities case, the court's reasoning bolsters our conclusion that joint and several liability is appropriate in this matter. See Blatstein, 260 B.R. at 720 (finding Hughes relevant to its holding that "joint and several liability is an available remedy in fraudulent transfer cases").

---

[7] Kumar cites Granberry v. Johnson, 491 So.2d 926 (Ala. 1986) for the proposition that "under [P]UFTA, the debtor-transferor is the sole tortfeasor, and there are no joint tortfeasors" but the language he quotes from that case simply recognizes that, as of the "date of the [tortious] act, . . . [the] tort claimant is a creditor, and the alleged tortfeasor is the debtor." Id. at 928; (Kumar Reply at 19-20.) Neither that statement nor any other in Granberry bears on the question of whether a recipient of a constructively fraudulent transfer can be a joint tortfeasor, and the case therefore does not support Kumar's position.

### b. Intentional Torts

Having rejected Kumar's contention that there can be no joint tortfeasors under PUFTA, we turn to his second argument for the inapplicability of the UCATA to this case – "contribution principles do not apply to common law intentional torts." (Kumar Reply at 20.) Kumar cites a number of cases for the proposition that "Pennsylvania . . . does not permit an intentional tortfeasor the right of contribution." Kohn v. Sch. Dist. of City of Harrisburg, No. 11-109, 2012 WL 3560822, at *5 (M.D. Pa. Aug. 16, 2012). But, as stated in a recently-published decision by this Court, there is ample authority for the conclusion that the Pennsylvania Supreme Court would permit contribution for intentional tortfeasors. See Rich v. Brandywine Ins. Advisors, LLC, No. 16-3965, 2017 WL 961002, at *6 (E.D. Pa. Mar. 10, 2017) (citing Euro Motorcars Germantown Inc. v. Manheim Remarketing, Inc., No. 13-7614, 2015 WL 798969, at *7-8 (E.D. Pa. Feb. 25, 2015)).

In Euro Motorcars, the court relied on two Pennsylvania Superior Court cases which held that the UCATA's language contains no "limit [on] the right of contribution to tortfeasors who have been guilty of negligence" and that "[c]ontribution is available whenever two or more persons are jointly or severally liable in tort, irrespective of the theory by which tort liability is imposed." Euro Motorcars, 2015 WL 798969, at *8-9 (quoting Svetz for Svetz v. Land Tool Co., 355 Pa. Super. 230, 239 (Pa. Super. 1986)); see also McMeekin v. Harry M. Stevens, Inc., 365 Pa. Super. 580, 585-88 (Pa. Super. 1987) (where one joint tortfeasor was found liable in negligence and the other in strict liability, they were permitted to obtain contribution from each other due to the language of the UCATA and the statute's policy underpinnings). Although the authority cited in Euro Motorcars involved claims premised on strict liability rather than intentional torts, it is nevertheless persuasive. As stated in Svetz, "[t]he focus of the [UCATA] is

on the relationship existing between tortfeasors rather than the manner in which several tortfeasors have been held liable to an injured claimant." Svetz, 355 Pa. Super. at 238. Indeed, we need look no further than the plain language of the statute, which neither "expressly limit[s] its applicability to torts based on negligence" nor in any other way constrains the statute's reach. Alexander v. Hargrove, No. 93-5510, 1994 WL 444728, at *4 (E.D. Pa. Aug. 16, 1994). For the foregoing reasons, and assuming without deciding that constructive fraudulent transfer is an intentional tort, the UCATA applies to such claims.

### c. Statutory Construction

Finally, permeating Kumar's briefing is the argument that PUFTA is a self-contained, comprehensive statutory framework, leaving "no need, or basis, to incorporate contribution and joint tortfeasor release principles into the remittitur analysis." (Kumar Reply at 23.) Basic principles of statutory construction belie that contention. Under Pennsylvania's Statutory Construction Act of 1972, "[e]very statute shall be construed, if possible, to give effect to all its provisions," and, conversely, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(a)-(b). Here, the UCATA unequivocally governs situations where a settlement is reached with some, but not all, of a group of joint tortfeasors. See 42 Pa.C.S.A. § 8326. Nowhere in the statute does it state that it will only be operative on certain types of claims or cases relying on certain theories of liability, such as negligence.

It is apparent from the language of the Fair Share Act that the legislature knew how to limit the reach of a statute to claims grounded in negligence. See 42 Pa.C.S.A. § 7102(a) ("In all actions brought to recover damages for negligence . . ."); McMeekin, 365 Pa. Super. at 586 ("Unlike the [Fair Share Act], the [UCATA] is not geared only toward negligence situations.").

Analogous language precluding application of the UCATA to non-negligence claims was left out of the Act; instead, the statute provides a blanket rule mandating the effect of a partial release on non-settling tortfeasors.  It is not the province of the Court to "ignore the plain language of the statute and carve out an exception" to the UCATA, and indeed to do so would be in direct contravention of Section 1921(b), which bars courts from disregarding the unambiguous language of a statute "under the pretext of pursuing its spirit."  J.F. v. D.B., 941 A.2d 718, 722 (Pa. Super. 2008); 1 Pa.C.S.A.A. § 1921(b).

In addition, there is no irreconcilable conflict between PUFTA and the UCATA such that we must determine which provision should prevail under Section 1933 of the Statutory Construction Act, which governs the effect of statutory conflicts.  While PUFTA sets forth the permissible remedies for violations of its provisions, it does not preclude application of a statute such as the UCATA, which, rather than supplanting PUFTA's remedial scheme, governs the effect of a partial settlement on non-settling joint tortfeasors.  Even if the two could be said to conflict, Section 1933's direction to construe them, "if possible, so that effect may be given to both," controls because, as explained above, finding that the UCATA governs the effect of the Partial Settlement on Kumar's liability is not contrary to PUFTA.  See 1 Pa.C.S.A. § 1933.  To reiterate, applying the UCATA to hold Kumar responsible for his *pro rata* share of the verdict does not result in the judgment being more than "an amount equal to the value of the asset[s] transferred" because the Partial Settlement was not solely in release of Impala's PUFTA claims and because sufficient evidence exists in the record to support the $16 million judgment.  See 12 Pa.C.S.A. § 5108(c).

In re Semcrude, L.P., No. 08-11525, 2010 WL 4814377 (Bankr. D. Del. Nov. 19, 2010) further bolsters the application of the UCATA to a claim arising under PUFTA.  In that case, a

committee of unsecured creditors filed suit against certain individuals involved with the debtor, alleging claims for fraudulent transfer and breach of fiduciary duty, among others. Id. at *1. The opinion relevant to the instant matter resolved the objection of PriceWaterhouseCoopers LLP ("PWC") to a settlement that was reached between the creditors and the defendants. PWC challenged a provision in the settlement that would have barred PWC from obtaining contribution from the defendants in the event that PWC were to be found liable in separate litigation pending between it and the creditors. Id. at *2, 5-6. The court found that Oklahoma's version of the UCATA governed the effect of the settlement and provided sufficient protection for the contribution rights of PWC insofar as the statute allowed PWC to obtain a setoff of the judgment in the amount of the settlement. Id. at *6.

Kumar argues that Semcrude is inapplicable because "the non-settling defendant [PWC] was not subject to a PUFTA claim," but that does not negate the case's applicability to the instant matter. (ECF 399, Kumar Brief Regarding Equitable Adjustment at 3 n.3.) The key aspect of Semcrude for purposes of this analysis is the court's finding that the UCATA governed a settlement of a statutory fraudulent transfer claim arising under Oklahoma's version of PUFTA, which is identical to PUFTA and contains the same remedial provisions. See Okla. Stat. tit. 24, §§ 116(A)(2), 120(C). Indeed, the court in Semcrude did not engage in any discussion of why or why not the UCATA should be applicable to the settlement, but rather assumed it to be. See Semcrude, 2010 WL 4814377, at *5-6 (describing application of the UCATA under header "Applicable Statutory Provisions Provide that Good Faith Settlements Extinguish Contribution Rights"). The court's analysis in Semcrude both underscores the non-mutually exclusive nature of the UCATA and PUFTA and provides an example of a court's application of the former to the settlement of a claim arising under the latter.

Statutory construction, therefore, also supports a finding that the UCATA is operative on the settlement of PUFTA claims.

### d.  Application of the UCATA

Having concluded that the UCATA applies to this case, we still must determine how it affects the resolution of Kumar's motion.  As stated above, the UCATA provides that a partial settlement "does not discharge the other tortfeasors unless the release so provides, but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid."  42 Pa.C.S.A. § 8326.  In Charles v. Giant Eagle Markets, 513 Pa. 474 (Pa. 1987), the seminal case interpreting that language, the Pennsylvania Supreme Court held that the UCATA "affords the parties to the release an option to determine the amount or proportion by which the total claim shall be reduced provided that the total claim is greater than the consideration paid."  Id. at 482.  In Charles, the parties had signed a *pro rata* release agreeing that any further recovery obtained by the plaintiff was to be reduced to the extent of the *pro rata* share of the settling defendant.  Id.  Even though adherence to the parties' agreement resulted in the plaintiff receiving a "windfall," insofar as the settlement combined with the non-settling defendant's proportionate share of the jury award exceeded the total jury award, the court enforced the *pro rata* release.  Id. at 479.

This concept of a "windfall" is important here, where Impala stands to receive $10,715,000 from the Partial Settlement, as well as Kumar's 59% share of $16 million ($9.44 million).  That would net Impala $20,155,000, which is $4,155,000 more than the jury's total award.  Charles provides support for this outcome, while the more recent case of Baker v. ACandS, 562 Pa. 290 (Pa. 2000), according to Kumar, may preclude it.  In Baker, the court

25

stated in dicta that the parties' agreement to have a *pro rata* release will only be honored if the settling defendants' *pro rata* share of the verdict is greater than the amount of the settlement.  Id. at 667-68.  Here, the Settling Defendants' *pro rata* share is 41% of $16 million ($6.56 million) which is <u>less</u> than the amount of the settlement ($10,715,000).  Therefore, if this statement in <u>Baker</u> governed, the parties' agreement regarding a *pro rata* release would not control, and the Court would offset the verdict by the entire amount of the settlement.  That is the outcome proposed by Kumar.  (Kumar Reply at 23-25.)

Contrary to Kumar's argument, we find that the court's statement in <u>Baker</u> is dicta, a hypothetical that runs directly contrary to the holding in <u>Charles</u>, and not the operative rule in Pennsylvania.  Indeed, the court in <u>Charles</u> faced the exact scenario described by the <u>Baker</u> court—the settling defendant's *pro rata* share was less than the amount paid for the settlement. <u>Charles</u>, 513 Pa. at 476 (explaining that the $18,600 that the settling defendants would have owed under the jury's proportionate liability allocation was less than the amount of the settlement ($22,500)).  Nevertheless, the court upheld the parties' choice of a *pro rata* set-off. <u>Id.</u> at 479.  Importantly, in <u>Baker</u> the court expressly did not overrule <u>Charles</u>, stating that, if it were to "revisit [its] holding in <u>Charles</u>," it would "wait for a matter where a windfall situation is presented."  <u>Baker</u>, 562 Pa. at 303 n.6.  We agree with Impala that the Pennsylvania Supreme Court has not yet reengaged with the question presented in <u>Charles</u> and that, to the extent <u>Baker</u>'s dicta runs contrary to <u>Charles</u>' holding, it does not govern this case.

Under <u>Charles</u>, we look to the agreement signed by the settling parties to determine the type of release executed.  Here, we have reviewed the Partial Settlement and find that it unequivocally calls for a *pro rata* release.  (ECF 434 at 15 ("Impala further agrees that <u>any judgment for money damages entered against other alleged tortfeasors arising out of claims</u>

asserted . . . in [this case] . . . by Impala shall be reduced by the *pro rata* share of liability apportioned to the [Settling] Defendants . . ., whether or not the [Settling] Defendants were in fact joint tortfeasor(s). The [Settling Defendants and Impala] understand and intend that '*pro rata* share of liability' means the sum of the percentage shares of liability apportioned to the [Settling] Defendants and further understand and intend that this release complies with the requirements of 42 Pa.C.S.A. § 8327 such that the [Settling] Defendants shall not be liable to any non-settling defendant for contribution.") (emphasis added).)

### C. Conclusion

As explained in the preceding pages, permitting a proportional reduction in the jury verdict by the amount that the Settling Defendants were found liable is neither contrary to PUFTA nor to any other rule of Pennsylvania law. Furthermore, it is equitable. Throughout his extensive briefing, Kumar neglects to recognize that a holistic view of the case reveals him, as the owner of Alliance, to be the true winner. The jury rejected Impala's attack on the Alliance Settlement, and left Alliance's security interest in A-1 untouched, resulting in Alliance's maintenance of the top priority (after receivership costs) on A-1's assets. Alliance has a $5.6 million security interest in A-1, as well as a $20 million secured judgment against it – substantially more than both the jury verdict in favor of Impala and the amount Impala will actually recover, after the reduction in the verdict achieved by this opinion. Because of Kumar's clear triumph as to the Alliance Settlement, the Court fails to see why equity demands diluting Impala's victory on the Bucks County Settlement.

### III.  Impala Motion to Add Pre- and Post-Judgment Interest

The second post-verdict motion before the Court is Impala's motion to alter the judgment by adding pre- and post-judgment interest. (ECF 371.) For the reasons discussed below, we

conclude that Impala is entitled to pre-judgment interest beginning from the date it filed suit against Kumar, at the Pennsylvania statutory rate of six (6) percent, as well as post-judgment interest.

### A. Legal Framework

Whereas pre-judgment interest is awardable as a matter of right in contract cases in Pennsylvania, in all other cases it is "an equitable remedy awarded at the discretion of the trial court." Sikirica v. Wettach, 511 B.R. 760, 772 (W.D. Pa. 2014). As a non-contractual matter, this case falls into the latter group, and requires our consideration of the following four factors before deciding whether to impose pre-judgment interest: (1) the plaintiff's diligence in prosecuting the action; (2) whether the defendant has been unjustly enriched; (3) whether the award would be compensatory; and (4) whether countervailing equitable considerations militate against an award of pre-judgment interest. Feather v. United Mine Workers of America, 711 F.2d 530, 540 (3d Cir. 1983). Several courts have analyzed those factors and awarded pre-judgment interest in fraudulent transfer cases under Pennsylvania law. See, e.g., Sikirica, 511 B.R. at 772-73; Tiab Comms. Corp. v. Keymarket of Nepa, Inc., 263 F. Supp. 2d 925, 947-48 (M.D. Pa. 2003) (awarding pre-judgment interest in a PUFTA case); In re Blatstein, 260 B.R. at 721-23 (remanding to the Bankruptcy Court with instructions to consider an award of pre-judgment interest in a PUFTA action).

As for post-judgment interest, 28 U.S.C. § 1961(a) provides that it "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). The Third Circuit has held that such interest must be calculated based upon the amount of the judgment

combined with the amount of pre-judgment interest.  See Skretvedt v. E.I. DuPont de Nemours, 372 F.3d 193, 217 (3d Cir. 2004).

### B.  Parties' Arguments

#### 1.  Impala

Impala contends that the weight of authority in Pennsylvania holds that "plaintiffs who prevail on claims under PUFTA are entitled to pre-judgment interest."  (ECF 371, Impala Mot. to Alter at 2.)  It then proceeds through the four factors outlined above.  First, it argues that its diligence in prosecuting the action is evident by the fact that the judgment was entered in this case only one year following the date Impala filed its complaint.  Second, Impala contends that the jury had to have found that Kumar was unjustly enriched in order to have found him liable for constructive fraudulent transfer.  Third, it asserts that pre-judgment interest would compensate Impala for the time-value of money.  Finally, it argues that no countervailing equitable considerations militate against an award of pre-judgment interest.  (Id. at 3.)

As for the time period in which interest should accrue, Impala states that for the $11.5 million in damages awarded in association with the Bucks County Settlement, interest should begin to accrue on the actual date of the transfers.  (Id. at 5.)  For the remaining $4.5 million awarded, Impala contends that interest should begin to accrue on December 31, 2012, because the majority of the transfers which could have formed the bases for that sum occurred in early 2012.  (Id. at 5-6.)  Impala asserts that the applicable interest rate should be the Pennsylvania statutory rate of six (6) percent.  (Id. at 6-7.)  Finally, Impala argues that post-judgment interest should be calculated by the total amount of the damages plus the pre-judgment interest, reduced by the 41% of liability allocated to the other defendants.  (Id. at 10-11.)

### 2. Kumar

Kumar also analyzes each of the four factors stated above, arguing first that Impala was not diligent in prosecuting its claims against him, as evident by the fact that it waited until March 2016 to bring suit against Kumar even though as early as August 2013 it knew of transactions from 2012 that it deemed fraudulent. (ECF 378, Kumar Opp'n at 3.) Second, Kumar contends that he was not unjustly enriched because, considering all of the transfers determined to be fraudulent by the jury, he only received $620,000 in cash. (Id. at 5.) Third, he states that because he did not cause Impala to lose use of the funds that the jury found were fraudulently transferred, it would be punitive rather than compensatory to add pre-judgment interest to the award against him. (Id. at 5-6.) Finally, Kumar maintains that countervailing equities sway against the imposition of pre-judgment interest because it would be unfair to award such interest against Kumar "for not returning dollars that Kumar did not receive and which he had no ability to return and thereby cut-off prejudgment interest accrual." (Id. at 6-7.)

Kumar argues that pre-judgment interest, if awarded at all, should begin to accrue on March 23, 2016, the date he was joined as a party, because "in PUFTA cases, including those cited by Impala, the start date for interest accrual is when the creditor files suit, not the date of the transfer." (Id. at 7-8 (emphasis omitted).) Regarding the interest rate, Kumar argues that the Court should apply the federal post-judgment rate specified in 28 U.S.C. § 1961(a) rather than the Pennsylvania statutory rate because (1) PUFTA is an intentional tort and pre-judgment interest is not typically awarded on intentional tort claims, (2) it would be inequitable for Impala to receive pre-judgment interest at the rate of six (6) percent when the pre-judgment interest awarded in connection with the LCIA award was calculated at the rate of two (2) percent, (3) courts in this District have exercised their discretion to use the post-judgment rate to assess pre-

judgment interest, and (4) in the bankruptcy context, pre-judgment interest on fraudulent transfer claims is assessed at the post-judgment rate.  (Id. at 9-10.)

### C.  Analysis

#### 1.  Pre-Judgment Interest

In order to determine whether pre-judgment interest is appropriate, we consider the four factors the Third Circuit has provided to guide the analysis.  First, whether the claimant has been less than diligent in prosecuting the action.  Kumar asserts that this factor "weighs heavily against Impala" because Impala filed suit against A-1, Slogam, and Suresh in August 2013, alleging fraudulent transfer claims, among others, but did not sue Kumar until March 23, 2016. (Kumar Opp'n at 3-4.)  But, the complaint filed in August 2013 alleged different underlying transactions as the bases for the fraudulent transfer claims than those alleged against Kumar and the other defendants in the instant case.  See Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc., No. 13-2930, ECF 12, Amended Cmplt. ¶¶ 84, 91 (describing A-1's transfer of assets to Slogam as the transactions underlying Impala's PUFTA claims).  In fact, the allegedly fraudulent transactions at the heart of this matter—those associated with the Bucks County and Alliance Settlements—did not even occur until May and September 2015.  Impala's diligence, or lack thereof, is not a factor weighing against the imposition of pre-judgment interest.

Second, we must consider the extent to which Kumar was unjustly enriched.  The weight of authority in Pennsylvania finds "pre-judgment interest . . . particularly appropriate where 'a defendant holds money or property which belongs in good conscience to the plaintiff, and the object of the court is to force disgorgement of his unjust enrichment.'"  Sikirica, 511 B.R. at 772 (quoting Kaiser v. Old Republic Ins. Co., 741 A.2d 748, 755 (Pa. Super. 1999)).  Just as in

Sikirica, where the court affirmed the Bankruptcy Court's finding that the defendants had been unjustly enriched because they "were holding or had used money that rightfully belonged to the bankruptcy estate," Kumar, as director of A-1, "used money that rightfully belonged to [Impala]" by approving the Bucks County Settlement, which the jury found to be constructively fraudulent. Id. We further note that the jury had to have found that Kumar was either "the person who received the transfer," a "subsequent transferee," or an indirect beneficiary of the transfer in order to have found him liable for constructive fraudulent transfer. (ECF 361, Trial Transcript at 1294.) This factor sways in favor of pre-judgment interest.

Third, we must determine whether an award of pre-judgment interest would compensate Impala for the time-value of money. Kumar's argument on this prong centers on his alleged lack of agency in the underlying fraudulent transactions. He argues that he "did not cause Impala to lose the use of funds" because it was "others, including A-1, [who] did not pay" Impala. (Kumar Opp'n at 5-6.) Kumar appears to be focusing on A-1's default on its contracts with Impala as the basis for an award of pre-judgment interest. (Id. at 5 (stating that "an award of prejudgment interest against Kumar, who was exiled from A-1 in July 2012 and had no ability to require A-1 to comply with its contract obligations, would be a penalty . . .").) However, Kumar's role in A-1's default on its contracts with Impala is immaterial; what matters is that the jury found Kumar liable for constructive fraudulent transfer, which transfers caused "money [to be] unavailable to [A-1] for investment or paying off its creditors." Tiab, 263 F. Supp. 2d at 948. In Tiab, the court awarded the creditor pre-judgment interest on the funds that had been fraudulently transferred against the entities that had been found to be transferees of the assets. Id. at 947-49. We follow the court's lead there in finding that pre-judgment interest would compensate Impala for the time-value of the assets fraudulently transferred.

Finally, we must decide whether countervailing equitable considerations militate against pre-judgment interest. Kumar asserts that the "extremely limited" nature of his decision-making authority at A-1 and his inability to authorize any payments to Impala, which would have cut-off prejudgment interest accrual, compel the conclusion that an award of pre-judgment interest would be inequitable. (Kumar Opp'n at 6-7.) To support this argument, Kumar cites Sugartown Worldwide, LLC v. Shanks, No. 14-5063, 2016 WL 7203513 (E.D. Pa. Apr. 7, 2016), in which Judge Kearney held that an award of pre-judgment interest was not warranted where the defendants had defaulted on a royalty agreement because, upon the defendants' default, the plaintiff had promptly brought suit and ended the agreement and therefore had not lost any royalties, and because the defendants had not "personal[ly] gain[ed] from money improperly retained." Id. at *2-3. Kumar analogizes Sugartown to his situation based on the fact that "Impala hopes to receive prejudgment interest from Kumar on amounts he did not receive [and] was not obligated to pay under PUFTA." (Kumar Opp'n at 6.)

But, whereas in Sugartown there was no evidence that the defendants were unjustly enriched by virtue of the fraudulent transfers, here there was evidence that the Bucks County Settlement resulted in Kumar's unjust enrichment insofar as it provided that A-1, rather than Kumar and Suresh, would compensate Om and Leena for the distributions they did not receive in years prior. See Sugartown, 2016 WL 7203513 at *3 (noting that the defendants "candidly admit[ted] making a bad business decision and not getting any money from [the plaintiff] or from sales without forwarding the royalties"). Further, if the $4.5 million awarded by the jury for transfers not associated with either settlement was intended to remedy the Chopra transfers, which were given to Kumar in exchange for Chopra's shares in Alliance, then there was

"evidence of personal gain from money improperly retained"—evidence of unjust enrichment. See id. Considerations of equity do not militate against the award of pre-judgment interest.

Having concluded that all four factors relevant to the pre-judgment interest analysis sway in favor of granting such interest to Impala, we must determine the appropriate accrual date. The key point of contention between the parties is whether to use the date of the transfers, as Impala argues, or to begin accrual on the date that Kumar was joined as a party, per Kumar's filings. Having considered the parties' briefing as well as supplemental letters submitted to the Court on this issue, we conclude that in Pennsylvania, the date on which the complaint is filed is the appropriate date on which to begin accruing interest. Kumar cites a number of persuasive cases for this proposition, such as Tiab, in which the court awarded pre-judgment interest beginning on the date that the plaintiff joined one of the defendants because it was only then that the plaintiff began to "prosecute [the] action in a diligent manner." Tiab, 263 F. Supp. 2d at 948-49; see In re Wettach, No. 05-38188, 2013 WL 5999167, at *8 (Bankr. W.D. Pa. Nov. 12, 2013) (beginning accrual of pre-judgment interest on date complaint filed), aff'd, Sikirica, 511 B.R. at 772, aff'd, In re Wettach, 811 F.3d 99 (3d Cir. 2016). We are further persuaded by the approach taken by courts in bankruptcy cases involving preferential transfers, which is to begin accrual as of "the date of the pre-complaint demand for payment of the value of an avoidable transfer," or, where there is no evidence of the date of such a demand, as of the date the complaint was filed. In re David Cutler Indus., Ltd., 502 B.R. 58, 80 n.28 (Bankr. E.D. Pa. 2013); In re Great-Point Intermodal, LLC, 334 B.R. 359, 363-64 (Bankr. E.D. Pa. 2005). We conclude that pre-judgment interest is appropriately assessed beginning on the date that Impala asserted claims against Kumar, which is March 23, 2016.

Finally, we must determine at what rate the interest should be calculated: Pennsylvania's statutory six (6) percent rate, under 41 P.S. § 202, or the federal post-judgment rate, under 28 U.S.C. § 1961(a). While we recognize that there is limited authority on this specific issue, we conclude that Kumar has failed to justify a departure from the default interest rate set forth in Section 202. As stated in <u>Tiab</u>, "[u]nder Pennsylvania law, unless otherwise specified by the parties, the rate of prejudgment interest is calculated as simple interest at a rate of six percent per year." <u>Tiab</u>, 263 F. Supp. 2d at 949. Kumar cites <u>Wettach</u> in support of application of the federal post-judgment rate, but there the court only used that rate because the plaintiff had proposed it and the defendants did not dispute it. <u>See</u> <u>In re Wettach</u>, 2013 WL 5999167, at *8 n.5. Kumar also cites <u>David Cutler</u>, but that, too is distinguishable, insofar as the court's decision to use the federal post-judgment rate rested on its "conclusion that the award of prejudgment interest is a remedy provided by a federal bankruptcy cause of action, i.e., 11 U.S.C. § 550(a)," and therefore "the appropriate interest rate is determined by federal law." <u>In re David Cutler</u>, 502 B.R. at 80-81. Here, the sole claim at issue arises under Pennsylvania law, making <u>David Cutler</u> of little precedential value.

In sum, neither Kumar's briefing nor the Court's research reveals a compelling reason to depart from application of Section 202 to this case. Pre-judgment interest will therefore be assessed at a rate of six (6) percent from March 23, 2016 to March 23, 2017, the date of the judgment, on $9.44 million, resulting in $566,400 in interest. The total judgment including pre-judgment interest is, therefore, $10,006,400.

## 2. Post-Judgment Interest

The parties agree that post-judgment interest dating back to March 23, 2017, the date judgment was entered, should be assessed pursuant to 28 U.S.C. § 1961(a). (Impala Mot. to

Alter at 10-11; Kumar Opp'n at 10-11.)  Pursuant to Section 1961(a), post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."  28 U.S.C. § 1961(a).

Post-judgment interest shall be assessed from March 23, 2017 to the date on which judgment is no longer outstanding, on $10,006,400, at the rate specified in Section 1961(a).

## IV.     Conclusion

For the foregoing reasons, Impala is entitled to pre-judgment interest beginning from the date it filed suit against Kumar, at the Pennsylvania statutory rate of six (6) percent, as well as post-judgment interest at the federal statutory rate.

O:\CIVIL 16\16-1343 Impala v. A-1\16cv1343 memo re post-verdict motions.docx